# EXHIBIT A

## Employee Information Report



### Nafeesa Syeed

**Job:** Reporter (BLP)

**SBU/BU:** NEWS/NEW32

**Department:** National Security

**Location:** Washington D.C. - 1101 NY Ave

**Manager:** Bill Faries

**Anniv Date (Years of Service):** 19-Oct-2014 ( Y: 10   M: 0 )

**Position:** Reporter (BLP)

**Class:** Regular EE (Z)

**Status:** Inactive

**PSID:** 63605

**UUID:** 13165776

**Bloomberg**
CONFIDENTIAL & PROPRIETARY

CONFIDENTIAL

Page 1 of 3



05-Nov-2024 at 01:35:56 PM
S#: 63605-42831-42831

BLP_NS_0000105

# Employee Information Report

## Personal Info

| Sex: | F | Citizenship: | USA - United States | Home Address: | ███████ |
|---|---|---|---|---|---|
| Date of Birth: | ███████ | | | | |

## Internal Experience

| Start Date | To Date | SBU/BU | Department | Manager | Job Title | Location | Full / Part | Status | FWA | Change Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 23-Jun-2018 | 23-Jun-2018 | NEWS/NEW32 | National Security | Bill Faries | Reporter (BLP) | Washington | Full-Time | Termination | No | Termination |
| 09-Jun-2018 | 09-Jun-2018 | NEWS/NEW32 | National Security | Bill Faries | Reporter (BLP) | Washington | Full-Time | Termination w/Pay & Benefit | No | Termination w/ Pay & Benefit |
| 22-Jul-2016 | 08-Jun-2018 | NEWS/NEW32 | National Security | Bill Faries | Reporter (BLP) | Washington | Full-Time | Active | No | Position Change |
| 17-Jun-2016 | 21-Jul-2016 | NEWS/NEW32 | National Security | Bill Faries | Reporter | Wash1101 NY | Full-Time | Active | No | |
| 16-May-2016 | 16-Jun-2016 | NEWS/NEW32 | National Security | Bill Faries | Reporter | Wash-1399 | Full-Time | Active | No | Jobcode Change |
| 15-Apr-2016 | 15-May-2016 | NEWS/NEW32 | National Security | Bill Faries | Reporter - BLP | Wash-1399 | Full-Time | Active | No | Location Change Department Change Position Change |
| 19-Oct-2014 | 14-Apr-2016 | NEWS/NEW22 | Eco/Gov Middle East | Alaa Shahine | Reporter - BLP | Dubai | Full-Time | Active | No | Hire |

## Performance Evaluation Ratings

| Date | Rating | Job Title | SBU/BU | Manager |
|---|---|---|---|---|
| ████ | | Reporter (BLP) | NEWS/NEW32 | Bill Faries |
| | | Reporter (BLP) | NEWS/NEW32 | Bill Faries |
| | | Reporter (BLP) | NEWS/NEW32 | Bill Faries |
| | | Reporter | NEWS/NEW32 | Bill Faries |
| | | Reporter | NEWS/NEW32 | Alaa Shahine |
| | | Reporter | NEWS/NEW22 | Alaa Shahine |

## 180 Feedback Ratings

| Date | Rating | Quartile | Bus Unit Average | Business Unit | Manager Level | Manager |
|---|---|---|---|---|---|---|
| No Data Available | | | | | | |

**Bloomberg**
CONFIDENTIAL & PROPRIETARY

CONFIDENTIAL

Page 2 of 3

05-Nov-2024 at 01:35:56 PM
S#: 63605-42831-42831

BLP_NS_0000106

# Employee Information Report

**Certifications**

| Certification |
| --- |
| No Data Available |

**Affiliations**

| Affiliation |
| --- |
| No Data Available |

**List of all Conversation(s)**

| Conv Date | Type | Sub-Type | Finalized on | Finalized By |
| --- | --- | --- | --- | --- |
| No Data Available | | | | |

**Conversation Details**

| Conversation Details |
| --- |
| No Data Available |

Bloomberg
CONFIDENTIAL & PROPRIETARY

CONFIDENTIAL

05-Nov-2024 al 01:35:56 PM
S#: 63605-42831-42831

BLP_NS_0000107

# EXHIBIT B

Page 1

* * * C O N F I D E N T I A L * * *

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

NAFEESA SYEED,                     )
                                   )
              Plaintiff,           )
                                   )
        vs.                        )    No. 24-cv-06101
                                   )       (GHW)(GWG)
BLOOMBERG L.P.,                    )
                                   )
              Defendant.           )
------------------------   )

May 15, 2025
9:57 a.m.

Deposition of NAFEESA SYEED, held at the offices of Proskauer Rose LLP, 11 Times Square, New York, New York, before Laurie A. Collins, a Registered Professional Reporter and Notary Public of the State of New York.

Page 2

A P P E A R A N C E S:


     CLANCY LAW FIRM

     Attorneys for Plaintiff

          40 Wall Street

          New York, New York  10005

     BY:    DONNA H. CLANCY, ESQ.

               dhc@dhclancylaw.com


     PROSKAUER ROSE LLP

     Attorneys for Defendant

          11 Times Square

          New York, New York 10036-8299

     BY:    ELISE M. BLOOM, ESQ.

               ebloom@proskauer.com

               ALLISON L. MARTIN, ESQ.

               amartin@proskauer.com


ALSO PRESENT:

     LAUREN FISHKOFF, ESQ. (Bloomberg)

     JOE RAGUSO, Videographer

Page 12

Syeed - Confidential

the United States?

A.    Yes.

Q.    How long had he been working for Drexel University here in the United States?

A.    I can't recall the exact date, but I ███████████████████████████████████████

Q.    And were there any periods of time between 2013 or 2014 when he joined and March of 2016 wherein he was living somewhere other than here in the United States?

A.    He was living in the United States.

Q.    The entire time?

A.    Yes.

Q.    Now, you said that you moved to Washington, D.C., in March of 20 --

A.    2016.

Q.    And prior to that you were living in Dubai; is that correct?

A.    Yes.

Q.    And in Dubai you were working for Bloomberg; is that right?

A.    Yes.

Q.    Why did you move back to -- or why did you move to the United States from Dubai?

Syeed - Confidential

A.    For family reasons, and also to further my career in Washington and to leave the hostile work environment that I was facing in Dubai.

Q.    What were the family reasons that caused you to move back -- that caused you to move to the U.S.?

A.    My husband's job.

Q.    ███████████████████████████ University?

A.    Yes.

Q.    Are you a U.S. citizen?

A.    Yes.

Q.    Are you a citizen of any other countries?

A.    No.

Q.    At the time that you left Dubai, you did not have a job, a firm job, at Bloomberg in D.C.; is that correct?

ATTORNEY CLANCY:  Objection to form.

A.    I was still employed at Bloomberg in my Dubai position, and I had applied for jobs in D.C. And my managers both in Dubai were aware, and managers in D.C.

Q.    In terms of your job in Dubai, that job

Page 14

Syeed - Confidential

was scheduled to end in March of 2016; correct?

A.    Yes.

Q.    And when you say that you had applied for positions here in the U.S., you came to the U.S. without an actual position; is that correct?

ATTORNEY CLANCY:  Objection.

A.    I was still employed by Bloomberg at the time.

Q.    When you say "still employed by Bloomberg," you mean that your technical employment in Dubai had not ended; correct?

A.    That's correct, when I came to Washington, yes.

Q.    But that was scheduled to end in March of 2016; correct?

A.    Yes.

Q.    And you did not receive a position from Bloomberg in Washington, D.C., until April of 2016; correct?

ATTORNEY CLANCY:  Objection.

A.    The announcement of my position in Washington was made in April of 2016 by the bureau chief.

Q.    When you say "the announcement," that

Page 15

Syeed - Confidential

was when you got -- that was when you got a position in the Bloomberg Washington, D.C., bureau; correct?

A.    There was an announcement made of the job that I received in Washington, D.C., made by the bureau chief.  I had been in discussions with managers in Washington, D.C., between March and April about positions in D.C. and even before that with managers in New York and D.C. about transferring.

Q.    But you did not have an actual position until April of 2016; correct?

A.    Correct.  My position in Washington began at that time.

Q.    And what was that position?

A.    The position as announced in -- by the bureau chief was that I was going to cover the intersection of technology -- excuse me, technology, national security, and foreign policy at the nexus of cybersecurity, intelligence, and national defense.  Those were the various fields in which I was told that I would be focusing on.

Q.    And do you know whether that was a position that was created for you?

Page 21

Syeed - Confidential

Hamade and Andrew Barden.

Q.    And which managers in D.C.?

A.    I was in touch -- I had interviewed with Craig Gordon and Bill Faries.

Q.    When you say you had interviewed, you met with them about the possibility of a position in the U.S.?

A.    I had applied for foreign policy reporter position in D.C. while I was in Dubai before I arrived, and I had a phone interview with Craig Gordon.  And then when I arrived at the bureau, I had an in-person interview with Bill Faries and then another in-person interview with Craig.

Q.    And do you know if that position was filled?

A.    Yes.

Q.    Do you know who filled it?

A.    Yes.

Q.    Who filled it?

A.    Nick Wadhams.

Q.    And what, if anything, do you know about Mr. Wadhams' background?

A.    All I know is he was coming from the

Page 24

Syeed - Confidential

Bates numbers 200 and starts -- it says "hi, everyone" near the top of the page.  Do you have that in front of you?

A.    Yes.

Q.    You referenced earlier an announcement about you coming to the D.C. office.  Is this the announcement that you were talking about?

A.    Yes.

Q.    And I see you referenced at the bottom of the page; is that correct?

A.    Yes.

Q.    And if you look at the first page, 198, you sent an email to Craig Gordon over this email announcing your arrival; is that right?

A.    Yes.

Q.    And you said to Mr. Gordon:  Hi, Craig.  Just wanted to say thanks very much for your support and consideration.  I'm excited to join the bureau and look forward to working with everybody -- with everyone.  Best, Nafeesa.

That's what you wrote to Mr. Gordon; is that right?

A.    Yes.

Q.    And I assume that when you wrote that

Page 25

Syeed - Confidential

you meant that?

A.    When I wrote that I had to make the best of the situation because I had applied for the foreign policy position.  I had been told that I was a leading candidate.  It's also in the documents that were produced where Bill Faries says I was a top five or top in the running.

I also had conversations with Bill about the foreign policy positions.  My editors and managers in Dubai had put in a good word and were quite optimistic about the possibility of me getting the foreign policy job.

I had the phone conversation in March with Craig Gordon, and I outlined all of my foreign policy and my experience overseas as well as my educational background.  And then I met with Craig in person when I was at the D.C. bureau.  We went to the Starbucks across from the old bureau.  And, again, I was outlining my interest and my qualifications for the foreign policy position.

And he said, What about cybersecurity?  And I was surprised, and I didn't understand why then -- I was already told I had been one of the finalists for this position, for the foreign

Page 26

Syeed - Confidential

policy position.

I was given no choice.  I met with Megan Murphy, and I was told that I would not be getting the foreign policy position, even though I was qualified and I had applied and expressed my interest.

And I was told that that the only option was this cybersecurity or with these other topics around that, which was not completely defined.  And I had -- I was -- I had moved, I had a new experience, so I had to make the best of the situation and work collegially at the bureau.

Q.   So when you said, Hi, Craig.  Just wanted to say thanks very much for your support and consideration, you didn't mean that?

ATTORNEY CLANCY:  Objection.

A.   No, I wrote that, so I was thankful for being considered for a job at the bureau, even though it was not the job that I had applied for or was seeking and that I was qualified for.

Q.   Are you claiming that you were not qualified for the job that you got?

A.   No, I didn't say that.  I was also qualified for that position as well.

Page 27

Syeed - Confidential

Q.    And when you say that you were a leading candidate in the top five, who told you that?

A.    I was told that by Bill Faries when we met at a restaurant just down the street from the old bureau, because we moved a few months later. And he told me, This is a coveted position; you are one of the top candidates.  And also there's an email he sends to I believe my former managers saying that, you know, that I'm a top candidate as well in -- for that foreign policy position.

Q.    One of the top five; is that right?

A.    One of the top candidates.

Q.    And do you know whether it's typical -- whether there being five leading candidates is a lot or a little?

A.    I don't know.  I am not -- I don't -- I don't know the hiring practices of in terms of how many candidates they put.  But I was specifically told that I was a leading candidate, that I was one of the top candidates.

Q.    And is it fair to say that you are disappointed you didn't get that job?

A.    I had applied for the job.  It is my

Page 33

Syeed - Confidential

testimony?

A.    Yes.

Q.    One of those issues was cybersecurity; is that right?

A.    Well, I was also deployed to the Pentagon at the beginning of his administration, and I was covering many other issues as well as the Department of Homeland Security.

Q.    I just want to understand the breadth of your job as you are describing it.  One of the things was cybersecurity, but based on your testimony, there were many other facets to your job in 2017; is that right?

A.    Yes.  Throughout my tenure in the D.C. bureau, there were many federal agencies, private security companies, and many other -- which I can detail more, but there were many different things that I was asked to cover besides cybersecurity.

Q.    And those are all things that led to your development in news; isn't that right?

ATTORNEY CLANCY:  Objection to form.

A.    I had already been working for, you know, more than a decade in news, so par for the case of my career.

Page 34

Syeed - Confidential

Q.    Well, are you claiming that the things that you were exposed to in the Bloomberg D.C. office did or did not enhance your development as a newsperson?

A.    I had already covered federal agencies before and Congress and federal security agencies, so it was a continuation of what I had covered before as a journalist in Washington, D.C.

Q.    So were you or were you not interested in continuing to cover those topics?

A.    Interested in -- I'm not sure I understand the question.  Interested in what way?

Q.    What is it about the question that's unclear?

A.    I'm not sure that -- I'm not sure I understand the question.

Q.    Did you want to cover those topics?

A.    There were some topics I was interested in that I was covering that had to do with, you know -- sometimes I was pulled in to cover some things about foreign affairs, but then I was also, you know, asked to cover homeland security, I was asked to cover the intelligence community, intelligence agencies.  I was asked to fill in for

Page 35

Syeed - Confidential

my male colleagues constantly.

So I, you know, am a team player.  I pitched in, because that was the expectation.  But my beat was completely ill defined.

Q.    But it sounds like you covered a variety of different issues during your tenure in D.C.; is that right?

A.    Yes.  But that was not helpful in the advancement of my career because it did not allow me to develop specific expertise and sourcing within a specific institution or agency within Washington, which as a journalist to develop sources and you're also judged on your scoops and the sources that you have, which is not possible when you're being spread thin between a number of agencies.

Q.    So I just want to make sure I understand your testimony.  The job that you've described it's your testimony was not helpful to you in your development, in your advancement?

A.    I wouldn't say that it wasn't helpful. I mean, I continued to be employed as a journalist.  But in terms of the advancement of my career and having further career opportunities, it

Page 59

Syeed - Confidential

this event.

And he explained to me more because he found out more information about the role and then conveyed that to me.  So it had some foreign policy elements as well.  And so I had applied.  And we talked about what the role would entail.

So we had detailed conversation about this role specifically, and he had spoken as well in New York to the recruiters and people who were starting the website as well.  And so my understanding is that I was one of the candidates in the running as well.

Q.    And was Mr. Faries helping you in connection with your application for this role?

A.    He was providing information; and he knew that I was trying to move to New York, so he spoke with people there.  But I don't know what happened after that.

Q.    Your allegation in this case is that you've been discriminated against because of your race and your sex; is that right?

A.    Yes.

Q.    And what do you consider your race?

A.    My race is Asian, Asian-American.

Page 60

Syeed - Confidential

Q.     And your sex is female?

A.     Yes.

Q.     And are you claiming that you were discriminated against in connection with the site editor role?

A.     I was denied the opportunity when I applied, and it also had elements of foreign policy, which, again, was a stated interest. Again, just like the foreign policy position in D.C. when I applied, I was made to believe that I was being considered and that I was, you know, a candidate that was being taken seriously and then found out that I didn't get the role.

Q.     Well, with regard to the site editor role, what you were told is that the role had been canceled and wasn't being filled; correct?

ATTORNEY CLANCY:  Objection, asked and answered.

A.     Well, I don't know that it wasn't being filled.  They said they were using current resources for that role.  That kind of language, I don't know if that means they put someone else in the role from Bloomberg and didn't consider me.  I can't speak to whether or not it was, you know --

Page 76

Syeed - Confidential

Q.    Did you submit a formal application for that role?

A.    I first had a meeting in March 2018 when I learned that Kambiz Foroohar had left the position of the U.N. reporter position in New York.

I met with Bill Faries, my editor and my supervisor team leader of the national security team.  We met in the Washington, D.C., bureau immediately after I heard that Kambiz had left. And we went and sat -- there's these cushion stools that are right next to the studio in the Bloomberg D.C. office.

He told me Kambiz left, had some type of issue with the company.  And I said, Are you going to fill the role?  Are you filling his role? He said, Why, are you interested?  I said, Yes. He said, At the time we're not sure whether we're going to fill it, what's going to happen.

I continued to ask and advocate and expressed my interest and continuously inquired and explained that I was interested and I wanted to apply and I wanted to be in that role over the many months.

Page 77

Syeed - Confidential

So, yes, March 2018 is when I first -- when I first told Bill Faries about the -- my interest in the U.N. position but not the first time that I talked about wanting to be part of foreign policy.

And just to note, the first time I expressed interest in the United Nations reporter position is when I visited the New York bureau between late November/early December 2015 and I met with Flavia Krause-Jackson, Laura Zelenko, and other senior people in the New York bureau because at that time the U.N. position also had just been newly vacated by Sangwon Yoon and then Kambiz took over.

So my interest -- expressing interest in the U.N. position goes back many years.  But when I found out specifically that Kambiz had left, I expressed my interest, I advocated and I demand that I am also considered and that I want to fill that position.

Q.    Okay.  So other than Bill Faries, did you express your interest in the alleged vacant United Nations reporter role to anybody else?

A.    Yes.  Also other people on national

Page 78

Syeed - Confidential

security team.  They also -- Bill was in contact with Craig Gordon, Mike Shepard, Wes Kosova, and people in New York who were the other people -- team leaders or managers, more senior managers in New York about my interest in wanting to move to New York.

And I believed that he was also in touch with them about the U.N. position and whether or not it was going to be filled and by whom.  And I had expressed my interest.  So I believed that he had conveyed my interest and that I wanted to fill that role and wanted to be considered.

Q.    Okay.  My question was whether you expressed your interest to anybody other than Bill Faries.  Is the answer to my question no?

ATTORNEY CLANCY:  Objection to form.

A.    The answer to your question is that I expressed interest in the U.N. position to senior managers in the Washington, D.C., bureau and people in New York, the HR recruiters, and managers in New York also knew that I wanted to be in New York and I had an interest -- stated interest in covering the United Nations.

Page 79

Syeed - Confidential

Q.    Which senior managers did you tell that you were interested in the vacant United Nations reporter role in 2018?

A.    I told Bill Faries, my team leader, of the national security team, and I believe he conveyed that to the senior managers in the bureau as well and to the senior managers in New York.

Q.    Did you tell anybody other than Mr. Faries?

A.    I believe that I also told other senior managers asked -- there were other editors that were around because there was constant chatter about whether or not it was going to be filled and who was filling it.  And I would ask more questions.  And I also conveyed that I was interested in the role.

Q.    Okay.  Other than Mr. Faries, is there any other senior manager that you specifically expressed an interest in the United Nations reporter role?

A.    Yes.  Mike Shepard.  He was the managing editor.  I specifically told him that I wanted to be considered for the role.  And Craig Gordon, he also was aware, as the documents in the

Page 80

Syeed - Confidential

BLP production show that he specifically knew that I was interested in the U.N. position.

Q.   Well, when you say Mr. Gordon knew --

A.   Yes.

Q.   -- did you tell him or are you claiming he knew through somebody else?

A.   I believe that he knew.

Q.   Did he know because you told him or for some other way or you don't know?

A.   I expressed interest in covering foreign policy and United Nations to my senior managers in D.C.

Q.   Okay.  My question is with regard to Craig Gordon.

A.   Yes.

Q.   And my question is specifically whether you expressed an interest to Mr. Gordon in this specific position, the United Nations reporter role.

A.   I believe that I told Bill Faries and that he told Craig Gordon.

Q.   Okay.  So your -- it was Mr. Faries who you think told Mr. Gordon, not you; is that right?

A.   I -- they had also told Craig directly

Page 81

Syeed - Confidential

because I was -- he was aware that I wanted to apply for the U.N. position.

Q.    Okay.  Do you have any specific recollection of telling Mr. Gordon directly?

A.    I believe that I told Craig Gordon as well that I was interested in the U.N. position.

Q.    And when did you do that?

A.    I don't have a specific recollection. As I said, this was over many months that I continued to advocate for myself to be considered for this position.

Q.    Well, when you say it was over many months --

A.    Yes.

Q.    -- in your answer to interrogatories you said you expressed an interest in March of 2018; is that right?

A.    Yes.

Q.    And you left Bloomberg on June 8th of 2018; correct?

A.    Yes.

Q.    When you say "many months," are you talking about the many months between March of 2018 and June 8th of 2018?

Page 82

Syeed - Confidential

A.    Yes.

And Craig Gordon also knew that I was interested in the U.N. position dating back to when I said between December 2015 -- sorry, November 2015-December 2015 that I wanted to be considered for foreign policy roles as well.

Q.    Okay.  That was -- at that time you claim there was a U.N. position that was vacant and it was filled by somebody else; right?

A.    Yes.

Q.    And you claim that person remained in the position until March of 2018, and then the position became vacant again; is that right?

A.    That was my understanding.  I found out that Kambiz left in March 2018, yes.

Q.    And that is when you expressed your interest in that role if that role was going to be filled; correct?

A.    Yes.  In March 2018 is when I first told Bill Faries, because I was made aware that the position was open, vacant.  Until then Kambiz was in the role.  We were on the same national security team.

So once I found that it was vacant, I

Page 83

Syeed - Confidential

expressed my interest and asked to be considered to filling the role.

Q.    And that's the conversation with Bill Faries?

A.    That is the conversation I had with Bill Faries, yes.

Q.    Did you submit any kind of formal application for the role like a CV or a résumé?

A.    They did not post the role, but, like I said, I continually asked -- excuse me, I continuously asked and inquired and advocated that I be considered for the role over those months, to my senior managers.

Q.    And your senior managers -- it's Bill Faries.  Anybody else?

A.    Bill Faries was my direct manager, yes.

Q.    And Mr. Faries told you that it was unclear whether that position was going to actually be filled; is that right?

A.    At that time when I first expressed my interest in filling the role, he said, Oh, we're not sure yet whether they're going to fill it. We'll see -- you know, we'll see, we're not -- we're still deciding in New York what's going to

Page 84

Syeed - Confidential

happen.  But when he said, Are you interested, I said, Yes, I want to be considered, and I want to fill that role.

And then subsequent to that, like I said, there was a lot of chatter.  Ben Holland, one of the others, came up and said, Oh, I heard that somebody is filling the role.  And then there would be -- you know, somebody would say, Oh, I heard so-and-so; I heard so-and-so.

So there was chatter all those months. And every time I said, Is it filled?  Did somebody fill it?  I would like to be considered.  I repeated my interest over and over again.

Q.    Did somebody eventually fill that role?

A.    I kept asking continuously about whether -- you -- you know, about what's happening with the role, the status of the role.  And I advocated that I wanted to be considered for the role, until I learned that David Wainer had filled the role and that I was denied the position and not given a chance to be considered for the role.

Q.    And do you know the circumstances under which Mr. Wainer filled that role?

A.    No.

Page 85

Syeed - Confidential

Q.    Do you know who made the decision to have him fill that role?

A.    I -- I did not know.  I learned in the BLP production that Wes Kosova sent an email in March 2018, the same time that I was inquiring about the role, that David -- he had already -- he told at that time Reto that they had already decided that David Wainer was going to fill the role.

Q.    And you learned that just from documents that were produced by BLP; is that right?

A.    I learned that they had already made the decision in March.  I learned eventually by end of May/early June that David Wainer was going to fill the role, verbally from people in the office.

Q.    And the decision that you're saying that you learned about is the decision that the role would be filled?  Is that what you're saying?

A.    Which decision?

Q.    You testified a minute ago that you learned from looking at documents that BLP produced in this case --

Page 86

Syeed - Confidential

A.    Yes.

Q.    -- that there had been a decision made to fill the role --

A.    Yes.

Q.    -- in March of 2018; is that right?

A.    What I will say is that I personally learned that David Wainer was going to fill the position late May/early June 2018.  That is when I was first informed that David Wainer would be the one by name to fill the position.  I had been asking for months.

In the BLP production I saw for the first time that the decision to hire David Wainer was made in 2018, according to an email that Wes Kosova sent to Reto Gregori, number two at the news organization at Bloomberg News, that they had already decided to send David to New York to cover foreign policy.  And he called the U.N. -- he said he will use the U.N. as a listening post to cover foreign policy.

And also in the production I learned that in January 2018 Roz Mathieson, who I knew from having worked on Asia- and EMEA-related stories, had written my manager, Bill Faries,

Page 87

Syeed - Confidential

saying that -- advocating that David Wainer is someone we should keep and groom, was the quote she used, and that we should send him to New York to fill the role.  And she was inquiring about Kambiz's status, again, like with the company.

So I was only made aware that these decisions and advocacy on David Wainer's behalf were made at the same parallel time that I was continually asking about the position and inquiring and advocating that I be considered for this role, but I was never told what was happening.

Q.    Well, none of the documents that you've just described had Mr. Faries; right?

A.    They did, actually.  Roz Mathieson sent an email to Bill Faries, my manager, in January 2018 when Kambiz was still in the role and saying what's Kambiz's status.  You know, essentially she was asking.

And she said that we should get David Wainer to New York to fill the U.N. role to cover foreign policy and that he's someone -- she was advocating for him from her post -- I believe at that time she was based in -- covering Asia and

Page 88

Syeed - Confidential

that kind of thing.

She was a senior editor.  I met her once when she came to D.C.  I didn't know she sent that email to my direct manager, Bill Faries, who I then asked in March 2018, when I found out that Kambiz had left his role:  Are you going to fill the position?  And he said, Why, are you interested?  And I said, Yes.

But even at that time, according to this email, Wes Kosova had already made the decision with senior managers that David Wainer was going to fill the U.N. position.  But that was never told to me over all of those months that I had advocated and asked to be considered and to fill that position.

Q.    So just so I understand, so your testimony here today is that the decision that David Wainer should fill that position was made before you expressed your interest to Mr. Faries?  Is that your testimony?

ATTORNEY CLANCY:  Objection, misleading.

A.    I am not aware of the timeline.  I'm just telling you what it is that I have learned.

Page 89

Syeed - Confidential

My personal experience is that I expressed my interest in this role when I found out -- immediately when I found out that Kambiz Foroohar was leaving his position.  My.

Editor in New York knew that -- I'm sorry, my editor in D.C., Bill Faries, my team leader, knew that I wanted to go to New York.  And the minute he said, Yes, Kambiz has left; ███ ██████████████████████████████ and I said, Are you filling the position?  And he said, Why, are you interested?  And I said, Yes, and I would like to be considered.

So that was my personal timeline. Between March and the end of May/early June 2018, I continually asked Bill Faries, I asked Mike Shepard.  I heard chatter around the newsroom about it being filled or not.  And Bill every time would deflect and look upset and say, No, we don't know what's happening with the positions.

But I'm saying the documents reveal that discussions about David Wainer had already been underway and I was never -- that was never conveyed to me nor was the position advertised in a way that I would be able to apply to, even

Page 90

Syeed - Confidential

though I had expressed interest continuously.

Q.     I just want to make sure I understand what you're saying --

A.     Yes.

Q.     -- because a few minutes ago you said that based on the documents you looked at that there had been a decision made to move David Wainer before you ever had your conversation with Mr. Faries.

Are you changing that testimony now?

ATTORNEY CLANCY:  Objection, misleading.

A.     No, I did not state that.  I did not say that -- I don't know the timeline of -- all I know is that in March 2018 Wes Kosova sent an email saying that the decision to appoint David Wainer, transfer him to New York, that was in and around the same time that I inquired about the U.N. job and expressed my interest.

Whether Wes's email was before that date or when that happened, I can't -- I don't have specific knowledge of that.  But I am explaining the timeline of my personal experience in asking and advocating for this job and that

Page 91

Syeed - Confidential

behind the scenes, as the documents reveal, there were discussions about David Wainer and a decision that Wes Kosova sent, a decision that was made according to that email, which is dated that March 2018.

Q.    A decision to place David Wainer in that position?

A.    Right.  But that was never revealed or conveyed to me over the many months I inquired. And I was told they were still trying to see -- it was this figuring out, oh, are we going to fill it, every time me saying I would like to be considered, I would like to fill that role, I would like to apply for that role.  But I was never given the chance to do so.

Q.    I understand that that's your position.

A.    Okay.

Q.    I'm just trying to understand what it is that you're -- what you've conveyed to me.

You mentioned some emails back from January or February of 2018.  You mentioned Mr. Gregori.  Were those emails about Mr. Wainer?

A.    Okay.  There were two emails that I saw in the production.  One was from January 2018 from

Page 92

Syeed - Confidential

Roz Mathieson, who was not based in Washington. She wrote my manager, Bill Faries, inquiring: What's going on with Kambiz, you know, what's his deal kind of thing -- right? -- like essentially asking -- because it looked like the questions about whether he was staying at the company were still going on.

She tells Bill:  We should -- David Wainer is someone we should keep and groom.  She uses -- one word I can quote is the word "groom." That I recollect.  And she suggests -- she advocates for David Wainer to become the U.S. foreign policy reporter in New York.

That's what I learned only when reading the BLP documents.  I had no previous knowledge of that before seeing the documents.  That's one email.

The other email that I'm referring to is the email from I believe March 2018 from Wes Kosova, who at that point had been promoted from bureau chief to, you know, executive editor, one of those very senior roles, and is an email I believe he sent to Reto Gregori saying David Wainer will be transferred to New York to cover

Page 93

Syeed - Confidential

foreign policy and use the U.N. "as a listening post."  That phrase I can put in quotes, "listening post."  That I can recollect.

So they had been making these decisions -- and I am only referring to those two emails -- to evidence that there were discussions going on behind the scenes that I was not aware of of David Wainer filling the U.N. role.

Whereas my experience in asking again and again and again when will I -- I would like to be considered for this role.  But that was never conveyed to me.  The evidence in those two emails was never conveyed to me.

My understanding was the role was still open and that I was continuing to advocate that I should be considered for that role.

Q.    What Bill Faries said to you and what you allege in your complaint, which is Exhibit 2, paragraph 63, is that it was unclear if the role was going to be refilled; correct?

A.    What page is that, sorry?

Q.    I'm on page 17, paragraph 63.

A.    Okay.

Q.    So what Mr. Faries was telling you is

Page 96

Syeed - Confidential

ATTORNEY CLANCY:  Objection to form.

A.    I don't know if -- I mean, I don't -- I wouldn't use the word "surprised."  I just don't know.  I have no specific knowledge of his start date.

Q.    And with regard to the, you know, reporter position that you say Mr. Wainer filled, you're not claiming that Mr. Wainer was not qualified for that job, are you?

A.    I was more qualified.  I have a master's degree in comparative literature from the School of Oriental and Africa Studies from the University of London in Arabic and South Asian languages.  I believe -- my understanding is Mr. Wainer does not have a master's degree.

Also I graduated from college a few years before him and started my professional career as a full-time journalist in 2006 with the Associated Press with a -- at the time the largest news organization in the world.  I started reporting overseas in 2003 while in Egypt, and I was a freelancer for USA Today covering Iraq war protests.

So Mr. Wainer was still in high school

Page 97

Syeed - Confidential

at that time, my understanding, in 2003, and I was already reporting overseas, sending feeds to Washington bureaus at that time.  So I was qualified, I believe better qualified, for this job, and I was not considered.

Q.    My question was a little different. Are you claiming that Mr. Wainer was not qualified for the job?

ATTORNEY CLANCY:  Objection, asked and answered.

A.    I know that what my qualifications are and what I understand his qualifications to be, and I believe that I was better qualified.

Q.    I understand that your position is that you were better qualified.  My question is whether you're claiming that Mr. Wainer was not qualified.

A.    I don't have a specific judgment on that, but I know that -- I know based on his qualifications that I am aware of and the qualifications that I have that I was qualified, and I was not considered for the role.

I had also worked in Washington, D.C., and worked on foreign policy issues in the various roles that I'd had.  So I do again think that I

Page 98

Syeed - Confidential

had more qualifications.

Q.    I understand that you think that you had more qualifications.

A.    Okay.

Q.    That wasn't my question.  But you've answered my question now.

A.    Thank you.

Q.    Your testimony here today is that you did work on foreign policy issues when you were in D.C.; correct?

A.    The comment I just made was in reference to other news organizations that I had also worked for.  Are you asking what I covered while I was in Washington?

Q.    I just want to be clear on whether you're claiming that you covered foreign policy when you were in Washington for Bloomberg or not.

A.    What I can tell you is that my -- I didn't have a completely defined beat in D.C. in my role, but I can tell you the various agencies and the various topics that I covered.

So -- because they were constantly -- my managers were constantly asking me to source up and build contacts and to cover in so many

Page 99

Syeed - Confidential

different directions.

So part of that role was so many different agencies. So I can tell you I covered cybersecurity, military, military cyber. I covered the -- I was asked to cover the CIA, the defense intelligence agency, the FBI, the U.S. cyber command, the Pentagon, the Department of Homeland Security.

I was also asked to cover -- I filled in for the State Department for Nick Wadhams when he -- when they asked me to fill in for him, just like I had to do at the Department of Justice for Chris Strohm for events and things related to that.

I also was asked to cover and source up in private cybersecurity firms, congressional hearings, immigration, and also White House-related issues around Trump.

So that's just a sampling of the many different agencies and ways that I was stretched thin into the different directions of various federal agencies and topics.

Q.    And different opportunities that you got to cover different topics; correct?

Page 100

Syeed - Confidential

ATTORNEY CLANCY:  Objection to form.

A.     I disagree with that framing.  I didn't consider them just as opportunities.  I was being shoved and pushed in different directions:  cover this, cover this, now you're going to be in charge of this, you're not only in charge of the entire intelligence community, the CIA, the FBI, the DIA, the director of national intelligence, the DNI.

These are all incredibly large institutions.  And most journalists are asked to cover one of those.  I was asked to cover all of those plus the 10 other, 12, 20 other agencies I just mentioned.

Q.     When you say "shoved and pushed," you didn't mean physically shoved and pushed, did you?

A.     No, I did not mean physically.  I meant in the sense that I was pushed this way:  Do this now, do this, you have to cover this now, now you have to do this.

So it was never a clear defined beat. I had to cover so many different things which impacted and paralyzed my career.  So I don't consider those as opportunities; I actually consider those as hindrances.  And they hamstrung

Page 101

Syeed - Confidential

my career because I was unable to fully immerse myself into one agency or into one specific topic.

Q.     So looking back at your answers to interrogatories now and focusing again on this Interrogatory Number 3 on page 9, other than what you've listed here, there were no other specific positions that you claim you applied for in 2018 at Bloomberg; correct?

A.     I don't have specific knowledge, unless Bloomberg has records of other positions that I applied for.

Q.     But you are not aware of -- in answering Interrogatory Number 3, you say that you applied for two positions:  the new economy forum editor position and the health and/or health care reporter position; correct?

A.     This is what I correct, yes.

Q.     But you say you applied for those two positions; correct?

A.     That is what I recollect at this time.

Q.     Okay.  And you say you expressed an interest in the United Nations reporter role; correct?

A.     Yes.

Page 102

Syeed - Confidential

Q.    And you say that from January through June of 2018 you told Bill Faries and Mike Shepard numerous times that you were interested in foreign policy reporting jobs, investigative reporter jobs, and editing roles based in New York; is that right?

A.    Yes.

Q.    But you do not identify any specific positions that you applied for other than -- other than the three that we just talked about; correct?

A.    Actually, I can tell you.  I -- in answering -- January between January -- late January 2018 and early February 2018, Bill Faries asked me to meet him.  We met at the tables that are near the front conference when you walk into the bureau, so on the other side of the newsroom.

He sat me down.  He said, We want to raise your profile at the bureau.  We want you to plant a flag.  So this is -- you know, we know that you've been thrown all over the place, which, by the way, is referenced very explicitly in all of my performance evaluations, that I was spread thin, and acknowledged even with my good performance.

Page 103

Syeed - Confidential

And so he said, You know this is not -- what do you want to cover?  This is an opportunity that reporters seldom get to have, having the news organization ask you what do you want to cover; is it election security, is it Middle East, you know, to help narrow the scope.

I told him -- I took some time.  Then I told him I would like to cover Middle East foreign policy from Washington.  And he told me, okay, let's do that, let's make your beat.

I made a series of stories, like story ideas that I was going to do.  And then I even started reporting out some of those stories.  I remember one very specifically.  It was about the relationship between the crown princes in Abu Dhabi and Saudi Arabia.  I had talked to various sources already.  I was developing a story already because it was a very important foreign policy for the U.S. and the Trump administration.

And then I was told between February and March 2018, after I had been given the green light to start reporting on Middle East policy from Washington, I was told by Bill Faries that Craig Gordon no longer wants you to do anything

Page 104

Syeed - Confidential

related to the Middle East or foreign policy.  I was not to touch anything related to that.

Bill Holland, an editor that I had worked frequently with, told me one-on-one that he told stop talking to me.  He was not to talk to me about anything related to Middle East or anything around policy.

Now, this is a complete turnaround from just, you know, earlier where they had told me: Okay, what do you want to cover.  And I expressed -- I said I want to cover foreign policy; I want to cover Middle East.

Shortly after that, even after I had started working on that beat, I was told Craig says you are not to touch anything related to this.

And also I was told by my former editors in Dubai who I had -- they asked sometimes for interviewer feed.  I would send them things. They said, We were told you are not allowed to touch anything in the Middle East and we are not to contact you either about anything related to foreign policy.

Now I learned in the BLP production

Page 105

Syeed - Confidential

that there was an email sent by Bill Faries to Alaa Shahine and my other former managers in Dubai that Nafeesa is no longer going to be working on Middle East.

In the email he says she and we concluded that that would be too much -- that was too much to cover -- or that was not possible to cover both and she's only going to cover election security.

I disagree with that statement.  This was a decision made by Craig Gordon conveyed to me by Bill Faries, that I was not to touch anything related to Middle East foreign policy from Washington.  So I was then told that I had no choice but I had to cover only election security.

So I'm saying all of this to convey to you that I had expressed from January when I spoke to Bill Faries that I wanted to cover foreign policy.  And after that we talked about, you know, me going to New York and wanting to fill -- continuing to fill -- report on foreign policy.

So I was completely shut out of doing that kind of reporting and told suddenly that I was not to touch any of that.

Syeed - Confidential

Mike Shepard:  Thanks very much for taking time to speak.  You asked about what I'd like to do in six months.  In case it wasn't clear from our conversation, I'm currently interested in covering foreign policy, as I conveyed earlier this year.  Just thought it would help to put this in writing; is that right?

A.    That's what this email states, yes.

Q.    So you had a conversation with Mr. Shepard around June 5th of 2018; is that correct?

A.    Yes.

Q.    And you were telling him that if it wasn't clear, you wanted to be clear about what you wanted to do; is that right?

A.    Yes.

Q.    And you put that in writing; correct?

A.    Yes.

Q.    And then he responds to you on the same day:  Hi, Nafeesa.  I'm so glad we had the chance to talk at length today.  I really appreciated your openness, and I hope we can continue the conversation over the coming months; is that right?

Page 109

Syeed - Confidential

A.    Yes, that's what this stated.

Q.    On June 5th of 2018; correct?

A.    Yes.

Q.    You forwarded this to your permanent email; is that right?

A.    Yes.

Q.    Why did you do that?

A.    To have a record of this email.

Q.    Why?

A.    Because I had stated so many times that I was interested in foreign policy, and so sometimes as backups as journalists we would send, you know, things to our personal accounts so that we could have a record of it.

Q.    And then you resigned three days later; is that right?

A.    June 8th, yes.

Q.    Based on this email, Mr. Shepard was saying that he wanted to continue having conversations with you over the coming months; is that right?

A.    He said -- he states in the email:  I hope we can continue the conversation over the coming months.

Page 110

Syeed - Confidential

Q.    And did you have any reason to disbelieve him?

A.    Yes.

Q.    Why?

A.    Because I had been speaking to them for months already and had been -- I had expressed my interest, and I had -- and based on the specific conversation too.  That's not detailed in this email, the content of the conversation that we had.  I had asked him again why I was not considered for the U.N. role.

Q.    And what did he tell you?

A.    So in this conversation -- this is a conversation that I'd had after I spoke with Bill Faries, also asking him when -- why I did not receive or been considered for the U.N. role. Both of these conversations happened when I learned that David Wainer was taking the New York U.N. job, when I learned of that late May/early June 2018.

I met with Mike Shepard in the conference room, again, that I had met with Bill before behind our desks.  I met with Mike Shepard. I asked him multiple times again why was I not

Page 111

Syeed - Confidential

considered for the U.N. job.

In this conversation Mike -- I asked Mike why was I not considered for the job, why -- you know, why did I -- why was I not allowed to apply for this role, why was I not. So I asked him this question. I posed the question.

Instead of answering my question, he began to ask about my ambitions, you know, what do I want to be, where do I see my career. So he was not asking my question about the U.N. role.

He started telling me, you know, we're both Georgetown grads, like we worked at The Hoya newspaper. Tell me about, like, where you want to be. Again I said why was I not considered for the U.N. role.

And in this meeting I detailed for him my experience at the D.C. bureau. I told him that all of the senior management, including himself, Mike Shepard, Craig Gordon, Wes Kosova, all the senior management were white males.

I told him I don't see a future for myself here. I don't see where my career can advance, because until this time, again, I had been denied these opportunities, including the

Page 112

Syeed - Confidential

U.N. role.  They were all male.  My team was all male, all white male as well.  I was the only woman.

And I told him that, you know, I had been spread in so many different directions.  I told him -- and then I cataloged my experience at the bureau as well and the many, many experiences that I had in which I felt diminished in the bureau as well, which, again, reinforced, you know, why I felt like I did not see where -- what kind of future I had.

Even though he kept asking me, like, Yeah, what do you want to do?  I said I want to cover foreign policy, I would like to do the U.N. role, I would like to become this.  So I cataloged for him the many experiences that I had.  So those included -- and this is -- I told him all of this as well.

I told him about how I was confused and mixed up on multiple occasions with another South Asian-American woman, who looked nothing like me, Saleha Mohsin.  She has shoulder-length at that time brown hair.  I have big curly black hair.

We -- when he redid the seating chart

Page 113

Syeed - Confidential

after we moved into the D.C. bureau, they sat the two of us next to each other in a corner.  And she used to receive my mail, multiple team leaders, editors called us by each other's name.

TV producers in New York would contact our managers asking to speak with Saleha when they meant me or talking with Saleha when they meant Nafeesa.  This happened on so many occasions, one after another.

And so I explained this to Mike Shepard, and I told him, you know, that this also happened -- you know, at this point I had to look out the window because I was starting to choke up. It was very difficult to talk about.

But I said even -- even the bureau chief, even the bureau chief, mixed me up with Saleha in one of the biggest meetings that we had in D.C.  There was a big meeting.  Craig called everybody from the -- that was working on the Russia investigations to come into the room.  So we had national security team, the congressional team, the White House team, a bunch of the teams.

I walked in the room.  One of the congressional reporters started talking to me

Page 114

Syeed - Confidential

about the U.S. Treasury, which I didn't cover but Saleha did.  And I thought here's another person calling me Saleha, mixing me up.

Saleha was on the speakerphone.  And in front of the senior -- all of my colleagues Craig Gordon started talking about my coverage area and said Saleha is going to -- and then, you know, talking about my coverage area.  He was talking about me, and he called me Saleha.

He told this to Mike Shepard.  I said even the bureau chief can't tell me apart from this other person.

Q.    Are you claiming that you didn't get the U.N. job because of your race or your sex?

A.    I am -- yes, I am.

Q.    And what is the basis for that?

A.    I'm getting there, yes.

In the same conversation -- so I'm talking about the many incidents that happened in this environment.  And this is -- I'm still in the same conversation with Mike Shepard.  So I told him about the multiple conversations, a joke he made about microaggressions.

And I was walking back to my desk.  And

Page 115

Syeed - Confidential

my -- he was talking to Bill Faries, my manager, and he said -- they were laughing, and I looked up at them.  And Mike said, Oh, that's a microaggression; ha-ha.  And Bill said, What's that?  And Bill said, Oh, you'll learn about it in training.  And I just looked at them, and they started laughing and then they dispersed.  I told him about that.

I told him about how my colleague, Tony Capaccio, who I worked with at the Pentagon, just refused to say my name.  And he would say -- he would just, like, make up something.  One day I said, Tony, my name is Nafeesa.  It's Nafeesa.  And then he just threw up his arms and said, I'm doing the best I can.

And he usually worked the Pentagon bureau.  He came into the D.C. bureau to do the unconscious bias training, which I also completed.  And the whole time he was complaining so loudly.  He was sitting in the seats just opposite.  He was complaining the whole time about having to do it.  And Bill Faries, my editor, started, like, egging him on, you know, about how annoying it was and all that.

Page 116

Syeed - Confidential

I'm telling you all this because these are all things that I recounted to Mike Shepard about my experiences at Bloomberg. And I told him, you know, that these were all experiences that I've had. Then as we were talking about this, also -- yes, and so racial discrimination -- I'm going to get to that in a second.

Q.    What I'd like you to tell me is why --

ATTORNEY CLANCY:  Wait.

A.    I'm going to tell you because it's all related to this conversation. So if you will allow me to complete the conversation, because it was a long conversation and I want to make sure that it's all covered.

So in this conversation, in addition, when I kept saying -- when Mike -- when I kept asking why I was not considered for the U.N. job but Mike kept deflecting, Mike Shepard: What do you want to do, what's your ambition, what do you want.

He brought up the example of Sara Forden, who is an editor. This is the same example Bill Faries brought up when I asked him why I was not considered for the U.N. job. So I'm

Page 117

Syeed - Confidential

just mentioning that because two of my white male editors brought up the example of Sara Forden.

They both said -- and in this conversation referenced in this email -- Mike Shepard said, You can learn something from Sara Forden. She wrote a memo about a coverage area she felt we were lacking in. She took that, and she sent it to the senior managers. And she was able to create a new team or coverage area that she thought should be covered.

And so Mike was using this as an example of how a woman can advance at Bloomberg was only if she can justify somehow, you know, what her role or justify somehow to all of the white male senior editors.

So they used Sara Forden as an example. Sara Forden is also one of the people that confused me with Saleha. So he was using her. That is one of the examples.

So -- and I'll get back to the gender discrimination as well.

So we're having this conversation, and again I ask Mike Shepard why was I not considered for the U.N. job. And he looks at the TV -- I'm

Syeed - Confidential

sitting here (indicating).  The windows are behind me.  He looks at the TV and he says -- he says, Well, we wanted to make the New York job a diversity slot, but it didn't really work out that way.

And then I looked up at him.  I had never heard that term.  I said, What is a diversity slot?  Because he started saying something before this about, oh, how at the Washington Post, you know, we were better at building diversity.

I then said -- I then asked why was I not considered for the U.N. job.  He said, Well, we wanted to make the New York job a diversity slot, but it didn't really work out that way.  I asked what is a diversity slot.  He said something vague about diversity in the newsroom.

And I told him that as a person of color we don't want to have to -- I don't want to be a token.  I'm not in this position just to fill a slot.  I also told him at that time Bloomberg was having its diversity summit in New York, and I said a lot of us feel like that's a joke.

When I told him about all of the many

Page 121

Syeed - Confidential

Q.    Well, did you ever know anything more about his qualifications for the role?

ATTORNEY CLANCY:  Objection.

A.    I'm not sure I understand the question.

Q.    You said "not at this time."  My question is whether you know anything else about Mr. Wainer's qualifications for the United Nations reporter role other than what you've told us.

A.    My understanding was that he had been in the Israel bureau and that he had started his career after I had started my career.

Q.    And do you know who made the decision to put him in the United Nations reporter role?

A.    Only according to the BLP production that I saw in preparation that Wes Kosova sent that email in March 2018 saying that David Wainer was going to New York.

Q.    Do you have any knowledge about what the actual role was that he filled?

A.    I'm sorry, can you say that again?

Q.    Do you know what the actual role was that he filled once he got here to the U.S.?

A.    I was -- I mean, my understanding was that it was the U.N. foreign policy role.

Page 123

Syeed - Confidential

personal reasons; is that right?

ATTORNEY CLANCY:  Objection, asked and answered.

A.    Yes, for personal reasons and also to advance my career and my ambitions of becoming a foreign policy reporter.

Q.    If you can look at your complaint, which is Exhibit 2, paragraph 6.

A.    Yes.

Q.    What are the secure communication tools that you are referring to there?

A.    Yes.  This is one of the reasons that I also -- which I hadn't gotten into detail just yet, but the basis of gender sex discrimination.

I was not given access to secure communications as a security reporter or as a reporter with sensitive sources.  There were two -- there were two security reporters, one named Michael Riley and Jordan Robertson, in the counterclaim bureau.  And they were -- I found out that they had access to certain secure communication tools, such as burner phones and other type of encrypted communication devices that I was never told that Bloomberg had access to.

Page 124

Syeed - Confidential

When I tried to bring this up to Mike Shepard and Bill Faries, they dismissed me and said, They need that; you don't need this kind of thing.

We had a meeting about secure communications with Cesca Antonelli, who had come down from New York to D.C. to talk to us about some new kind of, like, encrypted portal that Bloomberg had, and I found out about secure communication tools.

And when I asked about getting PGP-encrypted tools to communicate with sources -- mind you, I was being asked by my managers to source up in CIA, in FBI -- these are highly sensitive, you know, agencies.  I can't be just texting them on my phone.

But my requests were denied.  And I -- I had to seek out PGP-encrypted technology on my own from a tech guy in New York who had nothing to do with, you know, necessarily with these folks. We spent hours trying to figure this out, because it wasn't something that was made available to everybody.

And so -- and it was a dated program.

Page 141

Syeed - Confidential

Kosova about the U.N. position -- about your interest in the U.N. reporter position?

A.    I don't have a specific recollection of that, because I do not know that he -- the people that I was always directed to speak to were my direct managers about that.

Q.    So sitting here today you have no recollection of speaking to Mr. Kosova about the U.N. reporter position; correct?

A.    I don't have a specific recollection at this time of that.

Q.    Now, met with Tamika on June 6th, and then you resigned two days later on June the 8th of 2018; correct?

A.    Yes.

Q.    And who did you tell you were resigning?  Who did you give your resignation to?

A.    I informed my direct manager, Bill Faries.

Q.    And what was Mr. Faries' reaction?

A.    We were in a conference room, and I spoke to him.  And he called me a, quote, young reporter.  And I told him not to say that anymore because he had made other comments about my age

Syeed - Confidential

her about all of my experiences.  I told her exactly everything that Bill had told me and everything that Mike had told me.

I told her about all of the same experiences, racist- and gender-based experiences, that I'd had, including, you know, being mistaken for other people, jokes about microaggressions.  I told her all of that, everything that I had told Mike Shepard.

I also told her that Mike Shepard had used the term "diversity slot."  After I told her, I recounted everything.  And I also told her I had been interested in the U.N. job.  So those are the things she told me -- this is what I remember -- after I recounted all the racist things that happened, racist- and gender-based things.

Q.    And those are the things you told me about this morning?

A.    Those are some of the things I told you.  I told you some of the racist things that -- racist things that I faced.  I haven't recounted all of the sexist things either.

So Tamika put -- I said I'm probably not telling you anything you haven't -- you

Page 159

Syeed - Confidential

gender, you can get promoted or not.

So he brought up, just like Bill Shepard -- sorry, Bill Faries.  Bill Faries.  I'm speaking about Mike Shepard right now.  He used the same example -- I didn't bring up Sara Forden; he did.

Sara Forden was an editor.  He said she wrote a long memo about this -- I believe it was something related to campaign finance or some type of area that she felt the bureau should cover more of, whatever that subject was.

He talked about -- he talked about how she wrote a long memo.  She shared it with all, you know, the white male managers to justify why they should have this team, why they should cover this coverage area.  So he used her as an example that I should follow.

And that indicated to me -- and, again, she was one of the people that confused me -- that mixed me up with Saleha.  So to use an example of one who also discriminated against me is, you know, not the best example to bring up.

But in any case -- I also told him that.  He brought up Sara Forden, went at length

Page 160

Syeed - Confidential

about how she wrote this memo and how she was able to create this team that she was leading or this coverage area because she wrote this memo.

So that to me indicated the sexist practices of promotion within Bloomberg, because to me that indicated that women, females, have to justify their promotion and hiring of justification existence as opposed to being considered for roles, you know, through the general process of applying, of being considered for roles.

And also the indication to me that for months I had been asking about the, you know, New York role and that it went to a male. And I was instead told: Oh, you didn't even -- by Mike and by Bill: You didn't even tell us you were interested in foreign policy, which was not true.

So the Sara Forden example is a great example to illustrate how white male senior managers who were all male -- and I told that to Mike as well. I said, I don't see I have a future here when there are no people of color and no women in senior leadership positions who are managing the bureau.

Page 165

Syeed - Confidential

Q.    You never moved to New York?

A.    No, I did not move to New York.

Q.    So after you resigned, did you go to India?

A.    After when after I resigned?

Q.    You resigned on June 8th of 2018.

A.    Yes.

Q.    At some point after that did you go to India?

A.    I went on a trip, research trip, yes.

Q.    And that was a research trip for a book you were writing; is that right?

A.    Yes.

Q.    And when did you do that?

A.    That was in the fall of -- in or around August or September 2018.

Q.    So August or September 2018 after your resignation from Bloomberg; is that right?

A.    Yes.

Q.    And you said it was a research trip. What was the book about?

A.    The book is exploring political issues in the conflict-ridden region of Kashmir.

Q.    And when did you start working on that

Page 166

Syeed - Confidential
book?

A.    I started -- I mean, I went there to do some research at that point.

Q.    My question was when did you start working on the book.

A.    I didn't start writing the book or researching until that fall.

Q.    Until you went to India?

A.    Yes.

Q.    When did you start planning to write the book?

ATTORNEY CLANCY:  Objection.

A.    Well, book ideas take a long time. There's an interest.  All journalists -- most journalists have book ideas.  I had an interest in it, but I never had an opportunity to do that.

Q.    So because you weren't working, you had the opportunity to go to India and work on your book; is that right?

ATTORNEY CLANCY:  Objection.

A.    It hadn't been my plan at that time.  I hadn't planned to go to India at that time to write that work.  I hadn't planned on it, I mean, when I resigned June 8th, if that's what you're

Page 168

Syeed - Confidential

A.   He was employed as a professor.

Q.   Where?

A.   At Drexel University.

Q.   Where?

A.   In Philadelphia.

Q.   Were you living with him during the time that you were working for Bloomberg in D.C.?

A.   Yes.  We were living in Washington, D.C., at 661 Morris Place.

Q.   And if he was working in Philadelphia, why were you trying to go to New York?

A.   Because we thought that would be -- for personal reasons we thought that would be an easier commute, that we could live somewhere where I could commute to New York and he could go to Philly, because he did not have to go that often. The commute from Washington, D.C., was becoming too much.

Q.   And as I understand it -- did you have any employment between June 8th of 2018 and when you left for India?

A.   I worked on the freelance piece for Bloomberg Businessweek.

Q.   During that entire time?

Page 169

Syeed - Confidential

A.    Yes, from June to August or July and August, around that time.

Q.    It took that amount of time to do the freelance piece?

A.    I mean, I can't -- I -- what I recollect is that I was contacted by Bloomberg Businessweek editor.  She asked me to work on the story.  I reported on it between June and July, and it was published.

Q.    And were you paid for that?

A.    Yes.

Q.    How much?

A.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Q.    And during that time were you looking for alternate employment?

A.    Yes.  I had been applying for jobs.

Q.    And what records do you have of applications that you made for jobs during the time period of June 2018 until you left for India?

A.    Well, any -- I don't recall specifically right now each application, but any applications that I filled out or any, you know, confirmations of, like, LinkedIn, you know, applications or anything like that I had turned to

Page 170

Syeed - Confidential

my counsel.

Q.    What you turned over to your counsel, is that everything or is that just everything that you kept a record of?

ATTORNEY CLANCY:  Objection.

A.    I turned over whatever I had to my counsel.

Q.    If you look at Exhibit 3 on page 19.

A.    Yes.

Q.    The question is about all prospective employers for whom you applied for employment after you left Bloomberg, L.P.  And if you turn the page to page 20, you provided an answer which has a list of companies.  Do you see that?

A.    Yes.

Q.    Can you tell me which of these you applied for between June of 2018 and when you left for India?

A.    I can't specifically recall the dates of each and every one of these companies where I applied for jobs.

Q.    Can you recall the dates of any of them?

A.    Yes, some of them I can.  The ACLU,

Page 171

Syeed - Confidential

that was in spring 2018.  And then McKinsey, I applied for several jobs over the years.  At one point I got -- I interviewed in 2021 with them. USA Today was also in 2018.  New York Times, is that listed here?  Forbes would have -- yeah, those are some of the dates I can remember.

There were so many jobs I was applying for off and on that I can't recall all of them specifically the dates right now.  But they're all in the -- you know, in the production.

Q.    When did you decide to file a lawsuit?

A.    When?

Q.    Yeah.

A.    In 2020.

Q.    So from the time that you resigned until 2020, you had no intention of filing a lawsuit against Bloomberg?

A.    No.

Q.    What happened in 2020 that motivated you to file the lawsuit?

A.    The murder of George Floyd.

Q.    And how did you find your lawyer?

A.    I researched employment lawyers like I would do researching anything else.  I came across

Page 173

Syeed - Confidential

A.     In or around September/October 2018.

Q.     And after you came back, you got a position at the University of Pennsylvania Center for Advanced Study of India; is that right?

A.     Yes.

Q.     And you were a nonresident visiting fellow?

A.     Yes.

Q.     And how did you get that job?

A.     Well, we were in Philadelphia, and I decided it was an opportunity to work on this book.  I contacted through another academic -- some academics I knew suggested that I contact the center for the Advanced Study of India at U Penn because they have these fellowships.  I contacted them.  I had meetings, you know, interview meetings, and then they gave me the offer.

Q.     And what specifically were you doing?

A.     Doing what?

Q.     At the University of Pennsylvania in that position.

A.     Oh, I was conducting my research and writing.  They have a huge South Asia archive.  So that is what I was working on.

Page 174

Syeed - Confidential

Q.    So you were working on your book?

A.    Yes.

Q.    And were you paid anything?

A.    No.  It was an unpaid opportunity.

Q.    With access to research for your book?

A.    Yes.  The way -- they supplement your access to the research materials and that kind of thing, yeah.  But it was not a salaried position.

Q.    Was there any kind of compensation?

A.    No.

Q.    Did you get meals?  housing?  anything?

A.    No.

Q.    And what was your husband doing in terms of employment at that time?

A.    He was at the same job.

Q.    And you did that until June of 2019; is that right?

A.    Yes.

Q.    And was that because that was the length of the fellowship or did it end for some other reason?

A.    No, that was the length of the fellowship.

Q.    And did you eventually publish your

Page 175

Syeed - Confidential

book?

A.    No.  It's not published.  I continued researching, writing.

Q.    After that the next thing you did in terms of employment was you were a director's visiting fellow at the Institute for Advanced Study in Princeton, New Jersey?

A.    Yes.

Q.    And that was also in connection with research and writing your book?

A.    Yes.

Q.    And that was from September of 2019 through July of 2020?

A.    June 2020.

Q.    So from August of 2018 through at least June of 2020, you were doing things that were focused on research and writing your book; is that right?

A.    Yes.

Q.    Were you paid any money as a result of the visitor fellow at the Institute for Advanced Study?

A.    Yes.  I received a stipend.

Q.    And how much was the stipend?

Page 176

Syeed - Confidential

A.    I don't recall specifically at the moment, but I had a monthly stipend that they would send.

Q.    Approximately how much was it?

A.    I can't recall at this moment.

Q.    Do you have records that would reflect that?

A.    Yes.

ATTORNEY BLOOM:  I'll put my request in writing, but we're obviously going to ask for that information.

Q.    After June of 2020, you then became a freelance editor; is that right?

A.    Yes.  I would take freelance projects as I could.

Q.    Why did you stop or how did your director visitor fellowship end at the Institute for Advanced Study?

A.    It's just an academic year post, so that is what were the terms of the offer.

Q.    Was there any other kind of compensation that went along with it other than the stipend?

A.    No, just, again, access to archives and

Page 177

Syeed - Confidential research material.

Q.   Any insurance?

A.   No.

Q.   Did you have insurance through your husband's employment?

A.   Yes.

Q.   Did you have insurance through your husband's employment during the time that you worked at Bloomberg?

A.   No.  I had my own Bloomberg insurance.

Q.   And then once you left Bloomberg, did you go on your husband's insurance?

A.   Yes.

Q.   Did you do any freelance work during the time that you were a directors visitor fellow at the Institute for Advanced Study?

A.   I don't believe so.  I don't recall specific freelance projects.

Q.   And that was also for the academic year.  The directors visitor fellow was for --

A.   Yes.

Q.   Okay.  Between June of 2020 -- well, what was your next job or employment or fellowship?

Syeed - Confidential

A.    Right, and then I did a fellowship.  I wasn't planning to do a fellowship after another, but the opportunities came up and it was a good opportunity.

Q.    Where was that?

A.    That was at UCLA.

Q.    Did you do something for Yale in between?

A.    No, I'm currently there.

Q.    You were a freelance editor, though, for individual clients?

A.    Yes.

Q.    And your UCLA position started in October of 2020; is that right?

A.    Yes.

Q.    So between June of 2020 and October of 2020, you were doing freelance?

A.    Sometimes, yeah, people would send me, you know, pieces they wanted me to edit. Sometimes, you know, it wasn't all paid, necessarily, but I would be consulting because I was looking -- I was thinking about starting to build a freelance editing role while I was doing the fellowships.

Page 179

Syeed - Confidential

Q.    And were you looking for any other employment during this time?

A.    Yes, yes.

Q.    And what were you doing to look for employment?

A.    I was applying for any jobs I found.

Q.    What kind of jobs?

A.    Journalism jobs, editing, writing jobs, reporting, all kinds of, you know, journalistic and writing-based jobs.

Q.    But then you decided to become a visiting scholar at UCLA; is that right?

A.    Yes.

Q.    And that was out in Los Angeles?

A.    Yes.

Q.    What was your husband doing at that time?

A.    He got a job at UCLA, so that's why we moved there.

Q.    So you moved to California because your husband got a job there?

A.    Yes.

Q.    And then you got the visiting scholar's position?

Page 180

Syeed - Confidential

A.    Yes.

Q.    And you had that from October of 2020 through May of 2024?

A.    Yes.  It was an affiliation after that, yeah.

Q.    Well, you were still working on your book during that period; right?

A.    Well, the academic year of -- the October 2021 to June -- till the next summer 2020 -- sorry, 2020 and then to the summer of 2021 I was still working on my book, yes.

Q.    Just till the summer of 2021, and then you stopped working on your book?

A.    Well, and then I got a job at the L.A. Times.

Q.    And that's when you stopped working on your book?

A.    Yes.

Q.    Because?

A.    Because I had full-time employment. That was the whole point of doing the fellowships was to have that time and space to work on a book. And I thought that would help advance my career submissions in becoming an editor and eventually,

Page 181

Syeed - Confidential

you know, being able to have more senior roles in a news organization.

Q.   So at the time that you were at UCLA, were you also teaching courses?

A.   I was initially -- well, not initially, but in the spring of 2021 I was hired to be a lecturer in their extension school.  But then for various reasons I did not actually end up teaching, just I couldn't commit because I had other things going on.  And so I did teach workshops in subsequent years to be in the student journalist program at the Daily Bruin, yes.

Q.   You said you couldn't commit because you had other things going on.  What other things were going on?

A.   Well, I just -- no, just because I was going to be starting a job.  So I decided that I didn't want to be teaching and working full-time at that time.

Q.   You were talking about you were going to be starting a job at the L.A. Times?

A.   Yes.

Q.   And that was December of 2021?

A.   Yes.

Page 182

Syeed - Confidential

Q.    In connection with your job at the L.A. Times when you started, your starting salary was about $117,000; is that right?

A.    Yes.

Q.    And you got a $10,000 retention bonus?

A.    Just the first year when I signed on, yeah.

Q.    And you stayed there until June of 2024; is that right?

A.    Yes.

Q.    And did you get successive salary increases during that time period?

A.    We -- I believe so.  I have to go -- I would have to go back specifically to see what kind of increments there were.  The company was also having a lot of financial problems, so they weren't able to make as many increases.  And our collective bargaining unit was still in talks as well with the management there.

Q.    Were you a reporter there?

A.    No.  I was an editor.

Q.    Had you sought any positions as a reporter at the L.A. Times?

A.    I had applied for other roles at the

Page 183

Syeed - Confidential

L.A. Times, yes.  In the spring of 2021, I had an interview as well.  I was on the opinion team. And I think there was some other role.  I don't recall specifically right now.

But, you know, as I was saying, I was looking to advance my career, and I needed -- and I believed that I needed to have an editing role on my résumé.

Q.    So you chose to not pursue reporting positions but instead to pursue this editor position at The Times; is that right?

ATTORNEY CLANCY:  Objection.

A.    It was a role that was available at that time, and I would also be able to work on foreign policy as an opinion editor, because the L.A. Times had closed a lot of its foreign bureaus at that -- you know, because of cuts, like all news organizations.  But being on the opinion desk, I would still be able to edit and work with writers from around the world.

Q.    Did your position change at all during your tenure with the L.A. Times?

A.    No.  I was the same role the whole time.

Page 184

Syeed - Confidential

Q. And did you get insurance through your job there?

A. I believe it was one of my benefits, yes, but I think that I was on my husband's insurance.

Q. And then in August of 2024 you started working at Yale?

A. Yes.

Q. So did you move?

A. Yes, moved -- well, no. We moved -- I mean, you're asking if we moved from California?

Q. Yes.

A. No, no, no. I teach physically -- I would come and teach my class this spring. But, no, my address is still in California, my home.

Q. And where does your husband live?

ATTORNEY CLANCY: Objection.

A. Where does he live?

Q. Does he live with you in California?

A. Yes.

Q. So you are a lecturer and research scholar at Yale?

A. Yes.

Q. And that's a part-time position?

Page 185

Syeed - Confidential

A.    It's considered something like 33 percent is what they call it.  But, yes, it's -- I mean, it takes up a lot of time, more than just part-time.  But, yeah, that's what I've been doing since we -- since this past -- yeah, academic year, so research and teaching.

Q.    And why did you leave the job at The Times, the L.A. Times?

A.    Because they were having a lot of financial difficulties and threats of, you know, layoffs.  Pretty much everyone I worked with has been laid off since then.  So I thought if I have this opportunity, you know, to then teach, I can take that and then also explore other positions.

Q.    And are you still working on your book?

A.    In what form?  Like writing?  Research? Editing?

Q.    Any form.

A.    I mean, it's still -- revisions are ongoing.

Q.    Did you leave the L.A. Times voluntarily or involuntarily?

A.    Voluntarily.

Q.    And does your husband also work at Yale

Page 186

Syeed - Confidential

now?

A.    He does, yes.

Q.    But you both still live in California?

A.    Yes.

Q.    And what does he do at Yale?

A.    He's a professor.

Q.    Full-time part-time or something else?

A.    Full-time.

Q.    What does he teach?

A.    He teaches history.

Q.    Have you held any other employment or done any other fellowships since you resigned from Bloomberg in June of 2018?

A.    Other than the ones that we spoke about?

Q.    We discussed.

A.    The one at U Penn, the Institute for Study in Princeton, and UCLA, those were the ones that I did as full-time fellowships for the academic years.  I had other fellowships I received, but those were not like the ones where you go and you are in-house at the institution.

I had a fellowship with a literary organization called the Lighthouse Writers

Page 187

Syeed - Confidential

Workshop.  I was their writing and color fellow.

Q.    And did you get paid for that?

A.    No.  They just give you, like, you could take classes without, you know -- a scholarship so you could take classes, writing classes, and things like that.

Q.    And when was that?

A.    That was between -- I believe the exact dates -- from what I know right now -- what I can recall right now, between 2021, 2023.

Q.    At some point since you left Bloomberg, you've been trying to adopt a child; is that correct?

ATTORNEY CLANCY:  Objection.  Counsel --

ATTORNEY BLOOM:  She can answer.

ATTORNEY CLANCY:  What does that have to do with this case, adopting a child?

ATTORNEY BLOOM:  First of all, you produced a bunch of documents about it.

Are you telling her not to answer the question?

ATTORNEY CLANCY:  I don't -- I think we just need a minute, then.

Page 196

Syeed - Confidential

Q.    Were you referring to anything else?

A.    Yes.

Q.    What else?

A.    Yes.  There were a number of things that I can -- that I can outline.  My eyes are getting tired.  Yeah, there are a number of things.

So there was the example of Sara Forden that was brought to me by both my managers, Bill Faries and Mike Shepard, in those meetings when I inquired about why, again, I wanted transparency about why I was not considered and offered the role in New York, the U.N. position in New York.

And in that meeting Bill Faries told me, you know -- there was gaslighting, which also felt gendered, where he said, You never told us you were interested, which was of course not the case.  Multiple times I had expressed interest.  He told me the only way to get things done in this company is if you advocate for yourself, which is exactly what I had been doing.

And he brought up the example of Sara Forden, of how as a woman I should understand the only way to get promoted in the company, which I

Page 197

Syeed - Confidential

outlined earlier.  Mike Shepard said the same thing.

There were other examples as well. Another example -- we spoke earlier about the two other cyber reporters, Michael Riley and Jordan Robertson, and how they had access to secure communications and tools and devices that I was not privy to or not told about or given access to.

And as well the way that the cyber coverage was at the company, they were given time and they were seen as this kind of untouchable, elite group that they did not have to do breaking news.  They would dump stuff to me, just like many other ways that things were just dumped on my plate, on my desk:  Okay, give it to Nafeesa, she'll do it.  So that's one of the examples.

And there also I was told tension between Craig Gordon and their supervisor, Winnie O'Kelly.  And I was told that for those reasons that I couldn't, you know, advance because there was that kind of friction.

So any time I would want to work on longer term stories or something else or more investigative kind of things or foreign policy-

Page 198

Syeed - Confidential

related things, these two, whatever they wanted to cover and whatever they wanted to do, I was -- I was told that I would not have that kind of opportunity.

And as men -- they were both white males -- they are both white males --

Q.    Told by whom?

A.    I was told by Bill Faries, I was told by, as well, other managers that they are the ones that cover the big cyber, the exclusive stuff.  I had to do what was the leftovers, whatever is considered their leftovers.

Sometimes they would email me and say, Oh, I don't want to talk to this guy, but maybe you can, or maybe you can look into this, as like -- as something that because it didn't rise to their level.

So it's very clear that there was a hierarchy between what they covered and what I covered.  And I was not to touch what they covered, only if it's left over and something they didn't want to do.

So that indicated to me that these white males who cover cyber were given -- and they

Page 202

Syeed - Confidential

reporting is seen as worthy and publishable and that I was completely undermined in that endeavor in original reporting that I had done, completely worthless now, even though those managers knew that I was working on the story and instead -- and not only did they use my reporting and knew about what I had known from very sensitive sources, they didn't -- basically what happened was Peter Waldman was checking what he knew against what I knew and then publishes a story.

So as a female reporter, that indicated to me that male managers do not value and do not see female reporters as equal to.

Okay.  After that there were also several comments made, disparaging comments, about Asian-American woman and their skills in the newsroom that were openly said that I heard in the Washington bureau while I was employed there.

One example is between my managers, Bill Faries and Larry Liebert.  I sat next to them.  My desk was here; their desks were here

Syeed - Confidential



Page 204

Syeed - Confidential

Both -- I also heard from people in Dubai --

Q.    When they rebuilt it with you, you mean when you came here in 2016; right?

A.    Yes, I'm saying they rebuilt it with Bill, myself, Kambiz, with Nick Wadhams, and Chris Strohm, all males except for me.

So you can just imagine that my

Page 205

Syeed - Confidential

perception when I wasn't sitting there but I was privy to all of these conversations, just doing my work, that what they would have said when someone like me is not there as a woman.  So that was another example of how --

Q.    Did you ever hear them make a comment about you that you thought was derogatory?

A.    Like that?

Q.    Like any derogatory comment about you.

A.    Well, there -- like I said, about the appearance and age.  We'll get back to that.

Q.    That you haven't told me about today.

A.    They were -- those were the comments that signified to me the environment that Bloomberg cultivated, that it was okay to speak about, not in their presence, but you could speak openly and criticize Asian females, female reporters, in that way and that you could speak openly -- that poorly of them openly in front of other colleagues.

Q.    The comments about you are the comments you've described today; right?

A.    Yes.

Q.    There's nothing in addition to that;

Page 206

Syeed - Confidential

right?

A.    There's more I'd like to say.

Another example from, you know, when we're talking about other kind of sexist discrimination that I faced was that I was shut out of meetings with high-profile sources that would come to the bureau.

Usually I would find out about it because I would see my managers wearing a blazer. Craig and Bill and those guys, they wore ties, but they didn't wear blazers on a daily basis.  That's when I would suddenly find out who was here.  It would be so-and-so from this agency, so-and-so from there.  And they would have a meeting.  I was regularly shut out of these meetings, not even invited, even when these people are on my beat.

One example where I advocated and I insisted that I be included in one of these meetings was when James Clapper, the former director of national intelligence, came.  I had to fight my way to demand that I be included.

Is this not part of my beat? Supposedly they asked me to cover the DNI, the director of national intelligence office.  He

Page 207

Syeed - Confidential

came.  It was in the big conference room downstairs from the main newsroom.  And it was -- I believe that I was the only female in that room, and the men commandeered the conversation, even though this was somebody who would be a good source on my beat.

Similarly I had a meeting -- I had set up an interview with Brian Bilyeu, who at the time was -- this is in 2018, in the spring 2018 -- who had been -- yes, end of 2017, beginning of 2018. He had been the number three at the CIA under -- in the first Trump administration, and he had been a friend of then CIA director Mike Pompeo.

In the conversations about this interview that I had, Craig said, you know, we want to make sure it's not a puff piece, because they're obviously trying to make him look good. So I was very clear about what this interview could be -- right? -- as a way to profile somebody but make it as a way of it is a critical journalistic look at who is this person in power.

So I thought -- I was under the impression I was going to the CIA headquarters to do this interview that I scored, which is what any

Page 208

                    Syeed - Confidential

reporter, when you get an interview, you're the

one that goes and does the interview.

          But I was told by my male managers that

I would not be allowed to go alone; the editor --

Washington editor of Bloomberg Businessweek, Matt

Phillips, would have to accompany me.

          So, again, as a woman I was not being

trusted to conduct my job on my own.  And when we

got there -- so Matt came with me.  Matthew -- I

think he's in the document, Matthew Phillips.

Matt came with me.

          And it was -- we were sitting at the

table in the CIA, people armed and everything.

And I had prepared so well for that interview

because I knew I did not want to make it a puff

piece.  This was going to be a serious profile.  I

had all my questions laid out.  I was ready to go.

          Again, Matt commandeered this interview

that I had gotten through my reporting and barely

let me get in a few questions during that

interview.  He is a white male as well.

     Q.    And there was an article generated from

that; correct?

     A.    There was.  But, again, I had written

Syeed - Confidential

it as a critical and, you know, exploratory understanding of who is this person in power, and then it was completely changed, not by me by but Matt, into a puff piece.

Q.    You thought it was a puff piece; right?

A.    Yes.

Q.    And you were the only byline on that; right?

A.    Yes.  But the interview, again, a male was told to accompany me as a woman.  I was a full-fledged reporter.  I wasn't like an intern, even though in my exit survey I said I felt like I was treated like one.  I can talk more about that.

But I as a woman was not allowed -- I was not allowed to go to this meeting unless I had a male accompany me.  And then it was my interview that I was doing as a journalist, but he asked all the questions, just like that -- just like that meeting where I tried to sit in with James Clapper.

There are a few more instances I would like to talk about.

Q.    Wait.  So on the article, there was one byline, and you got the byline; correct?

Syeed - Confidential

A.    Yes.

Q.    So for the world, the article, you were the one who got credit for it; correct?

A.    That's what I can recall right now.  We can look up the archive and see.

Q.    As I understand it, during the time that you were at Bloomberg, you also had a Columbia fellowship; is that right?

A.    Yes.

Q.    That was a fellowship that you applied for?

A.    Yes.

Q.    And you were paid your full salary for that fellowship; isn't that right?

A.    I was still paid during that time, yes.

Q.    How long was that fellowship?

A.    It was about three weeks, because I had to travel all the way to the Middle East and back. So I was traveling in Jordan and Djibouti.

Q.    You didn't get preapproval for that; right?  You sought out the fellowship, brought it back, and the people at Bloomberg said it was fine and you could do it?

A.    Not right away.  It took them -- I was

Page 211

Syeed - Confidential

offered the fellowship March/April of 2017, and they didn't tell me until about June. And I needed -- I had to tell the fellowship people -- you know, they were waiting for me. So months I -- that I definitely talked directly to Mike Shepard about.

Just like there was another opportunity where I was asked to be a mentor for the Coalition for Women in Journalism. Their founder asked me to be a mentor for other women journalists. Again, it took a long time. I talked to Mike Shepard about that. It took such a long time for them. By that time the organization had, you know -- I don't even know if they ended up putting me on their website.

Q. The Columbia fellowship, you participated in it?

A. Yes.

Q. As a result of that fellowship, there were a certain number of articles that Bloomberg needed to publish; correct?

A. I don't know if there was a quota about how many articles, but I did publish two. I published one very long-form article about Yemeni

Page 212

Syeed - Confidential

women refugees and another one about the Yemeni

Airlines operating under the war.

Q. And, as I said, you were paid for the entire time you were doing that fellowship; correct?

A. I was paid, yes, as a Bloomberg employee because I was still reporting for them.

But there are a few other things I would also like to say.

Q. We're going to mark this exhibit.

ATTORNEY BLOOM: Can you mark this exhibit, please? Thank you --

A. Can I complete what I was --

Q. In a minute. I'm just going to mark this exhibit first.

A. Okay.

(Syeed Exhibit 7, résumé, marked for identification.)

Q. You've just been handed a copy of a document that's marked as Exhibit 7. Is this your most recent résumé?

A. Well, this wouldn't be recent because it doesn't have my end date of the L.A. Times. So it would have been from last year.

Page 213

Syeed - Confidential

Q.    And your end date at the L.A. Times, we established, was -- what was the end date?

A.    June 2024.

Q.    And since then this wouldn't reflect your employment at Yale; correct?

A.    Yeah.  I would have an updated one. And the bullets under L.A. Times wouldn't be in present tense.

Q.    Okay.  Does this otherwise -- up through your employment at the L.A. Times, does this otherwise accurately reflect your employment?

A.    Well, it also would not have the present for the UCLA position.  That would also have an end date.  But otherwise, yes, it does.

Q.    And the descriptions of what you were doing at each of these jobs is accurately reflected in this résumé?

A.    Yes.

Q.    And it accurately reflects your educational background?

A.    Yes.

Q.    And you have an updated résumé that would have end date for the L.A. Times and also reflect what you're doing at Yale right now?

Page 214

Syeed - Confidential

A.    Yes.

Q.    You said earlier today that you were told that inquiries regarding job opportunities should go to your managers, not to HR?  Do you remember that testimony?

A.    I recall speaking about when I was exploring opportunities at Bloomberg.

Q.    Do you recall saying that you were supposed to ask managers as opposed to someone in HR?

A.    My understanding at Bloomberg, especially if you were trying to, say, move to another location, is that you would first alert your immediate manager, which is what I did in Dubai and which is what I did in D.C.

Q.    That's if you wanted to move locations?

A.    And you wanted to pursue another job, yes.

Q.    In a different location?

A.    Whether you wanted to -- were interested in a position or whether you wanted to move locations.

Q.    You were supposed to alert your manager?

Page 216

Syeed - Confidential

was a gender pay discrepancy at Bloomberg.

Q.    But just sticking with what's in paragraph 31 right now, did you supply any of the specific information that's in paragraph 31?

A.    I don't specifically remember.

Q.    You think this information came from your lawyer?

A.    Yes, at the direction of my lawyer.

Q.    And you said that after you left Bloomberg you did -- you wrote a freelance article for Bloomberg; is that right?

A.    Yes.  I wrote one full article, and we call it a sidebar, which is a shorter piece.

Q.    And you were paid for both of those; correct?

A.    I was paid one amount for those two pieces.

Q.    They said if you wanted to do more freelance you could; right?

A.    I mean, Dimitra reached out at some point, I think, but I didn't want to pursue it.

Q.    Why not?

Page 217

Syeed - Confidential

A.    Because I was wanting to pursue other things.

Q.    So you were working on your book at that time?

A.    Yes, and I was applying for other jobs.

Q.    So Dimitra reached out, asked if you wanted to do more freelance articles, and you responded that you did not, or you just didn't pursue it?

A.    I didn't pursue it, but also I wanted to move on from Bloomberg.

ATTORNEY BLOOM:  Let's take a five-minute break.  I might be almost done.

THE VIDEOGRAPHER:  Off the record.  The time is 3:56 p.m.

(Recess taken from 3:56 to 4:05.)

THE VIDEOGRAPHER:  Back on the record. The time is 4:05 p.m.

Q.    Did you have retirement benefits at Bloomberg?

A.    Yes.

Q.    Were you eligible for retirement benefits at the L.A. Times?

A.    Yes.

Page 218

Syeed - Confidential

Q.    And did you receive retirement benefits there?

A.    Yes.

Q.    An did you get retirement benefits through any of your subsequent employment?

A.    Since L.A. Times?

Q.    No, since Bloomberg.  Sorry, that wasn't clear.

A.    Yeah, the L.A. Times.

Q.    And besides the L.A. Times, anywhere else?

A.    There are some benefits at Yale as well, yes.

ATTORNEY BLOOM:  Thank you for your time today.

ATTORNEY CLANCY:  I will actually ask a question.  I don't think she completed an answer and you moved on to Exhibit 7.

EXAMINATION BY

ATTORNEY CLANCY:

Q.    I will actually ask a question.  I don't think she completed an answer and you moved on to Exhibit 7.  So I think the question was to describe any and all acts of sex discrimination

Page 219

Syeed - Confidential
you experienced at Bloomberg.  So --

A.    Yes.

Q.    -- please complete your answer for the record.

A.    So may I continue?

Q.    Yeah, I'm asking you, since I didn't think you were able to finish.

A.    Yeah, sure.

Yes, I had been describing many of the experiences that I had where I was either, you know, undermined my reporting, not -- blocked out of meetings; or when I had meetings, you know, would be not allowed to speak as a woman or be allowed to lead, like -- and have -- which -- which made me feel quite devalued and not have a voice and be seen as somebody who can be a leader and can lead.

In addition to that, a couple of other things that occurred included when Marty Schenker, who is part of the editorial management committee, contacted me and said -- well, contacted through my managers, said that an old buddy of his runs a PR organization and that this PR publicist represents a cybersecurity executive and that

Page 220

Syeed - Confidential

he -- Marty's friend wanted a cyber executive meet someone at Bloomberg.

So Marty requested that I come to work and meet with him, his friend who's the publicist, and with this cybersecurity executive. And Bill told me when Marty says -- asked you to do something, you can't say no; you have to do it.

So I left my job for the day and came to New York. And I was specifically told by Bill and Marty that this executive had some type of bad rapport or didn't really like Michael Riley, the other cybersecurity reporter that I had mentioned, who was put on a pedestal and hierarchy above myself and my reporting.

So in the meeting it was just the four of us: myself, Marty, across from the cybersecurity executive, and Marty's friend who was the publicist. So in this meeting, like the other meetings that I would attend with all males, Marty, you know, dominated the conversation, kept talking to the cybersecurity executive.

And at least three to four times in this meeting he kept telling the cybersecurity executive: You really should meet Michael Riley;

Page 221

Syeed - Confidential

you should meet Michael Riley.

Even though I was present, I felt invisible, even though cybersecurity is supposedly also part of what, you know, the vast mandate that they had in the ever-changing mandate that they had given me.

So I felt like a pawn. I was there because they were trying to connect this man with another man, and as a woman I was just put in this situation as a pawn.

And at the same meeting Marty also offered this cybersecurity executive to put the cybersecurity executive in touch with Bloomberg security, which then also made me question my journalistic efforts, if a senior manager at Bloomberg is trying to mix Bloomberg's business and editorial lines, which also was supposed to be against policy.

So I felt like a pawn as a woman in that situation.

Another example is in the production there is an email from Craig Gordon in the spring of 2018 saying, you know, do you want to come to me to this meeting at the Pakistani embassy. And

Page 222

Syeed - Confidential

I told him that, you know, I have some interviews lined up for my election security, which I had been told I could only work on.

And, again, to me I felt that this was using me as a pawn in this kind of situation because I was a South Asian woman. There was no reason I would need to accompany him to this meeting. Their own PR people had been reaching out to me, and I had been telling them: No, I'm not going to come because I have my other things to do.

As an example, most meetings I was completely shut out and would be all male. Why was this one example that's in the BLP production that I was asked to go -- I'm not Pakistani, but I was asked to go as a woman and because of my ethnicity, again, used -- I felt like I was being used as a pawn and based on my gender.

And for all of these reasons and the ones that I outlined earlier about, you know, the culture of how you could comment about women, also again about my age and appearance, about, you know, making comments that you look so young, which again made me question do they not think

Page 223

Syeed - Confidential

that I'm qualified or, you know, made me feel very devalued, or about my appearance. And I never heard comments like that about my male counterparts.

So for all of these reasons, this kind of sexist behavior on top of the -- this kind of sexist discrimination on top of the racial discrimination that I faced made me feel devalued, made me question my worth, made me wonder about, you know, how, you know, I'm perceived, my abilities to do my work.

So for all of these reasons -- also, since we're talking about sexist language, in the production there's a whole email chain in spring 2018 again between -- I think it's between March/April 2018 where all of my white male managers -- Craig Gordon, Mike Shepard, Bill Faries, Larry Liebert -- are on an email chain.

And Craig Gordon questions my metabolism, speaking about a woman, and bodily function. And appraising her based on that is also sexist in my opinion. So reading that once again confirmed my understanding of this type of sexist discrimination that women have to face,

Page 224

Syeed - Confidential

that I faced.

And in that email -- I don't agree with his statements saying that, you know -- he says certain things about, you know, not keeping pace or, you know, only doing one story, completely misrepresents what I was actually doing at that time.

So, again, as a woman I was being undermined in the amount of work I was doing and being told I was not doing enough when I was doing more -- I was doing equal if not more than my counterparts. And all of my performance reviews also speak to that. I became the go-to person for so many things.

But, again, I just want to reinforce the notion that during that time -- even after I was told don't cover Middle East, you're not allowed to do that, only cover election security -- I was asked to cover so many different things before I left Bloomberg, just like I had been my whole tenure in D.C. But specifically that spring of 2018 I covered everything.

I'm using this as an example again of sexist behavioral because my male counterparts

Page 225

Syeed - Confidential

were not asked to do this.  They were not asked to fill in -- they were not asked to fill in for other people.  I was always asked to do that. Sure, I was reliable, good at my job.

Again, that left me no clear path forward, for promotion, for moving on to the next stage of my career.  I covered everything that spring from whether -- and it was all imposed on me by my male editors.

So they spread me thin without allowing me to move forward.  So everything from North Korea, Syria, the Parkland shooting, cybersecurity, DHS.  I covered also the CIA -- new CIA director hearings on Capitol Hill.  So I was asked to go to Congress as well.

I had to cover also the Iran nuclear deal, DHS election security.  I was also asked to cover the Russia Muller investigations.  I was asked to cover, you know, the FBI.  So many other things that had nothing to do even with what they told me was supposed to be my beat, which was election security.

So I was spread thin once again.

And another example of the sexist

Page 226

Syeed - Confidential

behavior is that my -- any time I did bring up issues of I think we should cover this, as opposed to being told, Nafeesa, go do this, Nafeesa go do that.  Often I would hear my name yelled by one of the male managers sitting across saying, Hey, let's ask Nafeesa to look into that.

So first of all they were not allowing me to develop my sources so deeply, even though they were spreading me thin.  Even in the spring 2018 I was covering myriad different subjects.  I was developing my election security as best as I could, getting ahead of the primaries, interviewing people at all 50 states, the secretaries of state.

And that whole time, even though, you know, they keep saying -- and I did another story I just want to mention that Wes specifically asked me to do between March and April 2018.  He asked me specifically to do a story about U.S. unemployment and the effect on military recruitment.  This was actually a very popular story we had.  He asked me to do that even though it had nothing to do with what my supposed beat was.

Page 227

Syeed - Confidential

So I'm just -- this picture of male managers telling a woman:  You do this, you do this, you do this, you do that, oh, now we need you to do this, actually I need you to go to DOJ so you can get your fingerprints done so you can get your, you know, your badge ready for when Chris is gone, I need you to go cover this, I need you to go -- actually Biden is doing this thing in some remote place, I need you to go do that, I need to send you to Alaska, because they would specifically say, Oh, I don't want Nick to get burned out.  He's been doing so much.

Where was that kind of concern and behavior for me during that whole time?  Never expressed as a woman, as a person of color.

What I want to say about this is I was asked to do so many different things.  I was complying because I didn't know what other choice I had at the moment, even though I was still asking continuously about the U.N. job and wanting to advocate, promote myself and promote my career, I mean.

So throughout this time I am being told to do so many different things, and then I

Page 228

Syeed - Confidential

couldn't develop these deep sources.  Then this is what I want to get to as well is that --

ATTORNEY BLOOM:  Go on.

THE WITNESS:  It's all part of this, so since you asked I wanted to --

ATTORNEY BLOOM:  I actually didn't.  Your attorney did.

THE WITNESS:  It was from your earlier question.

So what I want to say is that when some breaking news thing would happen, Craig would come to my desk and say, Hey, check with your sources.  And it would be about anything.  It could be about whatever was the breaking news of the day.  So how was I supposed to grow and develop expertise in this kind of environment.

And as well after -- there's an email from Craig in all those exchanges about me leaving where they acknowledge things were not handled well around the U.N. position where they talk about, you know -- where Tamika acknowledges that Mike said the word "diversity slot" around -- and there's also my exit survey.  And she says, Nafeesa, like I

# EXHIBIT C

# NAFEESA SYEED

██████████████████████████████████

www.nafeesasyeed.com / @NafeesaSyeed

## SUMMARY

Award-winning writer, editor and multimedia producer with two decades of full-time experience on four continents in spot news and enterprise reporting, editing and producing. A quick and innovative thinker adept at both working independently in new and unpredictable environments as well as teaming up with colleagues to produce content for global audiences. Areas of expertise:

- ✦ Writing, editing and producing for competitive, real-time print and broadcast news as well as long form magazine, documentary-film and radio portals.
- ✦ Generating creative, multimedia feature stories from the United States, South Asia, Middle East, North Africa and Sub-Saharan Africa.
- ✦ Covering cybersecurity, intelligence, foreign policy, national security, political, emerging markets, tech, courts, presidential campaigns, urban affairs and culture beats.
- ✦ Co-author acclaimed book, *Arab Women Rising*, and assistant producer, *Valley of Saints*, 2012 Sundance audience award winner.
- ✦ Working with a range of writers and students on the craft of essay writing and creative writing.
- ✦ Guest lecturing and teaching writing workshops at universities, including undergraduate and graduate seminars at UCLA, The New School, Georgetown, Columbia, George Washington, Virginia Tech, Claremont, Lighthouse Writers Workshop, Wharton School at University of Pennsylvania, University of Kashmir and University of the West Indies. Presenting work at Institute for Advanced Study and American Academy in Rome.

## PROFESSIONAL EXPERIENCE

**THE LOS ANGELES TIMES / December 2021-present / Assistant Op-Ed Editor**
Full-time editing and commissioning of op-eds, commentary, essays and narrative writing from renowned academics, policy analysts, novelists, scientists and other writers for the Opinion Section.

- ✦ Heading opinion coverage of Ukraine war and Israel/Gaza war coverage. Leading foreign policy commissioning on major global debates and policy in countries such as in China, Tunisia, Pakistan, Sudan, India, Sri Lanka, Morocco, Algeria, Germany and the U.K.
- ✦ Leading personal essay, experimental essay and narrative writing commissioning with renowned novelists, poets and nonfiction writers, from ideation and multiple drafts to revisions of final text. Discovering new and emerging writers from underrepresented communities, and working closely with them one-on-one to develop their voices. And publishing original poetry.
- ✦ Played key role in abortion series after Supreme Court ruling on Roe vs. Wade, including recruiting a wide range of intellectuals and thinkers to write.
- ✦ Working with contributors on environmental issues, with major figures like Greta Thunberg and Martha Nussbaum.

Confidential

EXHIBIT NO. 7
DATE: 5/15/25
Reporter - Laurie A. Collins

SYEED000351

✦ Led opinion vertical in FORETOLD podcast series, editing and commissioning widely acclaimed essay series on the Romani community, a groundbreaking project for U.S. media.

✦ Regularly work with major U.S. book publishers to develop excerpts and essays with renowned writers.

## FREELANCE EDITOR / September 2020-December 2021
Editing content for individual clients and new media startups, including California-based Icebreaker media weekly newsletter and founder's blog.

## UNIVERSITY OF CALIFORNIA, LOS ANGELES / October 2020—present / Visiting Scholar
Selected for full-time visiting fellowship at UCLA's Center for India and South Asia at the International Institute. Completing research and editing for *Jail Park*, book project on Kashmir. Published, "Valley Within a Valley," excerpt from *Jail Park*, forthcoming book, in acclaimed literary journal *Critical Muslim, Issue 45: Transitions*.

## INSTITUTE FOR ADVANCED STUDY / September 2019-June 2020 / Director's Visitor
Selected as full-time member for fellowship at the IAS in Princeton, New Jersey. Completed research and writing for manuscript, focusing on mid-20th-century Kashmiri political movements. Lectured on current events in Kashmir during speaker series for School of Social Science. Participated in Institute seminars on South Asia and the Middle East.

## UNIVERSITY OF PENNSYLVANIA / November 2018-June 2019 / Visiting Fellow
Served as non-resident fellow at UPenn's Center for the Advanced Study of India in Philadelphia, conducting research on Kashmiri politics from 1965 Indo-Pak War through 1975 Kashmir Accord. Participated in CASI seminars and workshops; contributed to research discussions with faculty members and students.

## BLOOMBERG NEWS / October 2014-July 2018
**National Security Correspondent, Washington, D.C. Bureau** *April 2016-July 2018*
Staff reporter covering nexus of cyber and tech with national security, foreign policy, defense and intelligence for Bloomberg News and Businessweek. Produced and edited breaking news, analysis and features from nation's capital for print, television and radio.

✦ Lead election security coverage with in-depth series ahead of November 2018 midterms.

✦ Played key role in tracking impact of Trump administration policies on intelligence, defense and homeland security agencies. Served as Pentagon correspondent.

✦ Provided crucial coverage of hacking attacks into U.S. institutions, including stories on encryption, surveillance and privacy.

✦ Wrote big-picture feature stories, including on Pentagon's efforts in Silicon Valley and federal cybersecurity recruitment.

✦ Covered U.S. foreign policy, with focus on Middle East, including series on Saudi Deputy Crown Prince Mohammed Bin Salman's U.S. visit.

✦ Contributed to political coverage, from Congressional hearings to Russia investigations.

✦ Produced acclaimed text and photo coverage on Yemeni women through Columbia University reporting fellowship from Jordan and Djibouti.

SYEED000352

+ Covered Middle East and Africa news during World Bank and International Monetary Fund meetings in Washington.

+ Regularly appeared on Bloomberg Television and Bloomberg Radio for live, on-air hits as well as participating in other TV networks' shows, including on MSNBC and ABC. Appeared as guest commentator on numerous radio and podcast programs, including NPR and SiriusXM. Moderated panels at Bloomberg Government events, including televised one-on-one discussion with former Homeland Security Secretary Jeh Johnson, and Washington think tanks, such as Middle East Institute panel on Arab women's activism.

+ Produced popular social media-first videos for online network, TicToc News (now QuickTake), partnership between Bloomberg and Twitter. Wrote scripts and narrated videos.

+ Live-blogged for Bloomberg's TOP Live portal on live breaking news events.

**Gulf Politics and Economy Correspondent, Dubai bureau** *October 2014-March 2016*
Bloomberg staff reporter on political and economic news of Gulf Arab countries. Produced and edited breaking news and features from the United Arab Emirates.

+ Headed daily Yemen war spot and analysis reporting in coordination with stringer and Riyadh bureau chief, including features on AQAP and southern separatism.

+ Chronicled Gulf Cooperation Council security and foreign policy beat amid multiple regional conflicts, including major profile of Abu Dhabi Crown Prince. Source-building across government, diplomatic, business, opposition and NGO circles. Cultivated database of Middle East, North Africa and South Asian political and economic analysts.

+ Covered rise of Islamic State and Syrian war, including strong role in Paris attacks news and popular profile on Abubakar al-Baghdadi.

+ Reported on U.A.E./Gulf economic shift amid oil slump, including popular stories on IMF, government subsidies and Gulf nationals developing tech startups. Covered major World Economic Forum meetings in U.A.E. and Jordan.

+ Contributed to Iran deal and post-sanctions coverage from GCC perspective as well as companies and countries looking to break into new market.

+ Contributed to breaking news and features across region, including Egypt, Syria, Iraq, Kuwait, Bahrain, Tunisia, Turkey, Morocco, Libya, Qatar and Afghanistan.

+ Appeared on Bloomberg Television for live hits, including during Indian Prime Minister Narendra Modi's U.A.E. visit, as well as speaking on Bloomberg radio programs.

**AL JAZEERA AMERICA / July 2013-September 2014 / Associate Producer, Fault Lines, Washington D.C.**
Produced half-hour documentary films for award-winning current affairs program, "Fault Lines," airing weekly on Al Jazeera English and Al Jazeera America.

+ Conducted extensive quantitative and qualitative research for "America's War Workers," documentary film on trafficking of migrant workers from India to Dubai to U.S. military bases in Afghanistan. Debuted March 2014.

+ Field-produced shoots and conducted on-camera interviews with senior government officials, senators and congressmen for "Collect It All," documentary film on national security, surveillance and privacy. Debuted November 2013.

Confidential

SYEED000353

✦ Completed in-depth research and interviews for "Made in Bangladesh" film looking at the supply chain of U.S. retailers and Bangladesh's garment industry. Debuted August 2013.

✦ Contributed research and production assistance for other films, including field-producing interviews with former military officials and analysts for film on Taliban in eastern Afghanistan; film on Texas abortion laws; film on Ferguson riots; and film on South Sudan 2014 conflict.

✦ Assisted with production tasks, including with boom microphone on field shoots and logging interview tapes. Received training on DSLR cameras.

**FREELANCE MULTIMEDIA JOURNALIST / June 2011-June 2013**

Produced original content for leading news outlets in multiplatform storytelling formats; traveled solo throughout South Asia, the Middle East, North Africa and Sub-Saharan Africa.

**Writer, The Wharton School**

✦ Coauthored book "Arab Women Rising: 35 Entrepreneurs Making a Difference." Book featured in New York Times, NPR, Christian Science Monitor, Buzzfeed, GlobalPost, Solutions Journal and La Repubblica, among others. Speaking tour included Google New York office, Facebook HQ, Georgetown University, Columbia University, TechWadi Silicon Valley conference, HerGirlFriday at The Atavist. Appeared live on NPR's Tell Me More, Wharton podcast, YourMiddleEast podcast and KBIA's Global Journalist.

✦ Wrote features and conducted interviews for Arabic Knowledge@Wharton online business journal, including with Nobel economic laureates, CEOs and entrepreneurs on economic development and political expression. Co-taught 10 Wharton MBA students during fall 2012 semester required writing course.

**Writer and Multimedia Features Producer**

✦ Produced widely shared articles and slideshows for The Wall Street Journal's IndiaRealTime portal and The Christian Science Monitor from India and Yemen.

✦ Wrote on Yemen and Tunisia's post-revolution context for Al-Monitor with in-depth analyses looking at economic development and political transition. Led series on arts an culture amid upheaval, including producing viral multimedia project, "50 People Shaping Culture in the Middle East," cross-posted on Huffington Post. Interviewed musicians, painters, singers and other artists across region.

✦ Other news features from the Middle East and South Asia appeared in print or online for The Associated Press, The Guardian, Rolling Stone Middle East, Al Jazeera English, The National, VICE, Tehelka, Guernica magazine, Quartz, The Believer, GlobalPost, Women's eNews and Popular Anthropology magazine.

**THE CARAVAN December / 2010-June 2011 / Chief Copy Editor, New Delhi, India**

Edited and proofed all manuscripts and page layouts each month for India's only narrative journalism magazine, with major cover stories on national Indian politics and economy. Edited content including investigative longform features, opinion pieces, arts and culture profiles, fiction and photo essays.

**VALLEY OF SAINTS / October 2010-December 2010 / Assistant Producer, Srinagar, Kashmir, India**

Confidential

SYEED000354

Assisted with daily on-site production tasks and shot interviews with cast and crew members for feature film, *Valley of Saints,* winner of Sundance Film Festival 2012 audience award. Shot two-dozen interviews about Dal Lake for educational portal to accompany film.

**THE ASSOCIATED PRESS / October 2006-October 2010**

**Staff Writer, Mid-Atlantic Bureau, Washington D.C.** *May 2008-October 2010*

- ✦ Reported state and national news, focusing on public safety, courts and urban affairs in the U.S. capital. Worked as solo weekend editor for six months; frequently filled in for daily news desk supervisor, night editor and early broadcast editor, managing reporters as well as editing and publishing content for print and broadcast wires. Scripts often read verbatim on local TV and radio outlets in Washington, D.C.
- ✦ Developed first Mid-Atlantic public safety enforcement agencies, including the Metropolitan Police Department, U.S. Capitol Police, U.S. Park Police and FBI Washington Field Office.

**Staff Writer, Des Moines, Iowa AP Bureau** *October 2006-April 2008*

- ✦ Reported on state and national news; often worked solo broadcast, night and weekend editing shifts. Scripts read verbatim on local TV and radio outlets in Iowa.
- ✦ Covered the presidential campaigns of more than a dozen candidates, including Barack Obama, John McCain, Joe Biden, John Edwards and Fred Thompson, writing on their policies toward the economy, immigration and the Iraq war ahead of the 2008 Iowa caucuses.

**MATCH CHARTER HIGH SCHOOL / August 2004-August 2005 / Urban Education Fellow, Boston, Mass.**

Full-time journalism adviser and supplementary teacher, grades 9-12. Organized "Words 4 Change" citywide slam poetry event to benefit Boston Adult Literacy Fund. Taught English to immigrant students at Brighton High School through AmeriCorps program.

**USA TODAY / June 2002-April 2003 / Freelancer, Egypt; World Desk Intern, McLean, Virginia**

Cairo stringer during 2003 U.S. invasion of Iraq, fielding reports from protests and coordinating interviews for foreign reporters. Researched for foreign editor and staff. Contributed to investigative coverage for award-nominated World Trade Center 9/11 anniversary articles.

## EDUCATION

**SCHOOL OF ORIENTAL AND AFRICAN STUDIES, UNIVERSITY OF LONDON**

**Graduated December 2006, London, U.K.**

- ✦ MA in Comparative Literature, with Distinction in Modern Arabic and South Asian languages

**GEORGETOWN UNIVERSITY**

**Graduated May 2004, Georgetown College, Washington D.C.**

- ✦ BA, magna cum laude, double-major in Arabic and Government. GPA: 3.7/4.0

**AMERICAN UNIVERSITY OF CAIRO Spring 2003, Egypt, International Study Program**

SYEED000355

## AWARDS & FELLOWSHIPS

+ September 2021: Selected as 2021-23 Writing in Color Fellow, Lighthouse Writers Workshop.
+ September 2017: Media Fellow, Center for the Study of Social Difference, Columbia University, awarded in partnership with Luce Foundation.
+ July 2015: "America's War Workers," Emmy nomination for investigative journalism in news magazine, associate producer. "Ferguson: City Under Siege," Emmy nomination for coverage of breaking news in news magazine, associate producer.
+ April 2015: "America's War Workers," Overseas Press Club human rights award, associate producer.
+ April 2014: "Made in Bangladesh," Peabody Award for broadcast journalism, associate producer.
+ June 2010: "D.C. Sniper Ex-Wife," Second Place, Features category, Daily Newspapers/Wires division, 2009 Dateline Awards, Society of Professional Journalists Washington D.C. Pro Chapter.
+ June 2009: "Helicopter Crash," First Place, Spot News category, Daily Newspapers/Wires, 2008 Dateline Awards.

## SKILLS & TRAINING

+ Advanced knowledge of written and spoken Modern Standard Arabic. Conversational Spanish. Familiar with conversational Hindi/Urdu and Kashmiri.
+ Summer 2022: Weeklong advanced fiction writing workshop at Lighthouse Writers Workshop, with novelist/essayist Tiphanie Yanique. Craft seminar intensives on narrative, voice and point of view at Lighthouse LitFest with writers such as Dan Chaon, Steve Almond, Nadia Owusu and Teow Lim Goh.
+ Fall 2020: Twelve-week advanced novel workshop at A Public Space, with novelist/translator Elizabeth Gaffney.
+ Fall 2019: Six-week advanced fiction writing workshop at Catapult in New York, with author/journalist Kanishk Tharoor.
+ Spring 2019, Fall 2018: Two ten-week sessions at StoryLab fiction-writing workshop at Drexel University, with novelist and professor Nomi Saunders.
+ August 2012: Completed weeklong narrative journalism masterclass with The New Yorker staff writer Jon Lee Anderson at La Porte Peinte Centre, Noyers, France.
+ October 2011: Completed Wharton Seminar for Business Journalists, weeklong training with business school professors, Philadelphia.
+ Member of Media Guild of the West, Arab and Middle Eastern Journalists Association; Asian American Journalists Association; South Asian Journalists Association; Association of Writers and Writing Programs.

SYEED000356

# EXHIBIT D

**Bloomberg News, Foreign Policy Reporter**
Req #48660 Application Date: 2/2/2016
Recruiter: Danielle Hirshberg    Hiring Manager: Craig Gordon

Bloomberg is seeking a U.S. foreign policy reporter for the national security team in the Washington office. The successful applicant should have previous experience in foreign policy/government reporting and a proven ability to put breaking news developments into a global context. The reporter will be expected to tap into and generate scoops on the broader foreign policy community in Washington -- including diplomats, analysts, lobbyists, members of Congress and visiting politicians who help sway policy.

The preferred candidate will have a proven ability to produce breaking news stories under real-time deadline pressure in a team environment as well as take the lead on incisive enterprise and data-based stories that will distinguish Bloomberg's reporting from other outlets.

Collaboration is critical. The reporter will need to coordinate with journalists across the globe, helping develop stories emerging from Europe, Asia, Latin America and Africa as well as breaking news that those regions will carry through the day as they come on line. In an election year, he/she will also help further U.S. political coverage as the top candidates emerge and the transition to a new administration takes place.

Qualifications
- Bachelor's degree or the equivalent
- Experience working in a real-time news environment
- Minimum of five years of journalism experience
- Ability to write quickly, concisely and accurately under deadline pressure AND produce longer-form enterprise work
- Ability to identify trends and spot when a change of word choice signals a shift in strategy
- Ability to think creatively about how to most effectively explain a story, whether in short-form, long-form or via a chart or video
- An entrepreneurial approach to the job with a curious mind and a scrappy passion for reporting
- Demonstrable attention to detail and organizational skills
- Exposure to cyber-security policy and experience working abroad are preferable, though not required



PLAINTIFF'S EXHIBIT
3
PENGAD 800-631-6989

# EXHIBIT E

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------X
NAULA NDUGGA, on behalf of herself and
similarly situated women,
                        PLAINTIFF,

        -against-    Case No.:
                     1:20-cv-7464-GHW

BLOOMBERG L.P.,

                     DEFENDANT.
---------------------------------------------X

                     DATE: June 17, 2025
                     TIME: 10:06 A.M.

                     CONFIDENTIAL DEPOSITION
of the Defendant, BLOOMBERG L.P., as a
Witness, CRAIG GORDON, taken by the
Plaintiff, pursuant to a Subpoena and to
the Federal Rules of Civil Procedure, held
at the offices of Clancy Law Firm New York
40 Wall Street, 25th Floor, New York, New
York 10005, before Karyn Chiusano, a Notary
Public of the State of New York.

Page 2

A P P E A R A N C E S:

CLANCY LAW FIRM NY
   Attorneys for the Plaintiff
   NAULA NDUGGA, on behalf of herself and
   similarly situated women
   40 Wall Street ~ 25th Floor
   New York, New York 10005
   BY: DONNA CLANCY, ESQ.
        IRELAND CLANCY, ESQ.
   dhc@dhclancylaw.com
   ireland.clancy@dhclancylaw.com


PROSKAUER ROSE
   Attorneys for the Defendant
   BLOOMBERG L.P.
   11 Times Square ~ 28th Floor
   New York, New York
   BY: ELISE BLOOM, ESQ.
        MATTHEW ROSENTHAL, ESQ.
   ebloom@proskauer.com



ALSO PRESENT:
   LAUREN FISHKOFF,
        (via videoconference)

              *         *         *

Page 102

* CONFIDENTIAL ~ CRAIG GORDON *

Q.    Okay.  And in regard to Ms. Syeed's skills, did she have good sources?

MS. BLOOM:  Object to the form of the question.

You can answer.

A.    That is a very broad question.

Q.    Well, was she known as someone who could be relied upon for any of her sources that she knew that were outside the US?

MS. BLOOM:  Object to the form of the question.

You can answer.

A.    Relied upon?

Q.    Yeah.

A.    My recollection is that we hoped she was bringing some sources from her prior assignment in Dubai.  But I don't

Page 103

* CONFIDENTIAL ~ CRAIG GORDON *

think that was something we were terribly focused on.

Q.    You agree that it's a positive to have good sources when you are a reporter so that the stories are accurate and being able to be published?

MS. BLOOM:  Object to the form of the question.

You can answer.

A.    Good sources lead to good stories.

Q.    Okay.

(Whereupon, Plaintiffs' Exhibit 3, Foreign Policy Reporter Position posting February 2, 2016, was marked for identification as of this date by the Reporter.)

Q.    Exhibit 3 is a document that is one page.  It's marked ending in 58.

And it was provided in discovery as one of the jobs that Ms. Syeed had applied for while at Bloomberg.

Just let me know if you're familiar with this document.

Page 104

* CONFIDENTIAL ~ CRAIG GORDON *

A.    All right.  Give me one minute, please.

Q.    Sure.

(Witness reviews document.)

A.    I have reviewed it.



* CONFIDENTIAL ~ CRAIG GORDON *



Page 120

* CONFIDENTIAL ~ CRAIG GORDON *

MS. BLOOM:  Objection.

And note my continuing objection to the fact that it references an attachment and there's no attachment being provided.

Subject to that, you can answer.

Q.    As you sit here today, you do not have any recollection of interviews

Page 121

* CONFIDENTIAL ~ CRAIG GORDON *

with Ms. Syeed for the foreign policy role in 2016; is that right?

A.    I do not.

(Whereupon, Plaintiffs' Exhibit 6, E-mail from Craig Gordon to Nafeesa Syeed dated 3/11/2016, Bates BLP_NS_0000168, was marked for identification as of this date by the Reporter.)

MS. CLANCY:  For the record: Exhibit 6 is Bates Number ending in 168.

Q.    Let me know when you're finished reading this.

(Witness reviews document.)

A.    Yes.

(Whereupon, Plaintiffs' Exhibit 7, E-Mail from Craig Gordon to Tamika Alexander, dated 3/28/2016 was marked

Page 122

* CONFIDENTIAL ~ CRAIG GORDON *
for identification as of this date by
the Reporter.)

MS. CLANCY:  Exhibit 7 is Bates
Number ending in 1009.

Q.    Let me know, Mr. Gordon, when
you're done reading this.

A.    Um-hum.

(Witness reviews document.)

A.    Yes, I reviewed it.



* CONFIDENTIAL ~ CRAIG GORDON *

Page 130

* CONFIDENTIAL ~ CRAIG GORDON *

for her in D.C."

So based on that language, do you agree that you had not decided to give her the role of foreign policy reporter?

A.    I do not think that is what this e-mail says.

Q.    At some point, you decided not to give her the role; right?

A.    She did not get the role.

Q.    Okay.  So one more question regarding Exhibit 7.

* CONFIDENTIAL ~ CRAIG GORDON *



* CONFIDENTIAL ~ CRAIG GORDON *



(Whereupon, Plaintiffs' Exhibit 16, E-mail between Craig Gordon and Nafeesa Syeed, copying Bill Faries and Larry Liebert, was marked for identification as of this date by the Reporter.)

THE WITNESS:  Thank you.

Q.    Exhibit 16 is Bates Number 772, and it's an e-mail between Craig Gordon and Nafeesa Syeed, copying Bill Faries and Larry Liebert.

If you can take a look, let me know when you're done reviewing this document.

* CONFIDENTIAL ~ CRAIG GORDON *

(Witness reviews document.)

A.    Yes.

Q.    Okay.  Did you read this document in preparation for today's deposition?

A.    I did, yes.

* CONFIDENTIAL ~ CRAIG GORDON *



Page 216

* CONFIDENTIAL ~ CRAIG GORDON *

(Whereupon, Plaintiffs' Exhibit 17, E-mail string between Craig Gordon, Bill Faries, Larry Liebert and Mike Shepard, was marked for identification as of this date by the Reporter.)

Q.    17 is Exhibit Number 882 to 889, which was blank, but substantively, it looks to be a collection of e-mails between yourself and Bill Faries and Larry Liebert and Mike Shepard.

In regard to the 883 to 889, would you read --

MS. BLOOM:  Where exactly are you looking at?

There is no 883 to 889.

Oh, yep.  There we go.

Okay.  Never mind.

THE WITNESS:  It's right here, yeah.

MS. BLOOM:  Yeah.



* CONFIDENTIAL ~ CRAIG GORDON *

* CONFIDENTIAL ~ CRAIG GORDON *





Page 222

* CONFIDENTIAL ~ CRAIG GORDON *

chain which goes to the first page of Exhibit 18, and then I'll ask you a couple of questions.

(Witness complies.)

A.    I've read it.

* CONFIDENTIAL ~ CRAIG GORDON *



* CONFIDENTIAL ~ CRAIG GORDON *



# EXHIBIT F

**From:**     HUMAN RESOURCES HRES (9001|BLOOMBERG/ 731
              LEX|378583|159120||)[HRBLPNYK@Bloomberg.net]
**Sent:**     Tue 2/2/2016 6:32:19 AM (UTC-05:00)
**Subject:**  Thank you for applying

[MSG Greeting]: PLEASE DO NOT RESPOND --> ENTER AN SDSK ASKH FOR ALL HR INQUIRIES

Hello,

Thank you for your recent application for the Bloomberg News, Foreign Policy Reporter
position. We will be reviewing your application and will be in contact with you shortly.

If you have any questions regarding the status of your application, please let us know via
SDSK ASKH Ticket.

Thank you,
Global Recruitment



EXHIBIT 3
FARIES

9.25.25 ock

CONFIDENTIAL

BLP_NS_0000164

# EXHIBIT G

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
NAFEESA SYEED,

PLAINTIFF,

-against-          Case No.:
20cv07464(GHW)
1:24-cv-06101

BLOOMBERG L.P.,

DEFENDANT.
-------------------------------------------X

DATE:  September 25, 2025
TIME:  10:10 A.M.

DEPOSITION of the Defendant,
BLOOMBERG L.P., by a Witness, WILLIAM
COLBERT FARIES, taken by the Plaintiff,
pursuant to a Notice and to the Federal
Rules of Civil Procedure, held at the
offices of Clancy Fleishman, LLP, 40 Wall
Street, New York, New York 10005, before
Anna Khodachnik, a Notary Public of the
State of New York.

Page 2

A P P E A R A N C E S:

CLANCY FLEISHMAN, LLP
   Attorneys for the Plaintiff
   NAFEESA SYEED
   40 Wall Street, 25th Floor
   New York, New York  10005
   BY:  DONNA CLANCY, ESQ.


PROSKAUER ROSE, LLP
   Attorneys for the Defendant
   BLOOMBERG L.P.
   11 Times Square, 28th Floor
   New York New York  10036
   BY: ELISE BLOOM, ESQ.
        MATTHEW ROSENTHAL, ESQ.
        LAUREN FISHKOFF, ESQ.


ALSO PRESENT:
   ROSA LYNDEN



                *         *         *

Page 38

W.C. FARIES

you interviewed?

A.    No.

Q.    How many were external?

A.    I recall one person that I

interviewed being an internal candidate.

Page 64

W.C. FARIES

Q.    And that role that Nick Wadhams received was a good career opportunity for him as he continued to work at Bloomberg, is that fair to say?

A.    I think it was.  I assume Nick thought it was, too.

██  ██  ██ ██ ██ ██ ██
██  ██  ██ ██ █ ████
██  ██  ██ ██ ██ ▌ ██ ██
██  ██  ███ ███

Q.    So, as a team lead for the Washington bureau, what was your salary?

MS. BLOOM:  Objection.

And he's not going to -- he's not going to answer questions about compensation.

MS. CLANCY:  As a team lead during the time that he was at D.C.?

MS. BLOOM:  He's not going to --

MS. CLANCY:  So, are you directing him not to answer that question?

MS. BLOOM:  I am.

Page 90

W.C. FARIES

███████████████████████████████

███████████████████████████████

███████████

MS. CLANCY:  Off the record for a second.

(Whereupon, an off-the-record discussion was held.)

Q.    You could put that aside.  We are going to show you what's been marked as Faries 3.

(Whereupon, document was marked as Plaintiff's Faries Exhibit 3 for identification as of this date by the reporter.)

Q.    I'm showing you what we marked as Exhibit 3 which is Bates number 164. Have you ever gotten communication from human resources saying thank you for applying when you applied for any of your positions?

A.    I believe I have.

Q.    So, it's standard for an applicant to submit through the PATHGO and their resume or whatever application and

Page 91

                    W.C. FARIES

then they would get a response thank you
for applying, is that pretty standard, as
far as you know?

            MS. BLOOM:  Object to the form
      of the question.

            You could answer.

    A.    For positions that are listed
in the internal system, yes.

    Q.    If a position is not listed
internally and the applicant reaches out to
a manager, obviously the manager would
respond or not respond?

    A.    I would think so.

    Q.    On the occasions that you would
reach out, though, you did get a response
and obviously proceeded to get positions
through Bloomberg, correct?

            MS. BLOOM:  Objection to the
      form of the question.

            You could answer.

    A.    Yes.

Page 92

W.C. FARIES

██████████████████████████████████

██████████████████████████

███████████████████████████

████████████████████████████████

███████████████████████████████████

██████████████████████

████████████    ███████████████

██████████████████

████████████████████

██    ████████████████████████

█████████████

Q.    But when she applied for the job is when you would received notice of her application, correct?

A.    I don't know if I would have received this or if HR would have received this.

Q.    But you would have received some type of notification of an applicant that you should be following up with in regard to interviewing, correct?

A.    I believe so.

Q.    But did you have any decision making with respect to who you wanted to

Page 102

W.C. FARIES

A.    I think Craig would have --
Craig and I would have discussed how the
interview went.

Q.    You recall --

A.    But I don't recall that
conversation.

Q.    You could put that aside.

I'm showing you what we have
marked as Faries 6, which is Bates number
1016 through 1017.

(Whereupon, e-mail was marked
as Plaintiff's Faries Exhibit 6 for
identification as of this date by the
reporter.)

Q.    Let me know if you have ever
seen this document before.

A.    I saw this document while
meeting with my legal team yesterday.

Page 103

W.C. FARIES

Q.    So, this would have been one of the times that you had come from overseas to work for a week in the D.C. bureau?

A.    I believe so, yes.

Q.    And was Nafeesa performing work as a reporter in the D.C. bureau at that time?

Page 104

W.C. FARIES

A.    I don't recall how -- I don't recall how she was filling her time at that point.  It was a little bit of a gray area.



Page 105

W.C. FARIES



Page 109

W.C. FARIES

Q.    She did remain continuously employed, correct?

A.    She did.  I don't know if she needed to use any of her T days from Dubai for that.

Q.    And again, we say T days, we are talking about vacation days?

A.    Vacation days, yes.

Q.    But at some point a decision was made to afford her a different role and that role was a cyber security role, correct?

A.    That's right.

Q.    Let's look at the next exhibit, which is Exhibit 7, and it's Bates number 212 ending in 216.

(Whereupon, e-mail was marked as Plaintiff's Faries Exhibit 7 for identification as of this date by the reporter.)

Q.    Have you ever seen this document before?

A.    I don't believe I have.

Q.    So, if you -- we'll start from



Page 111

W.C. FARIES



Page 112

W.C. FARIES



Q.    And were you involved in determining what Nafeesa's role was going to look like at that time?

A.    We had talked about her taking on a role centered around cyber security.

Q.    And why cyber security?

Page 117

W.C. FARIES

████████████████████████

███        ████████████████████████████

████████████████████████

Q.    And it was a position that you thought Ms. Syeed was qualified for; is that right?

A.    We -- yes.

Q.    And so, Ms. Syeed began reporting to you and at that time you reported directly to who?

███        ████████████████████████

████████████████████████████████████

████████████████████████████████████

███        ██████████████

Q.    Let's look at Faries 8.

        (Whereupon, employment
   information report was marked as
   Plaintiff's Faries Exhibit 8 for
   identification as of this date by the
   reporter.)

Q.    So, Exhibit 8 you will see is a similar document that we had for Ms. Syeed. Have you ever seen this document before, an employee information report for Nick

Page 118

W.C. FARIES

Wadhams?

    A.    No, I have not.



Page 119

W.C. FARIES

Q.    So, it's fair to say, though, that before July he would have been given an offer and relocation agreement to come back to the States?

MS. BLOOM:  Objection to the form of the question.

You could answer.

A.    Could you repeat that again?

Q.    Sure.

Is it fair to say that before July 1, 2016 --

A.    Yeah.

Q.    -- he would have been given an offer as the foreign policy reporter and a relocation agreement?

MS. BLOOM:  Objection to the

Page 144

W.C. FARIES



Q.    So, my point is that information that is contained in 5A would have been the information to rely on considering her for the foreign policy role?

MS. BLOOM:  Object to the form of the question.

You could answer.

A.    I don't think it was the information to rely on.  I think, as I was saying earlier, I primarily would have looked at her body of work from Dubai, but perhaps she submitted this with her application for the job in Washington.

Q.    Was there any other documents in terms of a job application for the role of foreign policy reporter that was required to be submitted?

A.    I don't recall any -- I don't recall specific documents that were

Page 150

W.C. FARIES

at the next exhibit which we've
marked as Exhibit 12.

(Whereupon, year-end
performance evaluation statement was
marked as Plaintiff's Faries Exhibit
12 for identification as of this date
by the reporter.)

Q.    This is Bates number 76 to 77.
Do you recognize this document?

A.    I believe I saw this when
meeting with my team yesterday.

Q.    And did you write this
performance evaluation?

A.    I believe I did.



Page 151

W.C. FARIES



Page 152

W.C. FARIES

Q.    Do you know if they agreed with your comments?

A.    I think they would let me know if they objected.

Page 153

W.C. FARIES



Page 155

W.C. FARIES



Would you agree, though, that Ms. Syeed was more of the go-to to cover for other reporters that couldn't attend certain events?

A.    I mean, if there's a gap in our coverage I expect any reporter to be able to jump into it.

Q.    But was it more often than not Nafeesa who did that?

A.    I don't know that I would characterize it that way.

Q.    Okay.

Was any other reporter on your team spread thin across multiple beats besides Nafeesa?

A.    I think every reporter on every team and every editor would say that they were spread thin across a range of issues.

Q.    Including Mr. Wadhams?

A.    Very definitely.  Everybody.



Page 156

W.C. FARIES



Page 166

W.C. FARIES

but we certainly in a very competitive news environment like Washington D.C., we have very high expectation that people will break news with extreme consistency.

W.C. FARIES

MS. CLANCY:  Let's move on to
the next, 2017 interim performance
which is Bates number 87 through 88.

(Whereupon, 2017 Interim
Performance Evaluation was marked as
Plaintiff's Faries Exhibit 13 for
identification as of this date by the
reporter.)

Q.    This is a performance
evaluation that you wrote for Nafeesa?

A.    Do you mind if I -- let me take
a minute to --

Q.    Sure.

A.    -- run through this.

Q.    Of course.

A.    Okay.

Q.    You wrote this, right?

A.    Yes.



Page 176

W.C. FARIES

right?

A.    No.



W.C. FARIES

Q.    Nafeesa, would you agree, had a beat that was not as clear or narrowly defined as the other three men on the team?

MS. BLOOM:  Object to the form of the question.

You could answer.

A.    We are talking about Tony,

W.C. FARIES

A.     Ah-ha.

Q.     -- of Nafeesa Ms. Syeed.

(Whereupon, 2017 year-end performance evaluation was marked as Plaintiff's Faries Exhibit 14 for identification as of this date by the reporter.)

Q.     Are you familiar with 2017 year-end?

A.     I believe I saw this when I was meeting with my team tomorrow -- yesterday.

Q.     Did you prepare this in 2017 or rather going into early 2018?

A.     Yes, this would have been the year-end that I would have -- I would have written and would have given to her in a verbal meeting before the end of February of 2018.



Page 189

W.C. FARIES

chief.

Q.    And this 2017 year-end would have been given to Ms. Syeed in 2018?

A.    Yes.



W.C. FARIES

Page 195

W.C. FARIES



Q.    Were you transparent with Nafeesa in telling her that you believe she lacked confidence, that she needed to jump start her motivation by going to the Middle

Page 196

W.C. FARIES

East to write stories in a fellowship program that she typically would not even be qualified to take?

A.    I would never tell someone that I thought they lacked confidence.  I was quite surprised when Nafeesa approached me and told me that she had already begun the application process for this fellowship.

And she said she needed me to get approval from the company for her to both take the time away from her job and then to publish the stories that she would produce in the role.

And I viewed that as -- I viewed that as a big -- as a big request. I felt like I was going to expend political capital trying to convince managers that it was a worthwhile endeavor and I think I felt like they were going to expend their own political capital if they agreed to it.

It was a highly unusual request and she had started the process of applying for it without consulting me at least at the time.

W.C. FARIES

Q.    Well, she started the process to be part of a fellowship program, would you agree, because she felt that she was qualified as a reporter to participate in such a program, right?

A.    I don't know why she decided that that was a program to apply for.

Q.    Would you agree that someone that lacked confidence would not apply to a program across the world if they didn't think they were qualified to do it?

A.    I don't know what her motivation was.

MS. BLOOM:  I think he might not be done.

Q.    I'm sorry, did I cut you off?

A.    She may have seen it as a parachute out for her, a way for her to do something different, but I can't -- I really can't speak to --

Q.    So, you would be guessing --

MS. BLOOM:  Let him finish.

A.    Yeah, I just really can't speak to why she thought that was the best move

Page 198

W.C. FARIES

for her.

Q.    Well, didn't you just explain that fellowship programs are prestigious in the sense that they are rarely granted to -- unless they are a star reporter?

A.    Typically a reporter who is going to apply for a prestigious fellowship -- I was not familiar with this fellowship at all, but typically a reporter who is doing that would do so after consulting with their managers and saying I think there's this great opportunity, it's going to help me in my coverage area, but it will require time off, travel and, you know, whatever else comes with it.  Usually that is something that is done in conjunction, not something that you surprise your managers with.

Q.    Were you upset with her because you felt she surprised you with this request, that you now had to use your capital with your managers and they did as well to get approval from Reto Gregori?

MS. BLOOM:  Object to the form

Page 199

W.C. FARIES

of the question.

You could answer.

A.    I don't think I was upset with her. I was certainly surprised by the request.

Q.    Did you tell her that you were surprised and that you would have preferred her to go to you first before she started applying?

A.    I believe I told her that I was surprised.

Q.    She could have just withdrawn the application if you did not want to sponsor her, right?

A.    The fact that she had applied told me that it was important to her and, again, I thought maybe this is a way to get her more motivated, more excited about her work here.

Q.    So, you felt at this point, the beginning of 2018, that she was not excited about her work at Bloomberg?

A.    We were concerned about her performance in Bloomberg at this point, for

Page 201

W.C. FARIES

Q.    And did you put that in any type of interim 2018 performance evaluation?

A.    I don't recall the details of the 2018 mid-term -- the 2018 interim and I don't have that in front of me and I don't recall when Nafeesa left if there even was one.

Q.    Did you express to Nafeesa that you felt that there was not some improvement after she came back from the fellowship?

Page 202

W.C. FARIES



**W.C. FARIES**





Page 213

W.C. FARIES

W.C. FARIES





**Page 223**

W.C. FARIES

[REDACTED]

Q.    So, with that conversation with Nafeesa, did she express frustration that she was not considered for that role?

A.    The first time I recall Nafeesa expressing frustration that she wasn't considered for that role was when she pulled me into a conference room to say she was leaving the company.

[REDACTED]

Page 225

W.C. FARIES

Q.    Is it your testimony that Nafeesa had not asked about the UN role before she informed you that she had resigned or was resigning?

MS. BLOOM:  Object to the form of the question.

You could answer.

Q.    Why did you think it was not a priority for the company when Wes was telling you about his idea for the role?



Page 243

W.C. FARIES

Page 265

W.C. FARIES

Q.    If we look at the last compensation statement, Exhibit 18.

(Whereupon, document was marked as Plaintiff's Faries Exhibit 18 for identification as of this date by the reporter.)

Page 266

W.C. FARIES



Page 267

W.C. FARIES



MS. CLANCY:  So, let's just mark this.

(Whereupon, e-mail was marked

Page 273

W.C. FARIES

██████████████████████████████████████

██████████████████████  ████████████████

██████████████████  ████████████

██████████████████████████████████████

████████████████████

████  ██████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████

████  ████████████████████████

██████████████████████████████████████

██████████████████████████████████████

Q.    I understand.

       MS. CLANCY:  Let's mark that.

       (Whereupon, e-mail was marked

   as Plaintiff's Faries Exhibit 21 for

   identification as of this date by the

   reporter.)

Q.    I will show you Exhibit 21.

A.    Okay.

Q.    So, this is Bates number 850.

A.    Ah-ha.

Q.    And do you recall this e-mail?

A.    I saw it when I was meeting

Page 274

W.C. FARIES

with my legal team yesterday.



W.C. FARIES

Q.    Did Nafeesa ever complain to you that people on the team were mistaking her for another female that worked at the bureau?

A.    That people on the team were mistaking -- I don't recall her saying that.  I don't recall ever hearing that someone on the team mistook her for someone not on the team.

Page 315

W.C. FARIES

Q.    When was that?

A.    I don't know the timing of that.

Q.    It was in 2018?

A.    I don't recall the timing of it, 2018.  I would have to look at news events and things to sort of --

Q.    Nafeesa was present for that meeting?

A.    She was -- yeah, she was in the meeting.  It was a few representatives of several different teams in the Washington office who didn't always work together.

Q.    Was it a meeting where everyone was physically present?

A.    No, there were -- some people had dialed into it.

# EXHIBIT H

Appointment

| | |
|---|---|
| **From:** | Whelan, Catherine [cwhelan16@bloomberg.com] |
| **Sent:** | 2/26/2016 1:38:08 PM |
| **To:** | Gordon, Craig [cgordon39@bloomberg.com]; Syeed, Nafeesa [nsyeed@bloomberg.com]; Garry, John [jgarry1@bloomberg.com]; Faries, Bill [wfaries@bloomberg.com] |

| | |
|---|---|
| **Subject:** | Craig phone interview w.Nafeesa Syeed (Foreign Policy Reporter) |
| **Attachments:** | Nafeesa Syeed.doc |
| **Location:** | +971-528647320 |

| | |
|---|---|
| **Start:** | 3/2/2016 1:00:00 PM |
| **End:** | 3/2/2016 1:30:00 PM |
| **Show Time As:** | Busy |

| | |
|---|---|
| **Recurrence:** | (none) |



CONFIDENTIAL

BLP_NS_0000817

# EXHIBIT I

Message

| | |
|---|---|
| **From:** | CRAIG GORDON (9001\|BLOOMBERG/ NEWSROOM:\|190375\|10937331\|\|) [CGORDON39@Bloomberg.net] |
| **on behalf of** | CRAIG GORDON (9001\|BLOOMBERG/ NEWSROOM:\|190375\|10937331\|\|) <CGORDON39@Bloomberg.net> [CGORDON39@Bloomberg.net] |
| **Sent:** | 3/11/2016 1:01:33 PM |
| **To:** | NAFEESA SYEED (9001\|BLOOMBERG/ DUBAI OFF\|30068610\|13165776\|\|) [NSYEED@Bloomberg.net] |
| **Subject:** | Re:Fwd:Appointment Reminder: Craig phone interview w.Nafeesa |

Great calling now.


From: Nafeesa Syeed (BLOOMBERG/ DUBAI OFF) At: Mar 11 2016 07:58:44
To: Craig Gordon (BLOOMBERG/ NEWSROOM: ) Subject: Re:Fwd:Appointment Reminder: Craig
phone interview w.Nafeesa


Hi Craig, yes am here and ready. 202-403-1025. Thanks.

Sent from Bloomberg Professional for Android


From: Craig Gordon (BLOOMBERG/ NEWSROOM:) At: Mar 11 2016 16:54:49
To: Nafeesa Syeed (BLOOMBERG/ DUBAI OFF ) Subject: Re:Fwd:Appointment Reminder: Craig
phone interview w.Nafeesa


Hey there...are you still free to do this?  Will call at 8.

----- Original Message -----
From: CRAIG GORDON (BLOOMBERG/ NEWSROOM:)
At: 11-Mar-2016 07:03:00

This is an appointment reminder. See the attachment for full details.

Subject   : Craig phone interview w.Nafeesa Syeed (Foreign Policy Reporter)

Start Time: Friday, 03/11/2016 8:00 AM

Location  : 202-403-1025



# EXHIBIT J

Message
_____

From:            CRAIG GORDON (9001|BLOOMBERG/ NEWSROOM:|190375|10937331||) [CGORDON39@Bloomberg.net]
on behalf of     CRAIG GORDON (9001|BLOOMBERG/ NEWSROOM:|190375|10937331||) <CGORDON39@Bloomberg.net>
                 [CGORDON39@Bloomberg.net]
Sent:            3/28/2016 9:42:21 PM
To:              TAMIKA ALEXANDER (9001|BLOOMBERG/ 1399 NEW|635807|232147||) [TALEXANDER@Bloomberg.net]; BILL
                 FARIES (9001|BLOOMBERG/ MIAMI OFF|44518|4312022||) [WFARIES@Bloomberg.net]; AUDREY LOBO
                 (9001|BLOOMBERG/ 731 LEX|378583|6392435||) [ALOBO9@Bloomberg.net]
CC:              MARTY SCHENKER (9001|BLOOMBERG/ NEWSROOM:|190375|1199702||) [MSCHENKER@Bloomberg.net]; MEGAN
                 MURPHY (9001|BLOOMBERG/ NEWSROOM:|190375|2903411||) [MMURPHY41@Bloomberg.net]; ALAA SHAHINE
                 (9001|BLOOMBERG/ DUBAI OFF|30068610|6219868||) [ASALHA@Bloomberg.net]
BCC:             ALOBO9 () [alobo9@bloomberg.com]
Subject:         Re: Nafeesa Syeed


Let me add my voice to this. We think Nafeesa is terrific and we are trying to find a
role for her in DC. That is taking a little longer than we had hoped but we are
optimistic. So anything we can do to extend her time within the policy would be greatly
appreciated. cc Marty, Megan
----- Original Message -----
From: AUDREY LOBO (BLOOMBERG/ 731 LEX)
To: TAMIKA ALEXANDER, BILL FARIES
CC: ALAA SHAHINE, RIA DAVEY, CRAIG GORDON
At: 28-Mar-2016 17:03:00

Hi Bill -- I have cc'd Ria on this to confirm the 23 days policy since in the US it
doesn't work that way and ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

Once Ria confirms, Reto, Marty and Heather will have to OK to keep her after Thursday
since she will remain on our headcount if we decide to keep her to the new date and my
understanding was that they were looking at filling that role in the Middle East.

Please correct me if that is not the case.


-- Audrey
Sent from Bloomberg Professional for iPhone


----- Original Message -----
From: BILL FARIES (BLOOMBERG/ MIAMI OFF)
To: AUDREY LOBO, TAMIKA ALEXANDER
CC: CRAIG GORDON, ALAA SHAHINE
At: 28-Mar-2016 14:04:00


Audrey, Tamika: I spoke with Nafeesa Syeed today in Washington. As you know, her
employment with Bloomberg is scheduled to end Thursday, March 31 unless she finds another
role in the newsroom. She is one of the leading candidates for the foreign policy job,
but we may not have a final decision on the job before then.

Nafeesa told me she has 23 unused T days left, which BBG would owe her should she leave.
If that is the case, and to keep our options open a bit longer, could we keep her on
leave while we decide whether she will get the foreign policy spot or another opening in
the company? Seems like that would be easier than losing her Thursday and later on
deciding that we want to keep her on. Happy to discuss -- Bill

PLAINTIFF'S EXHIBIT ALEX 3
6/10/25 WH
PENGAD 800-631-6989

CONFIDENTIAL                                                                    BLP_NS_0001009