UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

NAFEESA SYEED,

       Plaintiff,                    1:24-cv-06101 (GHW) (GWG)

    -against-

BLOOMBERG L.P.,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X


<u>**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

**TABLE OF CONTENTS**

I.     Introduction ....................................................................................................1

II.    Statement of Facts .........................................................................................1

    A.    Plaintiff Joined Bloomberg with an Extensive Professional Background..............1

    B.    In 2016, Bloomberg Denied Plaintiff a Promotion to a Foreign Policy Reporter Position in Favor of a White Male ........................................................2

    C.    Plaintiff Performed Well in Bloomberg's Washington, DC Bureau ......................2

    D.    In 2018, Bloomberg Denied Plaintiff Another Promotion, Now to a New York Position Covering the U.N./Foreign Policy, in Favor of Another White Male ........................................................................................................4

    E.    Shortly After, Plaintiff Formally Complained and Resigned from Bloomberg ....................................................................................................5

III.   Legal Standard................................................................................................6

    A.    NYSHRL Employs a Burden-Shifting Framework................................................7

    B.    NYCHRL Provides a More Plaintiff-Friendly Standard ........................................9

IV.   Argument.......................................................................................................10

    A.    Plaintiff's NYSHRL Claim Survives Summary Judgment ...................................11

        1.    Plaintiff has shown a prima facie case of discrimination .........................12

        2.    Plaintiff shows genuine issues of material fact in the record regarding Defendant's "legitimate non-discriminatory reasons" .............20

        3.    Plaintiff's circumstantial evidence shows discriminatory animus ...........23

    B.    Plaintiff's NYCHRL Discrimination Claim Independently Survives Summary Judgment ........................................................................................27

    C.    Plaintiff's Damages Claims Survive Summary Judgment ...................................30

        1.    Damages for discrimination can continue after Plaintiff's departure from the discriminating workplace..........................................................30

        2.    Defendant cannot establish that Plaintiff indisputably failed in her duty to mitigate..................................................................................34

V.    Conclusion....................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Dep't of Pub. Safety*,
764 F.3d 244 (2d Cir. 2014) ........................................................................................22

*Alonzo v. Chase Manhattan Bank, N.A.*,
70 F. Supp. 2d 395 (S.D.N.Y. 1999) ...........................................................................35

*Anderson v. N.Y.C. Health & Hosps. Corp.*,
2020 WL 2866960 (S.D.N.Y. Mar. 2, 2020)........................................................15, 23

*Banks v. Gen. Motors, LLC*,
81 F.4th 242 (2d Cir. 2023) ..........................................................................................23

*Bart v. Golub Corp.*,
96 F.4th 566 (2d Cir. 2024) ....................................................................................22, 23

*Byrnie v. Town of Cromwell, Board of Education*,
243 F.3d 93 (2d Cir. 2001) ...........................................................................................22

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .........................................................................................................6

*Chambers v. TRM Copy Ctrs. Corp.*,
43 F.3d 29 (2d Cir. 1994) ................................................................................................7

*Cronin v. Aetna Life Ins. Co.*,
46 F.3d 196 (2d Cir. 1995) ............................................................................................23

*Cross v. N.Y.C. Transit Auth.*,
417 F.3d 241 (2d Cir. 2005) ..........................................................................................20

*Cruz v. Coach Stores, Inc.*,
202 F.3d 560 (2d Cir. 2000) ............................................................................................8

*de la Cruz v. N.Y.C. Hum. Res. Admin. Dep't of Soc. Servs.*,
82 F.3d 16 (2d Cir. 1996) .....................................................................................8, 18, 19

*Dennis v. Columbia Colleton Med. Ctr.*,
290 F.3d 639 (4th Cir. 2002) .........................................................................................31

*Di Salvo v. Chamber of Com. of Greater Kansas City*,
568 F.2d 593 (8th Cir. 1978) ...................................................................................30, 31

*E.E.O.C. v. Bloomberg L.P.*,
   29 F. Supp. 3d 334 (S.D.N.Y. 2014) ....................................................................33

*Edelman v. NYU Langone Health Sys.*,
   2022 WL 4537972 (S.D.N.Y. Sept. 28, 2022) ...............................................29, 30

*Ellis v. Century 21 Dep't Stores*,
   975 F. Supp. 2d 244 (E.D.N.Y. 2013) ................................................................12

*Fed. Deposit Ins. Corp. v. Murex LLC*,
   500 F. Supp. 3d 76 (S.D.N.Y. 2020) ..................................................................21

*Ferrando-Dehtiar v. Anesthesia Grp. of Albany*,
   727 F. Supp. 3d 165 (N.D.N.Y. 2024) ................................................................25

*Garrison v. Am. Sugar Refining, Inc.*,
   789 F. Supp. 3d 291 (S.D.N.Y. 2025) ................................................................15

*Gomez v. Pellicone*,
   986 F. Supp. 220 (S.D.N.Y. 1997) .......................................................................8

*Gordon v. N.Y.C. Bd. of Educ.*,
   232 F.3d 111 (2d Cir.2000) ...................................................................................9

*Green v. Harris Publ'ns, Inc.*,
   331 F. Supp. 2d 180 (S.D.N.Y. 2004) ............................................................18, 19

*Greenway v. Buffalo Hilton Hotel*,
   143 F.3d 47 (2d Cir. 1998) .....................................................................34, 35, 36

*Grimes-Jenkins v. Consol. Edison Co. of N.Y., Inc.*,
   2021 WL 1226658 (S.D.N.Y. Mar. 31, 2021) ...................................................29

*In Re Guo*,
   965 F.3d 96 (2d Cir. 2020), *as amended* (July 9, 2020) .....................................31

*Guzman v. City of New York*,
   93 F. Supp. 3d 248 (S.D.N.Y. 2015) ....................................................................7

*Hawkins v. 1115 Legal Serv. Care*,
   163 F.3d 684 (2d Cir. 1998) .................................................................................35

*Hoag v. Fallsburg Cent. Sch. Dist.*,
   279 F. Supp. 3d 465 (S.D.N.Y. 2017) ................................................................15

*Holcomb v. Iona Coll.*,
   521 F.3d 130 (2d Cir. 2008) .................................................................................22

*Jain v. Tokio Marine Mgmt. Inc.*,
    2018 WL 4636842 (S.D.N.Y. Sept. 27, 2018) .................................................................... 18, 24

*Johnson v. Killian*,
    680 F.3d 234 (2d Cir. 2012) ........................................................................................... 7

*Littlejohn v. City of New York*,
    795 F.3d 297 (2d Cir. 2015) ........................................................................................ 8, 19

*Loeffler v. Staten Island Univ. Hosp.*,
    582 F.3d 268 (2d Cir. 2009) ........................................................................................... 9

*Mader v. United States*,
    654 F.3d 794 (8th Cir. 2011) ....................................................................................... 30

*Makinen v. City of New York*,
    86 N.E.3d 514 (N.Y. 2017) ........................................................................................... 9

*Maney v. Brinkley Mun. Waterworks & Sewer Dep't*,
    802 F.2d 1073 (8th Cir. 1986) .................................................................................... 30

*Martinez v. Staten Island Univ. Hosp.*,
    814 F. Supp. 3d 380 (E.D.N.Y. 2026) ....................................................................... 9, 10

*McDonnell Douglas Corp. v. Green*.
    411 U.S. 792 (1973) ........................................................................................... *passim*

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
    715 F.3d 102 (2d Cir. 2013) ....................................................................... 9, 10, 28, 29

*Miller v. N.Y. State Police*,
    2022 WL 1133010 (2d Cir. Apr. 18, 2022) ................................................................ 7

*Moll v. Telesector Res. Grp., Inc.*,
    94 F.4th 218 (2d Cir. 2024) .......................................................................................... 7

*Nobler v. Beth Israel Med. Ctr.*,
    715 F. Supp. 570 (S.D.N.Y. 1989) .......................................................................... 32, 33

*Nofal v. IMCMV Times Square LLC*,
    2024 WL 1138928 (S.D.N.Y. Mar. 15, 2024) ........................................................... 10

*Patel v. City of New York*,
    2016 WL 6820943 (S.D.N.Y. Sept. 29, 2016) ........................................................... 22

*Petrosino v. Bell Atl.*,
    385 F.3d 210 (2d Cir. 2004) ...................................................................................... 13, 14

*Rackley v. Constellis, LLC*,
  2024 WL 3498718 (S.D.N.Y. June 17, 2024) ...........................................................13

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ...........................................................20

*Reichman v. City of New York*,
  117 N.Y.S.3d 280 (App. Div. 2020)...........................................................10

*Rosen v. Thornburgh*,
  928 F.2d 528 (2d Cir. 1991) ...........................................................8, 18, 23

*Sangster v. United Air Lines, Inc.*,
  438 F. Supp. 1221 (N.D. Cal. 1977)...........................................................31, 32

*Slattery v. Swiss Reinsurance Am. Corp.*,
  248 F.3d 87 (2d Cir. 2001), *as amended* (June 6, 2001) ...........................................................17

*St. Mary's Honor Ctr. v. Hicks*,
  509 U.S. 502 (1993) ...........................................................8

*Sweeney v. Rsch. Found. of State Univ. of N.Y.*,
  711 F.2d 1179 (2d Cir. 1983) ...........................................................18

*Thorne v. City of El Segundo*,
  802 F.2d 1131 (9th Cir. 1986) ...........................................................32

*Townsend v. Exch. Ins. Co.*,
  196 F. Supp. 2d 300 (W.D.N.Y. 2002)...........................................................33

*Tse v. UBS Fin. Servs., Inc.*,
  568 F. Supp. 2d 274 (S.D.N.Y. 2008) ...........................................................30, 33

*Uttarwar v. Lazard Asset Mgmt. LLC*,
  2025 WL 704278 (2d Cir. Mar. 5, 2025) ...........................................................10

*Vega v. Hempstead Union Free Sch. Dist.*,
  801 F.3d 72 (2d Cir. 2015) ...........................................................7

*Walsh v. N.Y.C. Hous. Auth.*,
  828 F.3d 70 (2d Cir. 2016) ...........................................................22

*Walsh v. Scarsdale Union Free Sch. Dist.*,
  2019 WL 6789581 (S.D.N.Y. Dec. 12, 2019)...........................................................34, 35, 36

*Wells v. N.C. Bd. of Alcoholic Control*,
  714 F.2d 340 (4th Cir. 1983)...........................................................31

v

*Wheeler v. Praxair Surface Techs., Inc.*,
  694 F. Supp. 3d 432 (S.D.N.Y. 2023) ........................................................................8, 9, 18, 23

*Woodman v. WWOR-TV, Inc.*,
  411 F.3d 69 (2d Cir. 2005) ....................................................................................................8, 9

*Zann Kwan v. Andalex Grp. LLC*,
  737 F.3d 834 (2d Cir. 2013) ....................................................................................................20, 21

*Zimmermann v. Assocs. First Cap. Corp.*,
  251 F.3d 376 (2d Cir. 2001) ....................................................................................................20

**Statutes**

N.Y.C Local Law No. 85 (2005) ..............................................................................................9

New York City Human Rights Law § 8-107 *et seq*. ..................................................................1

New York State Human Rights Law §§ 290-301 *et seq.* ...........................................................1

**Other Authorities**

Ramona L. Paetzold & Rafael Gely, *Through the Looking Glass: Can Title VII
  Help Women and Minorities Shatter the Glass Ceiling?*, 31 Hous. L. Rev.
  1517 (1995) ............................................................................................................................26

## I.      INTRODUCTION

Plaintiff Nafeesa Syeed ("Plaintiff"), a South Asian American female, brings claims of discrimination on the basis of sex and race in violation of the New York State Human Rights Law §§ 290-301 *et seq.* ("NYSHRL"), and New York City Human Rights Law § 8-107 *et seq.* ("NYCHRL") based on Defendant Bloomberg, L.P.'s ("Defendant" or "Bloomberg" or "BLP") 2018 failure to promote her into a New York foreign policy reporting position. As the record reflects, Bloomberg knew of Plaintiff's qualifications for and interest in this assignment. Its proffered reasons for not promoting Plaintiff are pretextual. Because the record presents genuine triable issues of material fact under both the NYSHRL and NYCHRL, Defendant's motion for summary judgment, Dkt. 79; *see also* Dkt. 80 ("MSJ"), should be denied.

## II.     STATEMENT OF FACTS

### A.      <u>**Plaintiff Joined Bloomberg with an Extensive Professional Background**</u>

Plaintiff is a South Asian American female. Plaintiff's Statement of Additional Material Facts ("SOAMF") ¶ 1. Prior to working at Bloomberg, Plaintiff already possessed approximately 11 years of foreign policy reporting experience at outlets including USA Today, The Associated Press, and Al Jazeera America. *Id.* ¶¶ 5-6, 14. She earned her Bachelor of Arts, Magna Cum Laude, from Georgetown University in 2004, where she double majored in Arabic and Government. *Id.* ¶ 3. In 2006, she also earned a Master of Arts in Comparative Literature with distinction in Modern Arabic and South Asian languages from the School of Oriental and African Studies at the University of London. *Id.* ¶ 4.

After beginning applying to positions with the organization two years prior, Plaintiff commenced employment at Bloomberg on October 19, 2014 as a Gulf Politics and Economy Correspondent, reporting from Bloomberg's Dubai bureau. *Id.* ¶ 7. In Dubai, Plaintiff covered major regional conflicts, including Yemen, Syria and ISIS, and she built an extensive database of

political and economic analyst sources across the Middle East, North Africa, and South Asia. *Id.* ¶¶ 9-10, 17-19.

**B.    In 2016, Bloomberg Denied Plaintiff a Promotion to a Foreign Policy Reporter Position in Favor of a White Male**

In November 2015, during a visit to the New York bureau, Plaintiff formally expressed interest to senior leadership in a United Nations (U.N.) Reporter position and other foreign policy roles. *Id.* ¶ 11. In February 2016, Plaintiff applied for a U.S. foreign policy reporter position in Washington, DC, and was interviewed by Washington, DC Bureau Chief Craig Gordon. *Id.* ¶¶ 12, 20. In March 2016, Plaintiff relocated to the United States with Mr. Gordon's support; he wrote, "We think Nafeesa is terrific and we are trying to find a role for her in D.C." *Id.* ¶¶ 21-22. Thereafter, on March 28, 2016, National Security Team Leader William ("Bill") Faries identified Plaintiff as one of the "leading candidates" for the foreign policy role. *Id.* ¶¶ 23-24.

Despite Plaintiff's relevant experience in Dubai and academic background, the high-profile State Department/Foreign Policy role was given to Nick Wadhams, a white male. *Id.* ¶ 25. Instead of promoting Plaintiff to this position, it was announced on April 7, 2016 that Plaintiff would be covering the intersection of technology, national security, and foreign policy, focusing on cybersecurity, intelligence, and national defense. *Id.* ¶¶ 23, 26. This "beat" was "ill defined" and served to "hamstring" her career by preventing her from developing deep sourcing in a single institution. *Id.* ¶ 27. Moreover, Plaintiff was excluded from meetings with high-profile sources on her beat, forced to have a white male colleague accompany her to interviews she had personally secured, and denied access to secure communication tools needed for her job. *Id.* ¶¶ 30-31.

**C.    Plaintiff Performed Well in Bloomberg's Washington, DC Bureau**

In Plaintiff's 2016 Year-End Performance Evaluation, Mr. Faries noted that Plaintiff was "immediately thrown into an entirely new beat" where she was successful in "boosting [BLP's]

2

cybersecurity coverage." *Id.* ¶ 33. The review stated, "We've learned we can in a pinch ask [Plaintiff] to cover a range of events and issues for us on short notice and she always delivered." *Id.* ¶ 34. Mr. Faries credited Plaintiff with having "quickly built up an impressive coterie of sources" and noted her work on cabinet nominations and election hacking made her the "go-to person on [the] team." *Id.* ¶ 35.

In Plaintiff's 2017 interim performance evaluation, Mr. Faries described Plaintiff as a "valuable, flexible team member." *Id.* ¶ 36. Plaintiff's 2017 interim performance evaluation described her as having the "closest and most frequent contacts to the intelligence community" in the bureau and noted her "well-recognized ability to build sources across a range of fields." *Id.* ¶ 37. Plaintiff's 2017 interim performance evaluation noted she provided critical "missing links" to high-profile stories from both Washington and the Middle East. *Id.* ¶ 38.

In Plaintiff's 2017 year-end performance evaluation, Mr. Faries admitted that editors bore "blame" for having Plaintiff "spread too thin across a range of beats," which hindered her ability to score scoops. *Id.* ¶ 39. Despite being "spread too thin across a range of beats," Mr. Faries wrote in Plaintiff's Year-End Review that Plaintiff "had a good year, juggling sometimes competing demands . . . frequently becoming our go-to reporter on breaking news" in major agencies like the Pentagon and the Department of Homeland Security. *Id.* ¶ 40. Plaintiff's 2017 annual performance evaluation noted that Plaintiff had "considerable under-utilized potential to be an even better journalist" and that management intended to "remove some of the hurdles," such as being spread too thin, that had hindered her. *Id.* ¶ 45.

Despite BLP-created obstacles, Plaintiff received 100% of her performance-based target bonus for 2017 and was also granted a rare journalism fellowship in Jordan, where she produced "two excellent pieces" regarding the conflict in Yemen. *Id.* ¶¶ 43-44.

3

**D.**    **In 2018, Bloomberg Denied Plaintiff Another Promotion, Now to a New York Position Covering the U.N./Foreign Policy, in Favor of Another White Male**

In 2018, a male reporter stationed in BLP's New York office, Kambiz Foroohar, left his U.N. beat, creating a vacancy. RSOMF ¶ 34. Internal Bloomberg emails confirm that on January 10, 2018, Senior Editor Roz Mathieson advocated for David Wainer, a white male then-based in a BLP bureau abroad, to be moved to New York for a future U.N. reporter role to "keep and groom" him. SOAMF ¶ 50. In late January/early February 2018, Mr. Faries met with Plaintiff to discuss "raising her profile" and asked what she wanted to cover. *Id.* ¶ 51. Plaintiff stated Middle East foreign policy from Washington, an idea Mr. Faries initially approved. *Id.*. However, in or around February/March 2018, Mr. Faries later informed Plaintiff that Washington, DC Bureau Chief Mr. Gordon no longer wanted Plaintiff doing anything related to the Middle East or foreign policy. *Id.* ¶ 63.

In or around March 2018, Plaintiff learned that Mr. Foroohar was leaving his New York U.N. reporter beat, so Plaintiff immediately expressed her interest in the vacant role to Mr. Faries and other Bloomberg leadership. *Id.* ¶ 52. Mr. Faries told Plaintiff he "didn't believe [Bloomberg] [was] going to fill that role again." *Id.* ¶ 54. Yet, Bloomberg internal emails confirm that on March 27, 2018, management formally proposed moving Mr. Wainer into the equivalent of the U.N. role. *Id.* ¶ 55. Plaintiff was not considered or interviewed for the position. *Id.* ¶ 58. Between March and June 2018, Plaintiff repeatedly inquired about the U.N. assignment but did not learn that Mr. Wainer had been appointed until late May or early June 2018. *Id.* ¶ 65.

Plaintiff was more qualified than Mr. Wainer for a role in New York reporting on the U.N. She held a Master's degree in Comparative Literature, with a focus on Modern Arabic and South Asian languages, from the School of Oriental and African Studies at the University of London. *Id.* ¶¶ 4, 59. In contrast, Mr. Wainer lacked a Master's degree. *Id.*. Plaintiff's specialized academic

4

training in the languages and politics of the regions she intended to cover—specifically the Middle East and South Asia—made her a stronger candidate for a foreign policy-focused role like the U.N. beat. *Id.* ¶ 60. Moreover, she had more reporting experience. When Plaintiff was already reporting overseas for USA Today, covering the Iraq War protests in 2003, Mr. Wainer was still in high school. *Id.* ¶ 62.

Mr. Wainer's International Relocation Agreement was approved in early June 2018, providing for his compensation in the New York U.N. reporter role with all expenses paid by Bloomberg. *Id.* ¶ 66. The Agreement confirms Mr. Wainer's salary and targeted bonus was ▮▮▮▮▮ higher than Plaintiff's compensation in her then-current role. *Id.* ¶¶ 66, 26.

**E.        Shortly After, Plaintiff Formally Complained and Resigned from Bloomberg**

On June 5, 2018, Plaintiff met with Mike Shepard, then-Managing Editor of the Washington, DC bureau, to express her concerns about being passed over for the New York U.N. role afforded to Mr. Wainer. *Id.* ¶ 68. Mr. Shepard told her Bloomberg "wanted to make the New York job a diversity slot, but it didn't really work out that way." *Id.* ¶ 69. Plaintiff shared she felt she had no future at Bloomberg due to the sexist and racial disparate treatment she experienced. RSOMF ¶¶ 64, 70. Plaintiff also raised the issue that Bloomberg did not employ any women of color in senior roles in the Washington, DC bureau. SOAMF ¶ 68.

On June 6, 2018, Plaintiff met with the Washington, DC lead HR representative Tamika Alexander to report discrimination based on race, age, and gender, as well as issues with her beat and career development. *Id.* ¶¶ 71-74. Plaintiff specifically reported Mr. Shepard's comment that the New York role was not a "diversity slot." *Id.* ¶ 75.

Plaintiff formally resigned from Bloomberg on June 8, 2018. *Id.* ¶ 80. In her exit survey, Plaintiff cited numerous examples of sex-, race-. and age-based discrimination to which she was personally subjected and which she witnessed during her employment at Bloomberg. *Id.* ¶¶ 83-93.

5

For example, she was repeatedly mistaken for another South Asian woman. *Id.* ¶¶ 86-87. And she observed senior leaders mocking people of color and concerns about workplace discrimination. *Id.* ¶¶ 88-89. She listed failure to promote her as the primary reasons for her resignation and described the discriminatory environment she faced. *Id.* ¶ 84. That same day, Plaintiff informed her male supervisors of her resignation. RSOMF ¶ 71. Mr. Shepard was surprised, despite Plaintiff sharing all her experiences with discrimination with him previously. *Id.* ¶ 72. Plaintiff has suffered economic, emotional distress, and reputational damages as a result of her treatment at Bloomberg. SOAMF ¶ 13.

Ms. Alexander reached out to Bloomberg leadership and Plaintiff's managers as a result of Plaintiff's resignation. *Id.* ¶¶ 94, 100, 105-06, 113, 117. In internal Bloomberg emails, Ms. Alexander candidly admitted that "there is some truth to [Plaintiff's] comments" and noted that the handling of the Wainer/U.N. role was the understandable "breaking point" for Plaintiff. *Id.* ¶¶ 96-98. Ms. Alexander continued, "[t]he 'diversity slot' comment made things worse because [Plaintiff] interpreted that to mean [her managers] were only keeping her to check off a diversity box." *Id.* ¶ 103. Thereafter, Bloomberg determined it needed, and conducted, mandatory microaggression training specifically for the Washington, DC bureau to address the issues Plaintiff raised. *Id.* ¶¶ 114, 122.

After leaving Bloomberg, Plaintiff spent the next three years advancing her career by working on a book and pursuing a variety of journalism jobs and freelance assignments. *Id.* ¶¶ 123-30. She was hired by the Los Angeles (L.A.) Times as an editor in 2021 and went on to serve as a lecturer and research scholar at Yale University starting in 2024. *Id.* ¶¶ 131-32.

## III.    LEGAL STANDARD

Summary judgment is proper only when "there is no genuine dispute as to any material fact and that [defendant is] entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986) (referencing Fed. R. Civ. P. 56(c)). There is a genuine dispute if a "reasonable jury could return a verdict for the nonmovant." *Miller v. N.Y. State Police*, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022). The Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought" to determine if there exists a genuine dispute as to a material fact. *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

In discrimination cases, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare"; therefore, "the court must scrutinize affidavits and depositions carefully for circumstantial evidence that, if credited by the factfinder, could reasonably be interpreted as showing discrimination." *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 228 (2d Cir. 2024); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015) (noting that "clever men may easily conceal their motivations," so courts should be cautious about granting summary judgment in employment discrimination cases). The elements of Plaintiff's state and municipal discrimination claims differ, as set forth next.

### A.    NYSHRL Employs a Burden-Shifting Framework

Discrimination claims under the NYSHRL are analyzed under the Title VII burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792 (1973); *see also Guzman v. City of New York*, 93 F. Supp. 3d 248, 256 (S.D.N.Y. 2015). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Guzman*, 93 F. Supp. 3d at 256. In the

7

employment context, the burden of establishing a prima facie case is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

Failure to promote is a "paradigmatic adverse employment action." *Wheeler v. Praxair Surface Techs., Inc.*, 694 F. Supp. 3d 432, 456 (S.D.N.Y. 2023). To establish a prima facie failure to promote claim, a plaintiff must show that (1) she is a member of a protected class, (2) she applied for an available position, (3) she was qualified for the position, and (4) she was rejected under circumstances that give rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 (2d Cir. 2000); *de la Cruz v. N.Y.C. Hum. Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir. 1996). Because employers rarely leave a "smoking gun" of discrimination, a plaintiff can show an inference of discrimination through direct, indirect, or circumstantial evidence, *see Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991), or from "the more favorable treatment of employees not in the protected group," *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). Additionally, "[a]n inference of discrimination may arise if the position remains open and the employer continues to seek applicants of the plaintiff's qualifications, . . . *or if the position was filled by someone not a member of plaintiff's protected class*."[1] *Gomez v. Pellicone*, 986 F. Supp. 220, 228 (S.D.N.Y. 1997) (citing and adding emphasis to *McDonnell Douglas*, 411 U.S. at 802, and *de la Cruz*, 82 F.3d at 20).

Once a prima facie case is established, there is a presumption of unlawful discrimination that requires the defendant to articulate a "legitimate, non-discriminatory reason" for the employee's rejection. *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005). Once the

---

[1] Defendants ignore well established law that an inference of discrimination can be found "if the position was filled by someone not a member of plaintiff's protected class," attempting to heighten Plaintiff's burden beyond what the law requires. *See* MSJ at 11-12.

defendant sets forth its reasons, the plaintiff must demonstrate that the employer's reasons are a "pretext for discrimination." *Id.* A plaintiff is "not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that a prohibited factor was at least one of the 'motivating' factors" for the actions. *Wheeler*, 694 F. Supp. at 456 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)); *cf. Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000) ("It is . . . now settled that a plaintiff in a Title VII action need not disprove a defendant's proffered rationale for its adverse actions in order to prevail.").

### B.     NYCHRL Provides a More Plaintiff-Friendly Standard

Discrimination claims brought under the NYCHRL "must be analyzed separately and independently from federal and state discrimination claims" following the passage of New York City's Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005) ("Restoration Act"). *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013) (citing Restoration Act § 1). The Restoration Act "explicitly requires" that the NYCHRL be subject to an "independent liberal construction analysis in *all circumstances*" given its "uniquely broad and remedial purposes, which go beyond those of counterpart State or federal civil rights laws." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (citing to, with modifications and added emphasis, *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 31 (App. Div. 2009)). Similarly worded provisions of federal and state civil rights may be used to aid in the interpretation of the NYCHRL, but they cannot serve as a "a ceiling above which the local law cannot rise." *Makinen v. City of New York*, 86 N.E.3d 514, 519 (N.Y. 2017) (citing Restoration Act § 1); *see also Martinez v. Staten Island Univ. Hosp.*, 814 F. Supp. 3d 380, 402 (E.D.N.Y. 2026).

Under the NYCHRL, courts "apply the *McDonnell Douglas* framework with a mixed

9

motive standard to discrimination claims," imposing a lesser burden on plaintiffs. *Martinez*, 814 F. Supp. 3d at 402 (E.D.N.Y. 2026) (citing *McCarthy v. Motorola Sols. Inc.*, 2025 WL 2482247, at *3 (E.D.N.Y. Aug. 28, 2025)); *see also Uttarwar v. Lazard Asset Mgmt. LLC*, 2025 WL 704278, at *2 (2d Cir. Mar. 5, 2025) (applying the *McDonnell Douglas* framework with mixed motive standard). Dismissing a claim under the NYCHRL at summary judgment should occur "only if *no jury* could find [the] defendant liable under *any* of the evidentiary routes—*McDonnell Douglas*, mixed motive, direct evidence, or some combination." *Reichman v. City of New York*, 117 N.Y.S.3d 280, 285 (App. Div. 2020) (emphases added) (citing *Sanderson-Burgess v. City of New York*, 102 N.Y.S.3d 678, 680 (App. Div. 2019)). Thus, a plaintiff may defeat summary judgment by coming forward "with evidence that discrimination was one of the motivating factors for the defendant's conduct." *Martinez*, 814 F. Supp. 3d at 402 (citing *Wright v. White Plains Hosp. Med. Ctr.*, 232 N.Y.S.3d 594, 597-98 (App. Div. 2025)). "This allows the plaintiff to rebut the employer's legitimate reasons by establishing that the action was motivated at least in part by . . . discrimination rather than requiring the plaintiff to prove that the reason proffered by the employer was actually false or entirely irrelevant." *Uttarwar*, 2025 WL 704278, at *2 (citing with modifications *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 41 (App. Div. 2012)).

Under this "forgiving standard of the NYCHRL," even a "single comment . . . may be actionable" if it amounts to more than "'a petty slight [or trivial inconveniences]' based on the totality of the circumstances." *Nofal v. IMCMV Times Square LLC*, 2024 WL 1138928, at *4 (S.D.N.Y. Mar. 15, 2024) (citing *Mihalik*, 715 F.3d at 111). Plaintiff need *only* show that "she has been treated *less well* than other employees because of her gender." *Mihalik*, 715 F.3d at 110 (citing to, with added emphasis, *Williams*, 872 N.Y.S.2d at 39).

## IV.    ARGUMENT

Summary judgment is improper on both Plaintiff's NYSHRL and NYCHRL discrimination

10

claims, as well as her pursuit of damages.

### A.    Plaintiff's NYSHRL Claim Survives Summary Judgment

Plaintiff has produced ample evidence that raises genuine issues of triable fact that: she has established a prima facie case of discrimination due to BLP's refusal to promote her to a New York U.N. reporter position, and that Defendant's proffered reasons were mere pretext.

First, documents and testimony confirm that when it became known to BLP that its New York-based U.N Reporter, Kambiz Foroohar, would be leaving his position, Defendant took that slot, tweaked the job description somewhat, kept it based in New York covering the U.N. (along with a broader portfolio of foreign policy and international stories), and filled the job with a white male, David Wainer. Plaintiff's Response to Defendant's Statement of Material Facts ("RSOMF") ¶¶ 34, 40-42, 45; SOAMF ¶¶ 55, 65. However, BLP now takes the position that this job was simply eliminated, despite internal Bloomberg emails confirming that Defendant intended on filling the role with Mr. Wainer since as early as January 2018. RSOMF ¶¶ 34-37, 51; SOAMF ¶¶ 50, 55.

Second, neither when Plaintiff expressed interest in the vacancy in March 2018 (when she learned it was vacant due to Mr. Foroohar's departure), nor when she followed up with her managers in spring 2018, nor when Plaintiff spoke to her managers after learning that a white male had been afforded the position she sought, did Defendant *ever* tell Plaintiff that the position had actually been eliminated. RSOMF ¶¶ 60, 62, 64-67; SOAMF ¶¶ 52-54, 67-70.

Third, what one of Plaintiff's managers *did* contemporaneously tell her was that "we thought about making [the U.N. role] a diversity slot, but it didn't work out"; this comment implied that Plaintiff would only be considered for "diversity slots" and would not be considered for positions where a white man was in contention. SOAMF ¶¶ 69, 75, 92, 103, 110. Fourth, the hiring of Mr. Wainer over Plaintiff was part of a pattern of treating her less well than her similarly-situated white and/or male reporters. RSOMF ¶ 47; SOAMF ¶¶ 27-29, 31-32, 50, 53 62, 86-87,

91. Fifth, BLP's HR employee, Tamika Alexander, responded to Plaintiff's internal complaint of discrimination by acknowledging to the relevant managers that there was "some truth" to Plaintiff's allegations, and suggesting that personnel should receive training on unconscious bias and microaggressions. SOAMF ¶¶ 96-100, 111-12. On this record, summary judgment on the NYSHRL claim must be denied.

### 1.       Plaintiff has shown a prima facie case of discrimination

Plaintiff has more than satisfied the minimal requirements of establishing a prima facie case under the NYSHRL. Defendants do not dispute that Plaintiff, as a South Asian American woman, is a member of a protected class on the basis of her race and sex. Plaintiff sought an available position through her early and continuous expression of interest in foreign policy beats in New York and her explicit request to be considered for the U.N. reporting vacancy. RSOMF ¶¶ 59, 60, 68; SOAMF ¶¶ 11-12, 51-52, 65. Plaintiff was qualified for the role through her extensive education and work experience, and the growth potential identified by her editors. RSOMF ¶¶ 1, 3, 10, 16, 18, 20, 26, 40, 42, 59; SOAMF ¶¶ 13-19, 22, 33-38, 39-45, 59-62. Finally, Plaintiff has evidence that gives rise to inferences of discrimination: the position was filled by someone outside her protected class, and the selection of Mr. Wainer over Plaintiff's repeated expressions of interest reflects a more favorable treatment of an employee not in Plaintiff's protected group. RSOMF ¶¶ 37, 45, 47, 51-54, 56, 59, 60, 76; SOAMF ¶¶ 1, 50, 52-53, 65.

### a.       Plaintiff applied for the available U.N. reporter role

For failure to promote claims, "a plaintiff's informal notification to her supervisors of her interest in the position is sufficient where the '(1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer.'" *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 267 (E.D.N.Y. 2013) (citing *Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d

Cir. 2004)); *Rackley v. Constellis, LLC*, 2024 WL 3498718, at *11 (S.D.N.Y. June 17, 2024), *report and recommendation adopted as modified*, 2024 WL 3824108 (S.D.N.Y. Aug. 14, 2024) (denying summary judgment because the plaintiff applied informally by asking a supervisor to be considered before the position was filled). As early as 2015, Plaintiff began expressing her interest to her managers and senior editors in any open positions covering foreign policy the United Nations. SOAMF ¶ 11. Managing editors knew of her interest, as the record reflects that Plaintiff was a finalist for a D.C.-based foreign policy position in 2016, which was ultimately given to a white male, Nick Wadhams. *Id.* ¶¶ 12, 20, 22-25. While in Washington, DC, Plaintiff repeatedly told leadership that she wanted to work on foreign policy and Middle East-related stories. RSOMF ¶¶ 59-60, 66; SOAMF ¶¶ 51-52, 65. As soon as former New York-based U.N. Reporter Foroohar left his position in March 2018, Plaintiff told her supervisor, Mr. Faries, of her interest in this New York-based role. RSOMF ¶ 60; SOAMF ¶ 52. Throughout March and April of 2018, Plaintiff inquired multiple times into the U.N. reporter job, and Mr. Faries deflected up until Spring 2018, when plaintiff learned through the grapevine that the position was filled by Mr. Wainer; she then explicitly asked her managers about that decision. RSOMF ¶¶ 63, 64; SOAMF ¶ 65, 67-68.

Plaintiff applied for the U.N. reporting job under the informal application standard in *Petrosino*. 385 F.3d at 227. As in *Rackley*, the Plaintiff informed her editors that she was interested in the specific position before the U.N. reporting role was filled. RSOMF ¶¶ 59-60; SOMF ¶¶ 52-53, 65. To be sure, Mr. Gordon said he ███████████████████████████████ ████████████████████████████ SOAMF ¶ 82 (emphasis added)); *see Rackley*, 2024 WL 3498718, at *11. Defendant never formally posted the U.N. reporter vacancy on their internal website, SOAMF ¶ 56, and the record reflects that Defendant did not always post positions, *id.* ¶ 57. Rather, at times, employees applied and were selected for jobs through informal

13

conversations with supervisors. *See id.* ¶¶ 50, 55, 57, 65; *see* RSOMF ¶¶ 37, 47, 51; *see also*

*Petrosino*, 385 F.3d at 227 (finding that formal application was unnecessary when employees

applied to jobs "by speaking informally with supervisors; and that [Defendant] managers often

groomed favored candidates for specific managerial positions"). Indeed, an informal application—

an expression of interest and conversations between editors grooming Mr. Wainer for the

position—is precisely how Mr. Wainer received the U.N. reporting work, demonstrating it was a

process endorsed by the Defendant. *See* RSOMF ¶¶ 35-37, 47, 51-54; SOAMF ¶¶ 50, 55, 65-66;

MSJ at 6, 7. Mr. Wainer's application was even less formal than Plaintiff's: he had only expressed

interest in relocating to the United States; he had not requested the specific U.N.-based position.

*Compare* RSOMF ¶¶ 37, 47, *with* RSOMF ¶ 59; SOAMF ¶¶ 52, 65, 82;. Because Plaintiff applied

through the same informal procedures that Defendant endorsed, she applied for the U.N. reporter

assignment.

> b.    *The U.N. reporter position was not Eliminated; it was filled by*
> *David Wainer*

Defendant's characterization of the U.N. reporter position as "eliminated" is a narrative

contradicted by Defendant's own documents and filings. In March 2018, Defendant believed that

the U.N. reporter job scope needed to expand, but, in Defendant's own words, "[r]eporting on the

U.N. itself would be one component of this reporter's job," and the U.N. would serve as a

"'listening post' for the reporter to identify and inform foreign policy and national security news

outside of the U.N." RSOMF ¶¶ 38, 41-42, 51. The role continued to be a New York-based,

foreign-policy reporting job with connections to the U.N. and its impact on broader foreign policy.

*Id.* ¶¶ 40-42, 45, 51; SOAMF ¶ 55. Expanding the scope of a role is not the same as eliminating it.

The same "headcount" associated with the U.N. reporter position under Mr. Foroohar was carried

over to the position filled by Mr. Wainer. RSOMF ¶¶ 45, 51, 53. Mr. Wainer, in the role, would

14

go on to win the Elizabeth Neuffer Gold Medal in 2019 for "best print journalism at the UN"—an unlikely honor for a reporter whose role supposedly did not involve a significant amount of U.N. coverage. SOAMF ¶ 66. The role's continued existence is supported by Ms. Alexander's acknowledgement that Plaintiff's breaking point was "the Wainer *role*." *Id.* ¶ 98 (emphasis added; identifying a specific role, and *not* a redistribution of duties).

Courts have found a position is "eliminated" only when its responsibilities are fully distributed or the position is "completely eliminated." *E.g.*, *Hoag v. Fallsburg Cent. Sch. Dist.*, 279 F. Supp. 3d 465, 477 (S.D.N.Y. 2017). Neither scenario occurred with the U.N. reporter position, and so Defendant's own cases, MSJ at 13-14, are inapposite. In *Garrison v. American Sugar Refining, Inc.*, the Court found a position eliminated when a laboratory distributed a Senior Tech's responsibilities amongst existing, lower-level positions and a new lower-level lab tech. 789 F. Supp. 3d 291, 308 (S.D.N.Y. 2025). The new lab tech was not a one-to-one replacement. *Id.* Similarly, in *Anderson v. New York City Health & Hospitals Corp.*, the Court found a supervisor role was eliminated when all its supervisory responsibilities were "delegated to existing supervisors." 2020 WL 2866960, at \*14 (S.D.N.Y. Mar. 2, 2020), *report and recommendation adopted*, 2020 WL 1528101 (S.D.N.Y. Mar. 31, 2020). Here, the opposite happened. Unlike in *Garrison*, there was a one-to-one replacement between Mr. Foroohar and Mr. Wainer; unlike in *Anderson*, the U.N. reporter's responsibilities were not distributed among existing New York reporters. Instead, Mr. Wainer was brought in to take over the role in its entirety, with its expanded scope. *See* RSOMF ¶ 53 (Senior Executive Editor Wes Kosova confirmed that the move was "headcount neutral," indicating that Mr. Wainer was stepping directly into the vacancy created by the previous reporter's departure to "fill big holes" in coverage, rather than those responsibilities being absorbed by the existing team); SOAMF ¶¶ 55, 66.

15

Furthermore, Defendant's own reactions to Plaintiff after the position was filled reveal the U.N. reporter job was not eliminated. When Plaintiff asked *Mr. Faries* why she was not considered for the role, he did not tell her that the role had been eliminated. *See* SOAMF ¶ 67. Rather, he implied that she should have advocated for herself—ignoring Plaintiff's ongoing self-advocacy. *Id.* ¶¶ 65, 67. When Plaintiff asked *Mr. Shepard* why she was not considered for the role, he likewise did not tell her that the role had been eliminated. *See id.* ¶¶ 68-70; RSOMF ¶ 64. Like Mr. Faries, Mr. Shepard similarly told Plaintiff to advocate for herself, adding that Defendant had considered making the New York role a "diversity slot" but it "didn't work out that way." SOAMF ¶¶ 68-70, 92, 103, 110, 115-16; RSOMF ¶ 64.

To the extent that facts are undisputed, it is undisputed that the U.N. reporter position was *not* eliminated, but simply had its duties expanded. Defendant's attempt to argue it was eliminated and responsibilities delegated to existing positions *is* unsupported. While Defendant tried to imply that Mr. Wainer was doing his same job as previously, just transferring to a new location, the documents are quite clear that the authorization for "headcount" for this position came from the U.N. reporter assignment, not Mr. Wainer's prior post. RSOMF ¶¶ 45, 51, 53 (Mr. Kosova wrote: "[Wainer] will take Kambiz's head and we will hire to replace [Wainer] in Tel Aviv or Jerusalem," confirming that Mr. Wainer's original headcount remained in Israel to be filled by a new hire, while Mr. Wainer utilized the slot vacated by Mr. Foroohar in New York). The record reflects that the U.N. reporter position existed at the time Plaintiff informally applied for the role, and it was filled by Mr. Wainer during Plaintiff's employment. Moreover, the fact that Mr. Kosova advised that making these moves was "headcount neutral" further supports that Mr. Wainer was sliding into an existing vacancy rather than bringing a new headcount with him. *Id.* ¶ 53. At minimum, genuine issues of material fact on the status of the role preclude summary judgment.

16

Defendant contends that because it began considering changes to the U.N. reporter role before Plaintiff applied, it could not have discriminated against her. MSJ at 15. This argument turns on re-writing Plaintiff's complaint. Plaintiff has not complained about expanding the scope of the job responsibilities and would have been equally interested in the U.N. reporter job had she been made aware of the purported tweaks in the scope of responsibility. SOAMF ¶ 52. Plaintiff expressed interest in foreign policy positions in New York as early as 2015. SOAMF ¶ 11; RSOMF ¶ 59. And she did so again in 2016 whilst in Dubai and Washington, DC, only to be passed over for a foreign policy reporter role in favor of Mr. Wadhams; she continued to express interest in foreign policy positions thereafter—in particular, those in New York, including the U.N. reporter role in March 2018. RSOMF ¶¶ 59-60; SOAMF ¶¶ 11-12, 20, 23-26, 40-41-, 51-52, 65. The role was not filled and finalized until late May or early June 2018, which would have allowed ample time for Defendant to consider Plaintiff for the role. RSOMF ¶¶ 63; SOAMF ¶¶ 65-66.

      c.     *Plaintiff's years of experience and education qualified her for the position*

To demonstrate qualifications for a role, a "plaintiff must show only that [she] 'possesses the basic skills necessary for performance of [the] job.'" *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001), *as amended* (June 6, 2001). Plaintiff is more than qualified with her Georgetown Bachelor of Arts, double majoring in Arabic and Government, University of London Master's in Comparative Literature with distinction in Modern Arabic and South Asian languages, and more than 16 years of experience as a journalist as of 2018, with almost four years of relevant reporting at Bloomberg. RSOMF ¶ 81; SOAMF ¶¶ 2-10, 14-19, 33-38, 41-43. In 2016, she had been one of the top candidates for a foreign policy position based in Washington, DC. SOAMF ¶¶ 20, 23-24. Though Defendant tries to imply that Plaintiff had areas of improvement by mentioning feedback she received, MSJ at 4-5, BLP does not, and cannot, argue that Plaintiff

17

was unqualified for the U.N. reporter job. Defendant even acknowledges that Plaintiff was the "go-to person" on the team with positive performance evaluations and "under-utilized potential." MSJ at 5; RSOMF ¶¶ 10, 14, 16; SOAMF ¶¶ 35, 45. With her considerable experience, Plaintiff had more than the basic skills necessary to qualify for the U.N. reporter role.

At minimum, genuine issues of fact exist in the record as to whether Plaintiff was a more qualified candidate. Unlike Plaintiff, Mr. Wainer lacked a Master's degree. SOAMF ¶ 59. He did not have Plaintiff's specialized academic training in the languages and politics of the region that Plaintiff sought to cover. *Id.* ¶¶ 59, 60. And Mr. Wainer was still in high school in 2003 when Plaintiff was reporting overseas for USA Today, covering Iraq war protests. *Id.* ¶ 62.

> d.    *Plaintiff was rejected for a role that went to a white, male employee showing inferences of discrimination.*

If a position is filled by an employee who is not a member of the plaintiff's protected class, that creates an inference of discrimination.[2] *Green v. Harris Publ'ns, Inc.*, 331 F. Supp. 2d 180, 187 (S.D.N.Y. 2004); *see de la Cruz*, 82 F.3d at 20 (Puerto Rican man replaced by a Black woman satisfied the fourth prong of a prima facie case); *Sweeney v. Rsch. Found. of State Univ. of N.Y.*, 711 F.2d 1179, 1185 (2d Cir. 1983) (same for a woman denied positions that were then filled by men); *Jain v. Tokio Marine Mgmt. Inc.*, 2018 WL 4636842, at *5 (S.D.N.Y. Sept. 27, 2018) (same for an Indian man who was passed over promotion in favor of a white man). Plaintiff is a South Asian American woman; the U.N. reporter position was filled by Mr. Wainer, a white male.

---

[2] Defendant mischaracterizes *Wheeler* to imply that to prove an inference of discrimination a plaintiff must "point to any writings or statements by the decisionmakers indicative of racial bias." MSJ at 16 (quoting *Wheeler*, 694 F. Supp. 3d at 457). This is not a requirement since employers rarely document their discriminatory intent so explicitly. *See Rosen*, 928 F.2d at 533. In *Wheeler*, the position plaintiff sought was never filled, so the plaintiff could not draw an inference from someone outside the protected class receiving the job, and the court noted the plaintiff was unable to provide *any* circumstantial or indirect evidence of discrimination. *See Wheeler,* 694 F. Supp. 3d at 458-59. In contrast, the U.N. reporter job *was* filled by a non-protected class member, and Plaintiff has ample circumstantial evidence of discrimination.

SOAMF ¶¶ 1, 50, 65. Because Mr. Wainer is not a member of the plaintiff's protected class, an inference of discrimination has been established.

Mr. Wainer also received "more favorable treatment" than Plaintiff, which gives rise to further inference of discrimination. *See Littlejohn*, 795 F.3d at 312. Plaintiff had "under-utilized potential" just as Defendant believed Mr. Wainer had "high potential." RSOMF ¶¶ 14, 16, 37; SOAMF ¶ 45; MSJ at 5, 7. Yet, Defendant chose to single out Mr. Wainer for the U.N. reporter work because he wanted to work in the United States while gaining international experience. RSOMF ¶¶ 37, 47-48; SOAMF ¶¶ 50, 55. Defendant's treatment of Mr. Wainer is in stark contrast to Defendant's ignoring Plaintiff's repeated requests to work on foreign policy stories and to be considered for the same position. SOAMF ¶¶ 51, 58, 60, 63-65. Defendant also gave priority to Mr. Wainer's request for a job that was more geographically convenient for "personal reasons," RSOMF ¶ 47, but Defendant did not give Plaintiff priority when she wanted to be in New York to be in a place more geographically convenient for her family, SOAMF ¶ 53. Additional evidence proving more favorable treatment can be found in comparing their respective compensation. Both Plaintiff, in 2016, and Mr. Wainer, in 2018, were reporters stationed overseas who expressed an interest in moving to a state-side position. RSOMF ¶¶ 47, 58; SOAMF ¶¶ 11, 21. Mr. Wainer's relocation agreement shows his salary and targeted bonus were ▉▉▉▉ higher than Plaintiff's compensation in her then-current role. *Compare* SOAMF ¶ 66, *with* SOAMF ¶ 26.

Plaintiff applied to the U.N. reporter role, for which she was qualified; instead, someone who was outside her protected class received the role creating an inference of discrimination. *See, e.g., Green*, 331 F. Supp. 2d at 187; *de la Cruz*, 82 F.3d at 20. Plaintiff has thus established her prima facie case of discrimination under the NYSHRL.

19

2. Plaintiff shows genuine issues of material fact in the record regarding Defendant's "legitimate non-discriminatory reasons"

a. *Defendant's claim that it "eliminated" the U.N. reporter position is demonstrably false*

To establish that a defendant's proffered reasons are pretextual, a plaintiff may offer "[p]roof that the defendant's explanation is unworthy of credence," from which "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 249-50 (2d Cir. 2005). A prima facie case with evidence "that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.

Defendant's main proffered reason why Plaintiff did not get the New York U.N. reporting beat is because the assignment was eliminated. *See* MSJ at 14-15, 17. However, Plaintiff has set forth triable evidence that the position was *not* eliminated, meaning that Defendant's reason is "unworthy of credence." *See supra* Section IV.A.1.b. A jury could reasonably infer that Defendant created this reason to hide discriminatory treatment. *See, e.g.*, *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 382-83 (2d Cir. 2001) (upholding jury's verdict for the plaintiff since she had ample evidence that the defendant's non-discriminatory reason for firing her was false).

b. *Defendant's justifications are shifting and inconsistent*

From "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate . . . reasons for its action," a "reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (finding that a juror could infer pretext from inconsistent and shifting explanations for an employee's termination).

Defendant's explanations for why Plaintiff was not considered for the U.N. work are

inconsistent and shifting. First, BLP claims the role had to be eliminated for financial reasons. *See* MSJ at 7. *But see supra* Section IV.A.1.b. Second, it argues that Mr. Wainer needed a job in the United States for "personal reasons," as well as a role that would give him "international experience." MSJ at 7; RSOMF ¶ 47. Third, BLP asserts that Mr. Kosova was the decisionmaker and had nothing to do with the Plaintiff. MSJ at 15-16, 18. Fourth, and finally, Defendant implies that Plaintiff was not as qualified as Mr. Wainer and only if she had credentials "so superior" would Plaintiff be able to show pretext. *See id.* at 18-19 (quoting *Patel v. City of New York*, 2016 WL 6820943, at *6-7 (S.D.N.Y. Sept. 29, 2016)). The constantly shifting reasons are sufficient for a reasonable juror to conclude that the offered explanations are pretext for discrimination. *See Zann Kwan*, 737 F.3d at 846.

Plus, these issues are rife with disputed facts. Defendant now claims Mr. Kosova was the sole decisionmaker[3]; but several instances in the record indicate that more editors were involved. Mr. Kosova was not included on all the email discussions about the U.N. reporter job, suggesting that there were other decisionmakers. SOAMF ¶ 50; RSOMF ¶ 55. On emails with other editors discussing the U.N. role, Mr. Kosova shares his preference for Mr. Wainer to fill the role, but says "if ok with you," and also asking, "Cool with you?" RSOMF ¶¶ 51, 53. These statements could lead a jury to infer that other decisionmakers had to sign off on the selection of Wainer.

---

[3] Defendant has produced records and depositions that show multiple employees weighed in on the decision to have Mr. Wainer take over the U.N. reporter role, SOAMF ¶¶ 50, 69; RSOMF ¶¶ 51, 53, 55, and that the role's scope was expanded, not eliminated, SOAMF ¶ 55; RSOMF ¶¶ 38, 40-42, 51. Nearly a year later, Defendant attempts to change the record with a new declaration, Dkt. 83, claiming that Mr. Kosova was the sole decisionmaker who purportedly decided to "eliminate the position." *See, e.g.*, MSJ at 7, 15-16. The Court should reject Defendant's attempt to resolve issues of material fact with a last-minute declaration which contradicts the record gathered in discovery. *Cf. Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 95 (S.D.N.Y. 2020) (the sham affidavit doctrine "applies to sham affidavits offered to procure judgment for the offering party"). At a minimum, questions of Mr. Kosova's credibility emerge, which are better resolved at a later stage.

Furthermore, when Plaintiff talked to Mr. Shepard about the role being filled, he responded, "*We wanted to make the New York job a diversity slot, but it really didn't work out,*" again indicating that multiple people were involved in the decision-making process. SOAMF ¶ 69 (emphasis added). That Mr. Shepard now denies making this statement is itself a dispute of fact. *See* SOAMF ¶¶ 75, 92, 103, 110. In any event, Plaintiff can still succeed on claims if an "individual shown to have the impermissible bias played a meaningful role in the . . . process," even if that person was not the ultimate decisionmaker. *Holcomb*, 521 F.3d at 143 (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999)); *see Bart v. Golub Corp.*, 96 F.4th 566, 578 (2d Cir. 2024) (finding summary judgment inappropriate where the bias of one decisionmaker might have "infected" the employment decision), *cert. denied sub nom. Golub Corp. v. Bart*, 145 S. Ct. 173 (2024). Because there is conflicting information in the record, genuine issues of material fact exist, and summary judgment cannot follow.

Defendant's contentions about Plaintiff's qualifications and reliance on *Anderson* and *Patel* for the proposition that a plaintiff's credentials must be "so superior" that no reasonable person would pass over her for a job to show pretext, MSJ at 18-19, is also misplaced. The idea deriving from *Byrnie v. Town of Cromwell, Board of Education* is inapplicable here. 243 F.3d 93, 103 (2d Cir. 2001). *Byrnie* does not apply where "a case [is] about more than mere 'discrepancy in qualifications.'" *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 253-54 (2d Cir. 2014); *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 78 (2d Cir. 2016) (explaining that under *Byrnie*, qualification discrepancy on its own does not create a material issue of fact, but a discrepancy is not stripped of all probative value). Plaintiff is not simply arguing she was discriminated against because a candidate with arguably less journalism experience and fewer educational qualifications was hired. She alleges discrimination because: a less-qualified candidate was hired, *see supra* Section

22

IV.A.1.c.; her advocacy and application were ignored, *see supra* Section IV.A.1.a.; she was told the position was not a "diversity slot," *see* Section IV.A.3 *infra*; Defendant has been shifting its explanation for the decision, *see* Section IV.A.2.b *supra*; *and* she experienced other acts of bias during her employment under the same management, *see* Section IV.A.3 *infra*. The difference in qualifications is just one piece of circumstantial evidence that, with other evidence, raises a genuine dispute if the proffered reasons for passing over the Plaintiff were pretextual. *Anderson* recognizes that "it is not the Court's role to second-guess an employer's business decisions." 2020 WL 2866960, at *13. But evidence that "the decision not to hire the plaintiff was infected by discriminatory animus" elevates the decision beyond a choice merely about business. *Id.*

### 3. Plaintiff's circumstantial evidence shows discriminatory animus

The Second Circuit recently confirmed that in the third step of the *McDonnell Douglas* analysis, to meet the "pretext" burden, a plaintiff need only present "admissible evidence showing circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole *or in part* on discrimination." *Bart*, 96 F.4th at 576 (2d Cir. 2024) (citing to, with modifications and added emphasis, *Walsh*, 828 F.3d at 75); *see also Wheeler*, 694 F. Supp. 3d at 456 (plaintiff simply must show that the employer's reasons "were not the only reasons and that a prohibited factor was at least one of the 'motivating' factors"). A plaintiff can put forward additional evidence, but the burden "may often be carried by reliance on the evidence comprising the prima facie case." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). A plaintiff may survive summary judgment by assembling "bits and pieces" of information that together create a "mosaic of intentional discrimination." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023); *see Rosen*, 928 F.2d at 533. Here, Plaintiff has gathered sufficient evidence that would allow a reasonable jury to conclude that Defendant's failure to promote her was the result of race and sex discrimination.

23

At the outset, Mr. Shepard's statement to Plaintiff that, "We wanted to make the New York job a diversity slot, but it didn't really work out that way," implies that since the role was not for "diverse" candidates, Plaintiff was not considered. SOAMF ¶¶ 69, 75, 92, 103, 110. A reasonable jury could conclude that Mr. Shepard's statement reveals how Plaintiff's race and sex played a role in Defendant's decision. Furthermore, Mr. Shepard's comment that the New York position was not a "diversity slot," in direct response to Plaintiff's question of why she was not considered, reveals that Defendant's reasons for excluding Plaintiff were pretextual.

*Jain v. Tokio Marine Management* is instructive on such comments. 2018 WL 4636842. In *Jain*, the plaintiff, an Indian man, in being denied a promotion in favor of a white man, was told by a supervisor that he was not "the right cultural fit." *Id.* at *3. The employer claimed the plaintiff did not have the right qualifications. *Id.* at *5. Though it was "just one remark," the court found summary judgment inappropriate because the remark about culture, "even when isolated, could be enough to create a reasonable question of fact for a jury" that the plaintiff was discriminated against because of his race, not because of his qualifications. *Id.* at *7 (citing *Abrams*, 764 F.3d at 253). Similarly, Plaintiff was denied a promotion in favor of a white man and was told it was because the role was not a "diversity slot." Just as in *Jain*, a reasonable jury could conclude that Mr. Shepard's "diversity slot" comment creates a triable question of fact that the Defendant's reasons were pretext.

Additionally, the record shows "bits and pieces" of discrimination throughout Plaintiff's tenure. Plaintiff had previously been passed over for a foreign policy reporter position in 2016 in favor of a white male, despite being a top candidate. SOAMF ¶¶ 23-25. Plaintiff's team was composed entirely of men who received their preferred beats and positions. *Id.* ¶¶ 28-29; RSOMF ¶ 64. Defendant's own HR department acknowledged issues of discrimination against the Plaintiff:

24

when Plaintiff told Ms. Alexander about some of Plaintiff's experiences with racism and sexism, Ms. Alexander said that she "was not surprised by all the things that [Plaintiff] told her." SOAMF ¶¶ 71-77. In circulating Plaintiff's exit survey, which discussed issues of racism and sexism in the workplace, Ms. Alexander admitted, "Sadly, there is some truth to her comments." SOAMF ¶¶ 83-92, 95-97; RSOMF ¶ 73. Further, HR recognized the need for "micro-aggression training for managers" or "an unconscious bias refresher for managers . . . given some of the comments" directed at Plaintiff. SOAMF ¶ 112. Craig Gordon, the Washington, DC Bureau Chief, even acknowledged that he ███████████████████████████████████████████ ███████████████████████████ SOAMF ¶ 82. The record shows evidence that Defendant knew there was a problem of discrimination and admitted as much. RSOMF ¶ 73; SOAMF ¶¶ 77, 87, 95-97. Any proffered reasons cannot trump this acknowledgement of discriminatory animus at summary judgment.

The record also shows that Plaintiff had told editors and supervisors she wanted a foreign policy position in New York—a role for which she was qualified. RSOMF ¶¶ 59-61; SOAMF ¶¶ 11-13, 51-53, 65. The facts are consistent with and parallel to *Ferrando-Dehtiar v. Anesthesia Group of Albany*, where the Court denied summary judgment on the plaintiff's Title VII and NYSHRL failure to promote claims. 727 F. Supp. 3d 165, 185 (N.D.N.Y. 2024). In *Ferrando-Dehtiar*, the plaintiff, a woman, was passed over for a partnership promotion in favor of a man. *Id.* at 183. In evaluating the last step of the *McDonnell Douglas* framework, the Court found there were material questions of fact whether discrimination played a role since the record reflected that members of the board knew that plaintiff wanted to become a partner and had informally discussed it, and the plaintiff was qualified to fill the position. *Id.* The "limited but persuasive direct evidence" combined with the lack of female partners was proof "a reasonable jury could use to

25

infer that anti-female discrimination was at play." *Id.* at 184. Both in *Ferrando-Dehtiar* and in this case, women were passed over for men, where the women had informally expressed interest in specific positions for which they were qualified, and where they offered some persuasive direct evidence (here, the "diversity slot" comment). Like *Ferrando-Dehtiar*, Defendant's assertions of "undisputed" facts are insufficient to overcome Plaintiff's evidence of pretext.

Finally, Defendant seems to think that evidence of some managers supporting Plaintiff in some areas of her work negates any possible discrimination. *See* MSJ at 16-17. But Defendant wanting to keep Plaintiff in her particular role while refusing to promote her is not inconsistent with discrimination. There is a term for this behavior: the "glass ceiling." Ramona L. Paetzold & Rafael Gely, *Through the Looking Glass: Can Title VII Help Women and Minorities Shatter the Glass Ceiling?*, 31 Hous. L. Rev. 1517, 1519 (1995) ("This glass ceiling is a barrier that prevents women and minorities from moving to high level managerial positions of power and authority within organizations."). Defendants cite no failure to promote case to support its contention, which does nothing to contradict the inferences of discrimination here. Indeed, that Plaintiff's managers did not want her to leave Bloomberg only serves to undermine Defendant's attempt to suggest that Plaintiff was not a valuable, successful employee. *See* RSOMF ¶ 74.

The evidence taken together shows, or at least raises triable disputes about whether, Plaintiff was passed over for a promotion in favor of a less-qualified white male and was told the position was not a "diversity slot," while Defendant subsequently concocted a transparently false explanation about the position being eliminated. From these circumstances, a reasonable jury could easily infer discrimination. Plaintiff has shown her prima facie case and has rebutted Defendant's proffered reasons as pretext, giving rise to genuine issues of material fact. Summary judgment on the NYSHRL claim should be denied.

26

**B.**    **Plaintiff's NYCHRL Discrimination Claim Independently Survives Summary Judgment**

Plaintiff's NYCHRL claim independently survives summary judgment under the mixed motive standard. Construing the evidence in its totality, a jury could reasonably find that Plaintiff was treated less well because of her gender and race, and Defendant's conduct amounted to more than petty slights or trivial inconveniences for Plaintiff. During her employment in the Washington, DC bureau, Plaintiff observed a pattern of racist and sexist remarks by supervisors. Defendant "cultivated" an environment where male employees would openly make disparaging comments about Asian-American women and female reporters in general and with respect to their skills in the newsroom. SOAMF ¶ 46. Plaintiff's managers Mr. Faries and Larry Liebert commented that █████████████████████████████████████████████████████████ *Id.* ¶ 47 Two Bloomberg White House reporters referred to ███████████████████

███████████████████████████████████████████████

████████ *Id.* ¶ 48. On other occasions, Plaintiff heard editors, including her managers, speak disparagingly about ████████████████████████████████████████

████████████ *Id.* ¶ 49. Supervisors and senior editors at Bloomberg also made light of efforts to create a more inclusive workplace by "joking about microaggressions" and "unconscious bias training." *Id.* ¶¶ 88-89.

Plaintiff experienced differential treatment regarding opportunities and benefits because of her gender and race. After not being considered for the U.N. New York role or other potential foreign policy reporting positions in New York, she met with Mr. Shepard, the Managing Editor, to understand why. *Id.* ¶ 68; RSOMF ¶ 64. Mr. Shepard told her that the hiring team "wanted to make [the U.N. position] a diversity slot but it didn't really work out that way," effectively designating such a position to white males and reducing the opportunity to be considered for

27

women and people of color. SOAMF ¶¶ 69, 92, 103. He then discusse ▮▮▮▮▮▮▮▮ a female editor who wrote a long memo about an area that she felt Bloomberg should cover, and through that, was able to create the team she was leading. *Id.* ¶¶ 67, 70. Mr. Shepard told Plaintiff that she should look to ▮▮▮▮▮▮ as an example, signaling that "*women . . . have to justify their promotion and hiring . . . as opposed to being considered for roles.*" *Id.* ¶ 70 (emphasis added). Defendant also did not give Plaintiff access to secure communication tools needed to maintain confidentiality of her sources and therefore effectively do her job, while granting such tools to favored male members of the newsroom. *Id.* ¶¶ 31-32. When she raised that two security reporters ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ both had access to burner phones and other type of encrypted communication devices for their jobs, both Mr. Shepard and Mr. Faries "dismissed [her] and said, [t]hey need that; you don't need this kind of thing." *Id.* ¶ 32. These comments came while Plaintiff's managers asked her, as a reporter, to find sources in the CIA and the FBI. *Id.* ¶ 31.

The Head of D.C. Human Resources, Tamika Alexander, acknowledged that there was truth to the Plaintiff's comments. *Id.* ¶ 97. Ms. Alexander was aware of Bloomberg's systemic gender-based and racial-based discrimination and "was not surprised by all the things that [Plaintiff] told her." *Id.* ¶ 77. She explained to Plaintiff that management was "likely attempting to cover themselves" by asking about her ambitions after failing to consider her for the U.N. position. *Id.*

Courts have denied summary judgment on NYCHRL discrimination claims in analogous circumstances. In *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, the court denied summary judgment for the defendant-employer on the plaintiff-employee's gender discrimination claim because genuine dispute of material fact existed as to whether the plaintiff was treated less well than her male colleagues because of her gender, and as to whether the challenged conduct

28

involved more than petty slights or trivial inconveniences. 715 F.3d at 113-15. In so holding, the decision acknowledged that the defendant's demeaning and sexually charged conduct constituted more than petty slights or trivial inconveniences and subjected the plaintiff to a different set of employment conditions than her male colleagues. *Id.* The court also noted that the plaintiff's alleged poor performance would not excuse the defendant's alleged sexual advances and demeaning behavior under an NYCHRL discrimination claim. *Id.*

Similarly, in *Grimes-Jenkins v. Consolidated Edison Co. of New York, Inc.*, the court denied summary judgment because the record raised triable issues of fact as to whether the plaintiff was treated less well because of her gender. *Grimes-Jenkins*, 2021 WL 1226658, at *8 (S.D.N.Y. Mar. 31, 2021). To survive summary judgment, the court noted that plaintiff "need only adduce evidence of 'the existence of unwanted gender-based conduct.'" *Id.* (citing *Williams*, 872 N.Y.S.2d at 38). The plaintiff testified that her supervisors "made sexual comments about her body in the presence of others" and about "her not wanting a job because of her family and children." *Grimes-Jenkins*, 2021 WL 1226658, at *8. Moreover, the defendant "enforced a dress code that prohibited dresses, open-toed shoes, and other 'girly stuff.'" *Id.* The court acknowledged that such comments by plaintiff's supervisors "could unlawfully 'signal views about the role of women in the workplace.'" *Id.* (citing *Mihalik*, 715 F.3d at 111).

Further, even in circumstances where the court has granted summary judgment on other parts of a plaintiff's NYCHRL discrimination claim related to alleged adverse employment actions, it has denied summary judgment when the claim is based on allegedly sexist remarks. *Edelman v. NYU Langone Health System* is illustrative. 2022 WL 4537972 (S.D.N.Y. Sept. 28, 2022). In *Edelman*, the court denied summary judgment on a part of the plaintiff's NYCHRL discrimination claim "because a reasonable jury could find based on several insensitive remarks

that [d]efendants treated [p]laintiff less well because of her sex." *Id.* at *14. Specifically, defendants often reprimanded the plaintiff during work, called her a "bitch," and told her to "smile more" at work. *Id.* at *8, *14. The court, construing the evidence in its totality, concluded that "a jury could reasonably find [the defendants'] behavior constituted more than 'petty slights or trivial inconveniences' and that it was sexually-charged conduct that subjected [the plaintiff] to a different set of employment conditions than her male colleagues." *Id.* at *14.

Accordingly, summary judgment should be denied on Plaintiff's NYCHRL discrimination claim under the mixed motive standard. Triable issues of fact remain as to whether discrimination was one of the motivating factors in Defendant's differential conduct towards Plaintiff.

### C.    Plaintiff's Damages Claims Survive Summary Judgment

####    1.    Damages for discrimination can continue after Plaintiff's departure from the discriminating workplace

There is no dispute that Plaintiff does not bring a constructive discharge claim, and that the Second Circuit has *not* adopted a rule precluding the award of damages for the time period following a worker's voluntary departure from a defendant's employ. MSJ at 22-23. Bloomberg's request that this Court adopt a rule that the Second Circuit has not adopted is not well reasoned.[4]

---

[4] Defendant overstates the rulings of other circuits, asserting that the Third, Fifth, Seventh, Eighth, Tenth, and D.C. Circuits have adopted a rule precluding post-departure back pay absent termination or constructive discharge. MSJ at 23. However, that claim is supported only by the cases collected in *Tse v. UBS Financial Services, Inc.*, 568 F. Supp. 2d 274, 300 (S.D.N.Y. 2008), which cites cases from the Fifth, Eighth, and Tenth Circuits) and cites in the MSJ from the Third and D.C. Circuits. Nothing is cited in support of the Seventh Circuit having adopted this rule. Further, while the Eighth Circuit is listed based on *Tse*'s citation to *Maney v. Brinkley Municipal Waterworks & Sewer Department*, 802 F.2d 1073, 1075 (8th Cir. 1986), an earlier Eighth Circuit decision ruled to the contrary, *Di Salvo v. Chamber of Commerce of Greater Kansas City*, 568 F.2d 593, 598 (8th Cir. 1978) (in pay discrimination case, permitting collection of back pay until pay was equalized, even after plaintiff voluntarily left defendant's employ). The later decision cannot overturn the earlier ruling absent an *en banc* consideration. *Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) ("[W]hen faced with conflicting panel opinions, the earliest opinion

Defendant asserts the Fourth Circuit is the only court of appeals to reject the "strict rule" on constructive discharge. MSJ at 23 n.10. Not so. The Fourth, Eighth, and Ninth Circuits all have held that there is no automatic cut off of lost wages based on voluntary departure. The Fourth Circuit has an explicit rule that does not consider a voluntary departure and evaluates only what plaintiff did to mitigate damages. *See Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639, 651-52 (4th Cir. 2002) (where plaintiff voluntarily quit immediately after being denied promotion, only question was whether she acted reasonably to mitigate); *Wells v. N.C. Bd. of Alcoholic Control*, 714 F.2d 340, 342 (4th Cir. 1983) (affirming an award of post-termination damages, without a finding of constructive discharge, where the employee who was wrongfully denied a promotion later developed a disabling condition that prevented him from remaining in his original job classification). The Eighth Circuit focused solely on the reasonableness of mitigation in awarding lost wages to a plaintiff in a pay discrimination case, even after she voluntarily quit. *Di Salvo*, 568 F.2d at 598.[5] The Ninth Circuit affirmed a decision similar to the Fourth Circuit in *Sangster v. United Air Lines, Inc.*, which kept the focus on mitigation efforts and did not adopt a requirement that plaintiff remain with defendant. 438 F. Supp. 1221, 1230 (N.D. Cal. 1977), *aff'd*, 633 F.2d 864 (9th Cir. 1980). The alternative, the court noted, would mean an "employee would be constrained either to contribute by his labor to an employer who has treated him unfairly and who persists in that unfair treatment, or to take less than a whole remedy for injuries suffered." *Id.* That would be particularly inequitable given that cases could take several years to resolve, forcing plaintiff to remain employed in an unfair position or forgo relief, either of which would frustrate

---

must be followed."); *In Re Guo*, 965 F.3d 96, 105 (2d Cir. 2020), *as amended* (July 9, 2020) (same). Thus, the Eighth Circuit also rejects the rule that BLP advocates for.

[5] As explained above at n.3, this earlier Eighth Circuit ruling controls over the one relied upon by Bloomberg.

31

Title VII's purposes. *Id.* The Ninth Circuit's subsequent decision in *Thorne v. City of El Segundo* focused on the materially different position plaintiff sought (moving from a clerk to an officer position in a police department), and characterized the circumstances as closer to a refusal to hire than to a promotion. 802 F.2d 1131, 1134-35 (9th Cir. 1986). Nonetheless, the court found the "relevant inquiry to be whether the plaintiff had mitigated her damages by actively seeking employment following her resignation from the job with the discriminatory employer." *Id.* And while noting that workers "should not quit at the first sign of institutional discrimination," the court did nothing to try to overrule or reject the earlier ruling in *Sangster*. *Id.*

As Defendant acknowledges, several decisions within the Second Circuit follow suit in recognizing that the duty to mitigate does not always require remaining employed under discriminatory conditions. MSJ at 24 (citing *Nobler v. Beth Israel Med. Ctr.*, 715 F. Supp. 570, 573-74 (S.D.N.Y. 1989); *E.E.O.C. v. Bloomberg L.P.*, 29 F. Supp. 3d 334, 341-45 (S.D.N.Y. 2014); *Townsend v. Exch. Ins. Co.*, 196 F. Supp. 2d 300, 309-10 (W.D.N.Y. 2002); *Tulino v. Ali,* 2019 WL 1447134 (S.D.N.Y. Feb. 27, 2019), *aff'd sub nom.*, *Tulino v. City of New York*, 813 F. App'x (2d Cir. 2020); *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274 (S.D.N.Y. 2008)).

BLP asserts the exception only applies if the promotion that was denied was "unique" or when plaintiff "faced a permanent obstacle to career advancement." MSJ at 24. This reads the cases far too narrowly. While some did involve a unique position, *e.g.*, *Nobler*, 715 F. Supp. at 573-74 (plaintiff had been working towards becoming Director of Radiation Therapy, and another doctor was chosen; plaintiff had no prospect of becoming the department head had he stayed with that employer, since there was only one director at a time), the principle is not limited to specific sets of facts. The *Nobler* court noted that the strict rule BLP advocates "would, in the context of this case, contradict the goal of making a plaintiff, who had no hope of ameliorating his situation

32

with his employer, whole." *Id.* at 574. *Townsend v. Exchange Insurance Co.* recognized that the *Nobler* circumstances fell within the broader rule that courts have permitted awards of back pay following voluntary departures where "recognized opportunities for career advancement are closed off by reason of [the employer's] discrimination." 196 F. Supp. 2d at 309. In *Townsend*, there had been three team leader positions, but the employer reduced that figure to two positions, demoting plaintiff and closing off career advancement, regardless of how many positions there were. *Id.* at 310. *Tse* and *Bloomberg* similarly identified a broader rule rather than requiring a unique position, while finding the standard not satisfied on the facts before them. *Tse*, 568 F. Supp. 2d at 300-04; *Bloomberg*, 29 F. Supp. 3d at 341-42. *Tse* recognizes that when the defendant-employer's discriminatory conduct "effectively placed a permanent 'obstacle in the career progression of'" plaintiff, that remaining with that employer is not required. 568 F. Supp. 2d at 303. *Bloomberg* emphasized that the NYCHRL requirement of liberal interpretation gave added weight to the general rule that resignation does not categorically bar backpay, but rather requires case by case evaluation of mitigation. 29 F. Supp. 3d at 341-42.

Applying these principles here, Plaintiff falls within the exception for post-departure damages. At a minimum, there are disputed facts from which one could reasonably conclude that Plaintiff faced permanent obstacles to her career advancement at Bloomberg: she had been told she would only be considered for advancement if a position was deemed a "diversity slot," SOAMF ¶ 69; she had been seeking foreign policy focused positions with Bloomberg for over two years, SOAMF ¶¶ 11, 51-52, 60; RSOMF ¶ 60, and particularly positions based in New York, SOAMF ¶ 53, but had been repeatedly denied, SOAMF ¶¶ 25-26, 63-64; and she faced other obstacles to career advancement in terms of inequitable treatment, SOAMF ¶¶ 27-32, 91; *see* Sections IV.A.5, IV.B *supra*.

33

The roadblocks to Plaintiff's career advancement at Bloomberg are further bolstered by the testimony of Dr. Debra Dwyer, a qualified economist. Dr. Dwyer testified that Plaintiff's career would suffer long-term impacts from the denial of promotion, which meant that she faced the labor market in 2018 starting from a position that paid ▮▮▮▮▮▮ less than had she obtained the promotion, and that in addition to starting from a lower pay level in seeking her next job, the visibility of the lawsuit—an action which shows up with any internet search of Plaintiff's name—would also have an adverse impact on her career. SOAMF ¶ 136; *see also id.* ¶¶ 26, 66, 131.

On this record—and applying the summary judgment standard of drawing all inferences in favor of the non-moving party—Plaintiff has shown there is evidence that she did, and will continue, to suffer economic harm flowing from Bloomberg's denial of promotion in 2018.

> 2.      Defendant cannot establish that Plaintiff indisputably failed in her duty to mitigate

BLP concedes that employers have the burden to establish, as part of its affirmative defense, that a plaintiff failed to mitigate by showing that suitable work existed and the plaintiff did not make reasonable efforts to obtain it. *See* MSJ at 27; *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 53 (2d Cir. 1998); *Walsh v. Scarsdale Union Free Sch. Dist.*, 2019 WL 6789581, at *5 (S.D.N.Y. Dec. 12, 2019). BLP has not sought to show the availability of other jobs, relying instead on an exception to the general rule which relieves an employer of showing the jobs available only if it shows that plaintiff "failed to pursue employment *at all*." *Greenway*, 143 F.3d at 54 (emphasis added). The exception does not, as BLP appears to believe, swallow the rule entirely. Even if BLP thinks Plaintiff could have done more to mitigate her damages, that does not mean Defendant is entitled to summary judgment on the mitigation question. Rather, Bloomberg "must show that the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment. The range of reasonable conduct is broad and the injured plaintiff

34

must be given the benefit of every doubt in assessing her conduct." *Walsh*, 2019 WL 6789581, at *5. "Because an evaluation of an employee's reasonable mitigation efforts is fact-specific and depends on an individual's unique circumstances, it is typically determined by the jury." *Id.* at *8.

Indeed, plaintiffs who have done far less to mitigate have survived summary judgment. In *Alonzo v. Chase Manhattan Bank, N.A.*, the court denied summary judgment on mitigation where plaintiff sent out fewer than thirty resumes in six years, contacted a few employment agencies. and received only two interviews and no job offers. 70 F. Supp. 2d 395, 399 (S.D.N.Y. 1999). Even though the plaintiff's efforts were limited, they were not at the level of inactivity that led to summary judgment in *Greenway*.

Here, Plaintiff *did* take steps to mitigate her damages. As many reporters do, she worked on writing a book, which she hoped to sell to use to advance her career in journalism. SOAMF ¶¶ 126, 133.[6] Going into business for oneself is a permissible form of mitigation. *See, e.g., Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 696 (2d Cir. 1998) ("Self-employment, if it is undertaken in good faith and is a reasonable alternative to seeking other comparable employment, may be considered permissible mitigation."). Simultaneously, Plaintiff applied for journalism jobs and pursued and obtained fellowships and freelance assignments, which supported her book project, and kept her professionally active and visible in journalism. *Id.* ¶¶ 123-130, 135 (identifying 35 different employers she applied to). Ultimately, her numerous journalism job applications[7] bore fruit, and she obtained a position with the L.A. Times. *Id.* ¶ 131. Thus, she

---

[6] While Plaintiff traveled to India to complete research for this book, a fact Bloomberg harps on excessively, she was only there for three weeks which is not evidence of her abandoning her job search. SOAMF ¶ 126. Plaintiff testified that this book was "exploring political issues in the conflict-ridden region of Kashmir," *id.*, and that she thought her work on the book would "advance [her] career . . . [to] more senior roles in a news organization," *id.* ¶ 133.

[7] Plaintiff's interrogatory responses identify far more than three places she applied for jobs. SOAMF ¶ 135 (identifying 35 different employers she applied to). She also testified that while she

35

fulfilled her duty to mitigate, and Defendant has not sustained its burden to establish that she failed to take reasonable steps to obtain other jobs available to her.

Moreover, even if Plaintiff is ultimately found to have been insufficiently diligent with respect to mitigation, then the consequence is not denial of all damages, but calculation of damages based on the difference between what she would have earned if she obtained the promotion she sought, and what she would have earned if she pursued an alternative mitigation strategy. *See Greenway*, 143 F.3d at 54 (holding that plaintiff who failed to mitigate damages was entitled to backpay so long as "the total compensation . . . [s]he would have received from comparable employment would have been less than what [s]he received at [defendant in the absence of discrimination]"); *see also Walsh*, 2019 WL 6789581, at *5 ("[E]ven if an employee fails to mitigate damages entirely, he or she may still be entitled to some amount of backpay damages . . . if 'the total compensation . . . received from comparable employment would have been less than what [the employee] received from the defendant.'"). Given that Plaintiff's salary at the L.A. Times was actually less than what she was being paid by Defendant three years earlier, SOAMF ¶¶ 26, 131, and was significantly less than Plaintiff would have been paid had she obtained the position she sought, *id.* ¶ 66, it is clear that Plaintiff suffered economic losses, even if additional income is imputed to her during the period when she was self-employed.

---

produced what she had found in her email or files, she did not have documentation showing the date or details of every application she had made. *Id.* ¶ 134. Defendant's assertion that she only made three job applications prior to obtaining her position with the L.A. Times appears to be based on the documentation that she was able to find, ignoring her testimony and interrogatory response about the numerous places she had applied. *Id.* ¶¶ 134-35. Particularly given that Plaintiff did not think about filing suit until 2020, *id.* ¶ 137, her lack of complete documentation for job applications between her mid-2018 departure from Bloomberg and her filing suit in mid-2020 is not surprising, or a basis to ignore her sworn statements.

## V.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.


Dated: May 29, 2026                          Respectfully submitted,


                                             /s/ Donna H. Clancy
                                             Donna H. Clancy
                                             The Clancy Law Firm, P.C.
                                             40 Wall Street, 61st Floor
                                             New York, New York 10005
                                             (t) (212) 747-1744
                                             (f) (646) 693-7229
                                             dhc@dhclancylaw.com

                                             Christine E. Webber (*pro hac vice*)
                                             Rebecca A. Ojserkis
                                             Dana Busgang (*pro hac vice*)
                                             Cohen Milstein Sellers & Toll PLLC
                                             1100 New York Ave. NW, Suite 800
                                             Washington, DC 20005
                                             (t) (202) 408-4600
                                             (f) (202) 408-4699
                                             cwebber@cohenmilstein.com
                                             rojserkis@cohenmilstein.com
                                             dbusgang@cohenmilstein.com

                                             *Counsel for Plaintiff Nafeesa Syeed*

37

## LOCAL RULE 7.1 CERTIFICATE OF WORD COUNT

I hereby certify that this brief was prepared with a computer and complies with Local Rules 7.1 of the U.S. District Court for the Southern District of New York, which affirm that an opposition to a brief may exceed the rule's word count limitation if "the court permits a party to submit briefs longer than these limits." Section 2.D of the Individual Practices of Magistrate Judge Gabriel W. Gorenstein states that "[n]otwithstanding the provisions of Local Rule 7.1(c) to the contrary, the Court does not impose page or word count limitations on memoranda of law." Consistent with Local Rule 7.1(c) and Judge Gorenstein's Individual Practices, this brief contains 12,555 words, excluding the caption, table of contents, table of authorities, signature blocks, and the required certificates.

Dated:    May 29, 2026                        */s/ Donna H. Clancy*
                                              Donna H. Clancy

38

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2026, I electronically filed this Opposition to Defendant's

Motion for Summary Judgment with the Clerk of the Court using CM/ECF, which in turn sent

notice to the following:


Elise M. Bloom
Michelle A. Annese
Matthew S. Rosenthal
Eleven Times Square
New York, New York 10036
(t) 212-969-3000
(f) 212-969-2900
ebloom@proskauer.com
mannese@proskauer.com
msrosenthal@proskauer.com

Mark W. Batten (*pro hac vice*)
One International Place
Boston, Massachusetts 02110
(t) 617-526-9850
(f) 617-526-9899
mbatten@proskauer.com

*Counsel for Defendant Bloomberg L.P.*


Dated:    May 29, 2026                          */s/ Donna H. Clancy*
                                                Donna H. Clancy

39