**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| NAFEESA SYEED, | : | |
| | : | |
| | : | Case No. 24-cv-6101 (GHW) (GWG) |
| Plaintiff, | : | |
| | : | **ECF CASE** |
| v. | : | |
| | : | |
| BLOOMBERG L.P., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**DEFENDANT BLOOMBERG L.P.'S MOTION TO EXCLUDE**
**THE OPINIONS AND TESTIMONY OF DR. DEBRA DWYER**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ........................................................................................................................... 3

I.     Plaintiff Applies the Incorrect Legal Standard. ................................................... 3

    A.   Plaintiff Improperly Attempts to Collapse Rule 702's Relevance Standard Into Rule 401...................................................................................................................... 3

    B.   The 2023 Amendments to Rule 702 Reinforced—Not Relaxed—the Reliability Standard. ....................................................................................................... 4

II.    Dr. Dwyer's Opinions Remain Unreliable........................................................... 6

    A.   Dr. Dwyer's Wage Growth Methodology Remains Flawed.............................. 6

       1.   Dr. Dwyer Improperly Relied on Generalized BLS Data Instead of Plaintiff's Actual Compensation History. ................................................................. 6

       2.   Plaintiff's Revised Wage Growth Model Is a Post Hoc Reconstruction That Dr. Dwyer Never Performed. ................................................................... 8

       3.   Plaintiff's Criticism Regarding "Just Two Years" of Compensation Data Is Misleading..................................................................................... 9

    B.   Dr. Dwyer's Fringe Benefits Analysis Remains Flawed. .................................... 9

    C.   Plaintiff's 86.7% Savings Assumption Remains Indefensible. ....................... 11

    D.   Dr. Dwyer Improperly Considered Wainer's Target Bonus In Plaintiff's "But-For" Compensation. ................................................................................... 12

    E.   Plaintiff's Permanent Pay Gap Theory Remains Unsupported........................ 13

III.   Dr. Dwyer's Back Pay and Front Pay Calculations Remain Irrelevant. ........... 15

    A.   Plaintiff Does Not Meaningfully Rebut BLP's Back Pay Arguments.............. 15

       1.   Dr. Dwyer's Post-Resignation Damages Model Is Still Irrelevant............... 15

       2.   Dr. Dwyer Uses An Improper Accrual Date for Plaintiff's Back Pay Period. .............. 16

    B.   Dr. Dwyer's Front Pay Analysis Remains Unsupported By Economic Principles. ......... 17

    C.   Plaintiff Did Not Mitigate Her Damages. ....................................................... 19

IV.   Plaintiff Effectively Concedes That Dr. Dwyer's Opinions Regarding Wainer's Qualifications Are Improper. ............................................................................. 21

CONCLUSION..................................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amorgianos v. National Railroad Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)............................................................................................3

*Apple v. Atl. Yards Dev. Co., LLC*,
  No. 11-cv-5550, 2015 WL 11182422 (E.D.N.Y. Mar. 31, 2015)........................................7, 11

*Bermudez v. City of N.Y.*,
  No. 15-cv-3240, 2018 WL 6727537 (E.D.N.Y. Dec. 21, 2018)................................................14

*Bonura v. Chase Manhattan Bank, N.A.*,
  629 F. Supp. 353 (S.D.N.Y. 1986) ........................................................................................13

*Buckley v. Reynolds Metals Co.*,
  690 F. Supp. 211 (S.D.N.Y. 1988) ........................................................................................18

*Carden v. Westinghouse Elec. Corp.*,
  850 F.2d 996 (3d Cir. 1988)..................................................................................................20

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ................................................................................................3

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)..............................................................................................................3

*Dillon v. Coles*,
  746 F.2d 998 (3d Cir. 1984)..............................................................................................16, 17

*Donlin v. Philips Lighting N. Am. Corp.*,
  581 F.3d 73 (3d Cir. 2009).....................................................................................................18

*E.E.O.C. v. Bloomberg L.P.*,
  29 F. Supp. 3d 334 (S.D.N.Y. 2014)......................................................................................16

*E.E.O.C. v. Joe's Stone Crabs, Inc.*,
  296 F.3d 1265 (11th Cir. 2002) .........................................................................................16, 17

*Earl v. Bouchard Transportation Co.*,
  735 F. Supp. 1167 (E.D.N.Y. 1990) ........................................................................................7

*Freedman Normand Friedland, LLP v. Cyrulnik*,
  No. 21-cv-1746, 2024 WL 2306155 (S.D.N.Y. May 20, 2024)................................................3

*Garrison v. Am. Sugar Refin., Inc.*,
   789 F. Supp. 3d 291 (S.D.N.Y. 2025)...................................................................................19

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997).................................................................................................................8

*Gibson v. Mohawk Rubber Co.*,
   695 F.2d 1093 (8th Cir. 1982) ..............................................................................................18

*Hansard v. Pepsi-Cola Metro. Bottling Co.*,
   865 F.2d 1461 (5th Cir. 1989) ..............................................................................................20

*Hawkins v. 1115 Legal Service Care*,
   163 F.3d 684 (2d Cir. 1998)...................................................................................................19

*Hopkins v. Price Waterhouse*,
   920 F.2d 967 (D.C. Cir. 1990) ...............................................................................................21

*In re Mirena IUD Prods. Liab. Litig.*,
   169 F. Supp. 3d 396 (S.D.N.Y. 2016).....................................................................................11

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
   982 F.3d 113 (2d Cir. 2020)...................................................................................................10

*In re Terrorist Attacks on Sept. 11, 2001*,
   No. 03-md-01570, 2024 WL 5077293 (S.D.N.Y. Dec. 11, 2024).......................................4, 6

*Kaiser Aluminum Warrick, LLC v. US Magnesium, LLC*,
   766 F. Supp. 3d 462 (S.D.N.Y. 2025).....................................................................................5, 6

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007).....................................................................................14

*Manzo v. Stanley Black & Decker, Inc.*,
   2024 WL 5319230 (E.D.N.Y. Mar. 20, 2024) .........................................................................5

*Mazzuocola v. Thunderbird Prods. Corp.*,
   No. 90-cv-0405, 1995 WL 311397 (E.D.N.Y. May 16, 1995)...............................................21

*McDaniel v. Scotch & Soda Retail, LLC*,
   No. 23-cv-7859, 2024 WL 5456912 (S.D.N.Y. Nov. 22, 2024).............................................12

*Navigators Ins. Co. v. Goyard, Inc.*,
   608 F. Supp. 3d 44 (S.D.N.Y. 2022).......................................................................................22

*Ndugga v. Bloomberg L.P.*,
   No. 20-cv-7464, 2026 WL 1204484 (S.D.N.Y. Apr. 20, 2026) ...........................................3, 4

*Padilla v. Metro-N. Commuter R.R.*,
   92 F.3d 117 (2d Cir. 1996)................................................................................18

*Pogil v. KPMG L.L.P.*,
   No. 21-cv-7628, 2024 WL 1208909 (S.D.N.Y. Mar. 21, 2024).................................... *passim*

*Pozefsky v. Baxter Healthcare Corp.*,
   No. 92-cv-0314, 2001 WL 967608 (N.D.N.Y. Aug. 16, 2001)..................................4

*Pryce v. Progressive Corp.*,
   765 F. Supp. 3d 219 (E.D.N.Y. 2025) ...............................................................5

*Raimondo v. AMAX, Inc.*,
   843 F. Supp. 806 (D. Conn. 1994).....................................................................13

*Roniger v. McCall*,
   No. 97-cv-8009, 2000 WL 1191078 (S.D.N.Y. Aug. 22, 2000).........................7, 11

*Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd.*,
   401 F. Supp. 3d 433 (S.D.N.Y. 2018)................................................................20

*Smith v. Great Am. Rests., Inc.*,
   969 F.2d 430 (7th Cir. 1992) ............................................................................20

*Troy v. Bay State Computer Group, Inc.*,
   141 F.3d 378 (1st Cir. 1998)..............................................................................21

*Tuszynski v. Innovative Servs., Inc.*,
   No. 01-cv-6302, 2005 WL 221234 (W.D.N.Y. Jan. 29, 2005)................................20

*Tyler v. Bethlehem Steel Corp.*,
   958 F.2d 1176 (2d Cir. 1992).............................................................................18

*U.S. v. City of N.Y.*,
   No. 07-cv-2067, 2015 WL 7421994 (E.D.N.Y. Aug. 7, 2015) ..............................14

*Vera v. Alstom Power, Inc.*,
   189 F. Supp. 3d 360 (D. Conn. 2016).................................................................13

*Whittington v. Nordam Grp. Inc.*,
   429 F.3d 986 (10th Cir. 2005) ...........................................................................18

**OTHER AUTHORITIES**

29 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Evid. § 6263 (2d
   ed.) ....................................................................................................................4

Fed. R. Evid. 702 Advisory Committee Notes to 2023 amendments ..............................4

## PRELIMINARY STATEMENT[1]

Plaintiff's opposition does not cure any of the defects in Dr. Dwyer's opinions that were identified in BLP's opening brief.  Rather than engage with the substance of BLP's arguments, Plaintiff relies on the wrong legal standard, mischaracterizes BLP's arguments, and attempts to salvage Dr. Dwyer's analysis through post hoc calculations that she never performed.

***First***, Plaintiff applies the wrong legal standard.  Plaintiff repeatedly conflates Rule 401's minimal relevance threshold with Rule 702's far more demanding "fit" requirement, which requires expert testimony to bear a sufficiently close connection to the issues in dispute to assist the trier of fact. The 2023 amendments to Rule 702 reaffirmed the trial court's gatekeeping role and rejected the permissive admissibility rhetoric on which Plaintiff relies.  The cases Plaintiff cites to the contrary trace back to pre-amendment case law that does not reflect the current state of Rule 702 jurisprudence.

***Second***, Dr. Dwyer's opinions remain fundamentally unreliable.  Rather than use readily available, plaintiff-specific compensation data, she relied on generalized national averages from the Bureau of Labor Statistics ("BLS").  As a result, she assumed Plaintiff's wages would increase by 3% annually when Plaintiff's actual wages increased by only 1% per year.  Plaintiff's effort to supply alternative calculations now—calculations Dr. Dwyer never performed herself—only underscores the flaw in her methodology and tacitly concedes that her original analysis cannot withstand scrutiny.

The same defect permeates the rest of Dr. Dwyer's damages model.  She assumed Plaintiff's fringe benefits were worth 35% of salary based on BLS averages, despite evidence

---

[1] Unless otherwise defined herein, all capitalized and abbreviated terms have the same meanings as in BLP's Memorandum of Law In Support of Its Motion to Exclude the Opinions and Testimony of Dr. Debra Dwyer.  (*See* Dkt. 90.)

1

showing Plaintiff's actual benefits were less than half that amount.  She further assumed Plaintiff would save 86.7% of her gross income while living in New York City—an implausible figure unsupported by any accepted economic methodology.  And she projected that a single alleged non-promotion would suppress Plaintiff's earnings for the next 24 years without conducting any empirical analysis of Plaintiff's actual career prospects or labor market opportunities.

*Third*, Dr. Dwyer's damages calculations are irrelevant as a matter of law.  Plaintiff voluntarily resigned from BLP and was not constructively discharged, foreclosing any claim for post-resignation economic damages.  Even setting that aside, Dr. Dwyer's calculations are independently flawed: she employs an incorrect back pay accrual date, assumes an unreasonably long 24-year front-pay period, and ignores Plaintiff's failure to mitigate damages, including her decision to forgo paid employment for years in favor of unpaid fellowships and novel-writing.

*Finally*, Plaintiff effectively concedes that Dr. Dwyer's comparative qualifications opinions regarding David Wainer—Plaintiff's alleged comparator—are improper.  Dr. Dwyer admitted she had no independent knowledge of Wainer's background, did not verify any information about him, and acknowledged that his qualifications were irrelevant to her economic analysis.  Those opinions are outside her expertise, constitute impermissible legal conclusions, and should be stricken.

For these reasons, and as set forth more fully below, the Court should grant BLP's motion and exclude the opinions and testimony of Dr. Dwyer in their entirety.

2

**ARGUMENT**

**I.    Plaintiff Applies the Incorrect Legal Standard.**

**A.    Plaintiff Improperly Attempts to Collapse Rule 702's Relevance Standard Into Rule 401.**

Plaintiff contends that Rule 702 imposes no heightened relevance requirement and that the Federal Rules of Evidence favor "liberal admissibility" of expert evidence.  (Dkt. 98, "Opp." at 2.) That argument rests on a fundamental misreading of the governing case law.

Plaintiff principally relies on *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002), but the aging *Amorgianos* predates the 2023 amendments to Rule 702 by more than two decades.  The decision interpreted a different rule than exists today, and its brief reference to Rule 401 no longer states the prevailing test.

This Court's decision in *Ndugga v. Bloomberg L.P.* clarified that Rule 401 is merely one "part of" the relevance analysis.  No. 20-cv-7464, 2026 WL 1204484, at *5 (S.D.N.Y. Apr. 20, 2026).  But nowhere did this Court suggest that Rule 401 and Rule 702 impose identical relevance standards.  That is because Rule 702 requires more than mere logical relevance.  It requires a "fit" between the expert's opinions and the issues to be decided—in other words, the expert must not only provide relevant evidence, but that evidence must be helpful to the trier of fact.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993); *see also Freedman Normand Friedland, LLP v. Cyrulnik*, No. 21-cv-1746, 2024 WL 2306155, at *3 (S.D.N.Y. May 20, 2024) (explaining that the "helpfulness requirement . . . goes beyond mere relevance because it also requires expert testimony to have a valid connection to the pertinent inquiry").

Plaintiff's effort to brush aside BLP's authority as "out of circuit" is particularly unpersuasive because the authority she attacks is none other than *Daubert v. Merrell Dow Pharmaceuticals, Inc.*—the seminal decision establishing the modern framework for expert

3

admissibility under Rule 702.  (Opp. at 2.)  On remand from the Supreme Court, the Ninth Circuit explained what *Daubert* necessarily implies: that Rule 702's relevance requirement is "obviously" not "merely a reiteration of the general relevancy requirement."  *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995).  Rather, expert testimony must bear a sufficiently close connection to the issues in dispute to assist the trier of fact.  *See Ndugga*, 2026 WL 1204484, at *5 ("The question of relevance is tied to Rule 702's requirement that the expert testimony 'will help the trier of fact to understand the evidence or to determine a fact in issue.'").  As courts within this Circuit have recognized, Rule 702 requires that expert testimony "speak[] clearly and directly to an issue in dispute in the case."  *Pozefsky v. Baxter Healthcare Corp.*, No. 92-cv-0314, 2001 WL 967608, at *2 (N.D.N.Y. Aug. 16, 2001).  That requirement is plainly more demanding than Rule 401's minimal threshold.  *See* 29 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Evid. § 6263 (2d ed.) ("Rule 702 demands more than what is required by the relevance rules. . . . [M]erely establishing Rule 401's broad 'any tendency' connection between scientific evidence and the fact it is offered to prove is insufficient to justify admission.").

**B.    The 2023 Amendments to Rule 702 Reinforced—Not Relaxed—the Reliability Standard.**

Plaintiff's attempt to minimize the trial court's gatekeeping obligation is further undermined by the 2023 amendments to Rule 702.  Those amendments strengthened the court's gatekeeping role and squarely rejected the notion that reliability issues should be left to the jury— a problem that the amendments aimed to rectify.  *See* Fed. R. Evid. 702 Advisory Committee Notes to 2023 amendments (noting that "many courts" have "incorrect[ly]" applied Rule 702 in holding that "the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility").  The 2023 amendments further rejected any presumption of "liberal admissibility" of expert testimony (Opp. at 2), making clear

4

that an expert's opinion must be the product of sound methodology reliably applied to sufficient facts—requirements the judge, not the jury, must enforce. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-01570, 2024 WL 5077293, at *3 (S.D.N.Y. Dec. 11, 2024) ("The Advisory Committee on Evidence Rules proposed the changes in response to court decisions that admitted expert testimony too liberally."); *see also Pogil v. KPMG L.L.P.*, No. 21-cv-7628, 2024 WL 1208909, at *10 (S.D.N.Y. Mar. 21, 2024) ("[T]he court should not 'admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'"). Accordingly, there is no basis for Plaintiff's claim that the 2023 amendments "loosened the relevance standard" for expert admissibility. (Opp. at 3 n.1 (italics omitted).)

Plaintiff's reliance on *Manzo v. Stanley Black & Decker, Inc.*, 2024 WL 5319230, at *4 & n.11 (E.D.N.Y. Mar. 20, 2024), *Pryce v. Progressive Corp.*, 765 F. Supp. 3d 219, 232 (E.D.N.Y. 2025), and *Kaiser Aluminum Warrick, LLC v. US Magnesium, LLC*, 766 F. Supp. 3d 462, 473 (S.D.N.Y. 2025), is misplaced because the propositions for which Plaintiff cites those cases trace back to pre-amendment authority that does not reflect the current requirements of Rule 702. Plaintiff quotes *Manzo* for the proposition that "only serious flaws in reasoning or methodology will warrant exclusion." 2024 WL 5319230, at *4. But *Manzo* borrowed that language from a 2009 district court decision, which in turn relied on *Amorgianos*, decided in 2002—more than two decades before the 2023 amendments.

*Pryce* suffers from the same defect. There, the court relied on *Amorgianos* for the proposition that "a minor flaw will not render an expert's opinion per se inadmissible, but rather the judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." 765 F. Supp. 3d at 232 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994) (cleaned up)). But both *Amorgianos* and *Paoli* predate the

5

2023 amendments by decades.  The question is not whether flaws are characterized as "minor" or "serious"—as flaws at *any step* of the analysis preclude admissibility—but whether the proponent has demonstrated, by a preponderance of the evidence, that the expert's opinion satisfies Rule 702's reliability and fit requirements.  *See Pogil*, 2024 WL 1208909, at *10.

Likewise, *Kaiser Aluminum Warrick, LLC*, 766 F. Supp. 3d at 473 quotes *United States v. Jakobetz*, 955 F.2d 786, 797 (2d Cir. 1992) for the proposition that "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility."  (Opp. at 3 n.1.)  But that is precisely the sort of permissive admissibility rhetoric that the Advisory Committee identified as having led some courts astray, and which the 2023 amendments sought to rectify.  *See In re Terrorist Attacks on Sept. 11, 2001*, 2024 WL 5077293, at *3.

In short, Plaintiff attempts to import outdated Rule 702 principles through recent decisions that erroneously quote them.  But the date of the quotation, not of the citing case, is what matters.  To the extent these obsolete quotations suggest that reliability concerns should ordinarily be left to the jury, they cannot be reconciled with the amended Rule 702 or the Advisory Committee's explanation of the amendments.

## II.     **Dr. Dwyer's Opinions Remain Unreliable**.

### A.     **Dr. Dwyer's Wage Growth Methodology Remains Flawed.**

#### 1.     *Dr. Dwyer Improperly Relied on Generalized BLS Data Instead of Plaintiff's Actual Compensation History.*

Defending Dr. Dwyer's reliance on BLS national data rather than compensation data specific to her, Plaintiff attempts to reframe BLP's argument as a categorical challenge to the reliability of BLS data.  (*See* Opp. at 9-11.)  But that is a straw man.  BLP does not dispute that BLS data may be reliable in the abstract.  The problem, however, is that Dr. Dwyer chose to rely on broad national averages untethered to Plaintiff's circumstances while disregarding evidence of

Plaintiff's actual compensation history.  Rule 702 does not permit an expert to ignore the best available evidence in favor of generalized statistics simply because those statistics exist.  Where individualized evidence is readily available, an expert must account for it.  *See Roniger v. McCall*, No. 97-cv-8009, 2000 WL 1191078, at *3-4 (S.D.N.Y. Aug. 22, 2000) (rejecting reliance on nationwide data concerning "senior management and executive job seekers" because it was "too general" and failed to account for plaintiff-specific attributes); *see also Apple v. Atl. Yards Dev. Co., LLC*, No. 11-cv-5550, 2015 WL 11182422, at *7 (E.D.N.Y. Mar. 31, 2015) (excluding expert's opinion relying on overly broad workforce data that was not representative of the plaintiffs).  Similarly, here, Dr. Dwyer ignored evidence of Plaintiff's compensation history in favor of undifferentiated data that lumped together compensation data drawn from various jobs, requiring different levels of education and experience, in disparate industries operating in different markets across the country.

Indeed, Plaintiff's own authority undermines her position.  She relies on *Earl v. Bouchard Transportation Co.*, 735 F. Supp. 1167, 1175 (E.D.N.Y. 1990), but *Earl* approved the use of BLS data only "in the absence of contradictory particularized evidence."  Here, contradictory and highly particularized evidence plainly existed—that is, Plaintiff's own compensation statements, which show that her actual wage growth rate of 1% was materially less than the 3% national average Dr. Dwyer used.  (Bloom Decl. Exs. E & F.)  *Earl* thus supports exclusion, not admission.

Plaintiff's reliance on the testimony of BLP's expert, Dr. Stephanie Plancich, fares no better.  Plaintiff argues that Dr. Plancich acknowledged that national data may sometimes be appropriate.  (*See* Opp. at 10.)  But Dr. Plancich could not recall whether she had used national data on compensation growth herself, explaining that she instead relies on industry- or occupation-specific data when performing economic analyses.  (Supp. Bloom Decl. Ex. A, Plancich Tr. at

163:9-14.)[2]  More importantly, she testified that national data should be used only when employer-specific data is unavailable and agreed that Plaintiff's own compensation data would "obviously" be the "most direct" source of information in this case.  (*Id*., Ex. A at 163:20-164:17.)  Dr. Dwyer nevertheless ignored Plaintiff's actual wage growth history despite having ready access to it through Plaintiff's compensation statements.  (Dwyer Tr. at 60:21-25, 62:3-9.)

### 2.    *Plaintiff's Revised Wage Growth Model Is a Post Hoc Reconstruction That Dr. Dwyer Never Performed.*

Plaintiff attempts in her opposition to supplement Dr. Dwyer's analysis with some calculations of her own, in an effort to inflate her historical BLP wage-growth rate to 3.1%.  (*See* Opp. at 11-12.)  The actual record tells a different story: Plaintiff's compensation increased by only approximately 1% per year, on average, between 2016 and 2018.  (Bloom Decl. Exs. E & F.)  The 3.1% figure Plaintiff now manufactures does not appear anywhere in Dr. Dwyer's report and is the product of a new analysis that Dr. Dwyer herself never performed.  If district courts are to exclude "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," all the more should the Court exclude the *ipse dixit* of Plaintiff's counsel.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

To reach this inflated figure, Plaintiff's counsel selectively repackages Plaintiff's compensation history by: (i) emphasizing a 2.9% pay increase Plaintiff received while working in Dubai and being paid in a different currency;[3] (ii) incorporating a 4.4% mid-year cost-of-living adjustment tied to Plaintiff's 2016 relocation from Dubai to Washington, D.C.; and (iii) treating

---

[2] Excerpts from the deposition transcript of BLP's expert, Dr. Stephanie Plancich, are annexed to the Supplemental Declaration of Elise M. Bloom In Further Support of BLP's Motion to Exclude the Opinions and Testimony of Dr. Dwyer ("Supp. Bloom Decl.") at Exhibit A.

[3] Compensation varied by geographic region due, in part, to differing costs of living.  (*See* Alexander Tr. at 47:23-48:7.)

8

that one-time relocation adjustment as though it reflected recurring annual wage growth. (*See* Opp. at 12.) The resulting 3.1% rate is therefore driven largely by a unique relocation-related adjustment—not by any consistent pattern of salary increases.

Most importantly, Dr. Dwyer never performed this analysis. Plaintiff's counsel cannot cure a defective expert opinion through post hoc attorney math. Indeed, counsel's effort to construct an entirely new wage growth figure is an implicit concession that Dr. Dwyer's actual methodology cannot withstand scrutiny. If Dr. Dwyer's original analysis were reliable, there would be no need for counsel to replace it with their own invention.

### 3. *Plaintiff's Criticism Regarding "Just Two Years" of Compensation Data Is Misleading.*

Plaintiff criticizes BLP for relying on "just two years" of Plaintiff's compensation information. (*See* Opp. at 12.) This criticism is misleading. Plaintiff worked at BLP for only four years. (*See* Bloom Decl. Ex. D.) Two of those years were spent working in Dubai, where she was compensated in foreign currency and subject to a materially different cost of living. Thus, only two years of comparable U.S.-based compensation data exists, and neither the opposition nor Dr. Dwyer cites any evidence to support an inference that Plaintiff's increases while in Dubai were a reliable predictor of likely future increases in her U.S. role. BLP cannot be faulted for using the only relevant data available—and Dr. Dwyer cannot be credited for ignoring it in favor of national averages.

### B. Dr. Dwyer's Fringe Benefits Analysis Remains Flawed.

Plaintiff insists that Dr. Dwyer reasonably applied a uniform 35% fringe benefits rate derived from BLS data across multiple employers, again despite the availability of more relevant data. (*See* Opp. at 16.) Plaintiff further contends that any overstatement of benefits at her post-

9

BLP employers may actually have understated her damages. (*See id*.) Neither argument salvages Dr. Dwyer's flawed methodology. If anything, both underscore its unreliability.

The flaw is apparent from Plaintiff's actual benefits at BLP. Her benefits were valued at 13.65 to 13.8% of her salary—less than half the 35% rate that Dr. Dwyer used. (Bloom Decl. Exs. E & F; Amended Report at 8.) By applying this generic national average rather than using Plaintiff's actual benefits data, Dr. Dwyer substantially overstated the value of the benefits Plaintiff would have earned had she been given the New York role and remained at BLP, as she claims she would have. That inflation is not a minor discrepancy; it results in a six-figure overstatement of Plaintiff's benefits losses.

Further, Plaintiff's contention that overstating benefits at subsequent employers may have "understated" losses does nothing to cure the overstatement of benefits at BLP—the very figure from which Dr. Dwyer's lost benefits calculation begins. (Opp. at 16.) More fundamentally, Plaintiff's suggestion that some errors may have offset others concedes that the methodology contains errors in the first place. Rule 702 does not permit a party to defend an expert's unreliable methodology with counsel's speculation that one unsupported assumption may have canceled out another. Reliability is not measured by whether errors happen to offset each other; it is measured by whether the methodology is reliable at "every step." *Pogil*, 2024 WL 1208909, at *10; *see also In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020) (holding that "an expert's analysis . . . is admissible" only if it is "reliable at every step").

Nor can Dr. Dwyer justify her reliance on generalized national averages by claiming she lacked specific information regarding Plaintiff's benefits at the Los Angeles Times and Yale. (*See* Opp. at 14.) Plaintiff expressly acknowledges that Dr. Dwyer was operating without "complete information" and therefore resorted to BLS data as the purportedly "most reliable

10

option." (*Id.*)  That is not permissible.  *See In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 445 (S.D.N.Y. 2016) ("lack of access to reliable data does not justify use of unreliable data, and militates against admission under *Daubert*").  Further, if Dr. Dwyer lacked access to that case-specific information, that information was within Plaintiff's control—Plaintiff had access to it and chose not to provide it to Dr. Dwyer.  (Dwyer Tr. at 120:2-20.)  Dr. Dwyer's lack of access is therefore a failure of Plaintiff's proof; it is not a license for Dr. Dwyer to fill the gap with generalized statistics untethered to the facts of the case.

In any event, Plaintiff's premise is incorrect because better evidence did exist.  Dr. Dwyer had access to Plaintiff's actual compensation and benefits information from BLP, yet chose to disregard it in favor of a generalized national average.  Plaintiff cites no authority holding that an expert may ignore available plaintiff-specific data and instead rely on broad national averages simply because other aspects of the record are incomplete.  Rule 702 requires more.  *See Roniger*, 2000 WL 1191078, at *3-4; *see also Apple*, 2015 WL 11182422, at *7.

### C.      Plaintiff's 86.7% Savings Assumption Remains Indefensible.

In defense of Dr. Dwyer's claim that Plaintiff would have saved 86.7% of her gross income for investment had she received the U.N. Reporter role, Plaintiff conflates statutory prejudgment interest with Dr. Dwyer's hypothetical investment-return model.  (*See* Opp. at 16-17.)  No one disputes that Plaintiff would be entitled to prejudgment interest on a potential back pay award.  But Dr. Dwyer was not calculating statutory prejudgment interest, which is added after a verdict and never considered by the jury.  Rather, she calculated hypothetical investment returns on hypothetical savings—a fundamentally different analysis with no connection to statutory interest rates.  (*See* Amended Report at 3 (describing Plaintiff's savings being "available for investing").)

Plaintiff never rebuts BLP's main critiques of Dr. Dwyer's investment-return model: Dr. Dwyer assumed Plaintiff would have saved 86.7% of her gross income while living in New York

11

City without considering: (i) Plaintiff's actual spending habits; (ii) the cost of living (and renting) in New York City; (iii) likely tax burdens; or (iv) Plaintiff's actual investment behavior. (Dwyer Tr. at 83:24-85:12, 86:23-87:14, 87:23-88:3.) This assumption is facially implausible and wholly unsupported by any reliable economic methodology.

Plaintiff effectively concedes that Dr. Dwyer used the wrong framework. In a footnote, Plaintiff admits that Dr. Dwyer's experience is primarily in tort cases and argues she "should be permitted to update her calculations to conform to the correct legal parameters for interest in this case." (Opp. at 16 n.10.) This is an admission that Dr. Dwyer's original methodology was incorrect. Rule 702 does not permit an expert to offer unreliable testimony now on the promise that she might fix it later.

Moreover, if Dr. Dwyer were truly calculating prejudgment interest, there would be no reason for the jury to hear such testimony at all. The jury does not calculate statutory interest— the Court clerk does. Allowing the jury to award an embedded "interest" component as part of a back pay award and then separately adding statutory prejudgment interest post-verdict would result in impermissible double-counting.

### D. Dr. Dwyer Improperly Considered Wainer's Target Bonus In Plaintiff's "But-For" Compensation.

Plaintiff argues that because she regularly received a bonus, Dr. Dwyer reasonably included Wainer's target bonus in her "but-for" compensation. (*See* Opp. at 12-13.) Courts in this Circuit reject such speculation. *See McDaniel v. Scotch & Soda Retail, LLC*, No. 23-cv-7859, 2024 WL 5456912, at *6 (S.D.N.Y. Nov. 22, 2024) (observing that "courts in the Second Circuit 'are reluctant to accept assumptions about . . . bonuses for purposes of calculating damages'"), *adopted by*, 2025 WL 401108 (S.D.N.Y. Feb. 4, 2025); *Pogil*, 2024 WL 1208909, at *14 (observing that "courts are reluctant to accept assumptions about hypothetical . . . bonuses for purposes of

12

calculating damages"); *Bonura v. Chase Manhattan Bank, N.A.*, 629 F. Supp. 353, 361 (S.D.N.Y. 1986) (concluding that lost bonus awards were "entirely speculative"); *Raimondo v. AMAX, Inc.*, 843 F. Supp. 806, 810 (D. Conn. 1994) (same).

Plaintiff's sole authority—*Vera v. Alstom Power, Inc.*, 189 F. Supp. 3d 360, 387-89 (D. Conn. 2016)—is inapposite. In *Vera*, the court did not simply include the plaintiff's bonuses in her back pay award; the parties *stipulated* that, if bonuses were awarded, after trial, they would be calculated using the average bonus paid to other project managers—not a single employee's target bonus. *See id*. at 389. And *Vera* involved a retaliatory discharge, where the back pay question was what the plaintiff would have earned had she not been terminated. Here, Plaintiff voluntarily resigned and now seeks a bonus tied to a role she never held, based on Wainer's target compensation. That is precisely the kind of speculation this Circuit's courts reject.

Dr. Dwyer's methodology confirms the problem. She assumed Plaintiff would receive Wainer's projected target bonus without any reliable basis. Plaintiff's history of receiving bonuses at BLP does not establish through any accepted methodology that she would have received the specific bonus amount that Wainer was targeted to receive in 2018. *See Pogil*, 2024 WL 1208909, at *14 (describing hypothetical bonus awards as "speculative" even where "a plaintiff has a more robust history of . . . bonuses"). Dr. Dwyer offered no independent analysis of BLP's bonus structure (because she is unfamiliar with it)[4] and no methodology linking Plaintiff's performance to Wainer's target bonus. Rule 702 requires exclusion of such speculation.

**E.    Plaintiff's Permanent Pay Gap Theory Remains Unsupported.**

Dr. Dwyer assumes that Plaintiff's non-selection for the purported U.N. Reporter position permanently depressed her earnings for the remainder of her career. (*See* Opp. at 17-19.) But Dr.

---

[4] Dwyer Tr. at 82:17-83:2 (admitting that she does not know how BLP determines employee bonuses).

Dwyer admitted this "assumption" was not based on any independent analysis of Plaintiff's actual labor-market prospects. (Dwyer Tr. at 99:6-100:8.) Dr. Dwyer performed no empirical analysis showing that a journalist with Plaintiff's credentials who misses a single promotion would remain permanently behind for decades.

Instead, Dr. Dwyer relies on an unsupported assumption that the alleged non-promotion caused "permanent harm" to Plaintiff's reputation because internet searches relating to Plaintiff may have shown her involvement in this lawsuit, affecting her odds of being hired. (*See* Opp. at 19.) But this theory is entirely speculative.[5] Dr. Dwyer offers no evidence that any employer refused to hire Plaintiff because of this case and no methodology to calculate the alleged reputational impact of this litigation on her wages. *See U.S. v. City of N.Y.*, No. 07-cv-2067, 2015 WL 7421994, at *8 (E.D.N.Y. Aug. 7, 2015) (denying damages for lost future earning capacity based on reputational harm where claimant provided no documents or facts in support of such claim).

Dr. Dwyer's additional suggestion that the alleged non-promotion may have affected Plaintiff's "mental well-being" is plainly outside her expertise as an economist. (Opp. at 19.) Dr. Dwyer cannot offer opinions on Plaintiff's psychological condition, considering she has no training or expertise in that field. *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) ("An expert qualified in one subject matter does not thereby become an expert for all purposes. Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702."); *see also Bermudez v. City of N.Y.*, No. 15-cv-3240, 2018 WL

---

[5] "Q: And what is the basis for you including in your analysis any damages past her voluntary resignation from the company? A: That it – the alleged incident caused permanent harm to her reputation and perhaps her mental well being that would impact her career for the rest of her work life. Q: And where do you get that understanding from? A: So, that's an assumption. . . . It set her back. Q: Well, . . . are you testifying that it did set her back? A: It could set her back. Q: You don't know whether . . . it actually did; right? A: That's correct." Dwyer Tr. at 74:5-75:6.

6727537, at *4-6 (E.D.N.Y. Dec. 21, 2018) (precluding expert opinions on depression, anxiety, and post-traumatic stress syndrome where plaintiff failed to show that the expert was qualified to opine on those conditions and where the opinions were conclusory and unsupported).

The undisputed record further contradicts Plaintiff's "permanent setback" theory. Once Plaintiff earnestly pursued journalism opportunities, after years of voluntary abstention from the paid labor force, she obtained a position at the LA Times earning more than her BLP salary, plus bonus compensation.[6]  (*See* Bloom Decl. Ex. L.)  This fact alone undermines the premise that a single alleged non-promotion would permanently depress Plaintiff's earnings for the remainder of her career.

In short, all Dr. Dwyer has shown is that wages may increase generally over time—which no one disputes.  The relevant question, however, is whether Dr. Dwyer reliably established that, under the circumstances of this case, Plaintiff would suffer a decades-long permanent earnings deficit based on a single alleged non-promotion.  She did not.

III.    **Dr. Dwyer's Back Pay and Front Pay Calculations Remain Irrelevant.**

A.    **Plaintiff Does Not Meaningfully Rebut BLP's Back Pay Arguments.**

1.    ***Dr. Dwyer's Post-Resignation Damages Model Is Still Irrelevant.***

As Plaintiff has conceded, she voluntarily resigned and was not constructively discharged. As explained in BLP's summary judgment briefing, that concession precludes her from recovering

---

[6] Plaintiff argues that, because she began working for the LA Times three years after she left BLP, her LA Times salary "would have to be higher just to be equal to her 2018 [BLP] salary." (Opp. at 19.)  She also argues that her LA Times salary "was significantly lower than the salary [she] would have had in 2018 had she been promoted, let alone what she would have been paid in 2021 if she had been promoted in 2018." (*Id*.)  But BLP cited Plaintiff's 2021 LA Times salary not to perform a full damages calculation, but to show that Plaintiff cannot establish any continuing wage loss without speculation.  Plaintiff's response depends on unsupported assumptions that she would have remained at BLP through 2021, received particular salary increases, and earned some higher amount by 2021.  The mere passage of three years does not establish those facts, and Plaintiff identifies no competent evidence quantifying inflation, annual increases, or a 2021 BLP salary she allegedly would have received.  Her assertion that she would have earned more had she been promoted is therefore conjectural and insufficient to establish economic injury.

15

post-resignation economic damages as a matter of law.  (*See* Dkt. 80 at 22-27.)  Plaintiff argues that voluntary resignation does not categorically bar post-resignation damages under Second Circuit law.  (*See* Opp. at 4.)  But under either (i) the "strong" version of the constructive discharge rule, which categorically bars post-resignation damages absent a constructive discharge claim, or (ii) the framework applied in *EEOC v. Bloomberg L.P.*,[7] which permits post-resignation damages under two narrow circumstances, Plaintiff cannot recover such damages.  In any event, as discussed in Section 2.C, *infra*, Plaintiff's failure to seek comparable employment independently bars recovery.

### 2. *Dr. Dwyer Uses An Improper Accrual Date for Plaintiff's Back Pay Period.*

Plaintiff relies on two out-of-circuit cases to argue damages began when the U.N. Reporter position allegedly "became vacant" in March 2018—not when Wainer actually relocated to New York in October 2018.  (Opp. at 4-5.)  But neither of these cases support damages accruing before Wainer ever assumed his New York-based role.

Plaintiff's reliance on *Dillon v. Coles*, 746 F.2d 998, 1006 (3d Cir. 1984) and *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1276 (11th Cir. 2002) is misplaced.  Neither case stands for the proposition that damages accrue before a comparator actually assumes the role at issue.  In *Dillon*, the Third Circuit did not establish a rule that back pay automatically accrues when a job opens.  It simply deferred to the district court's equitable discretion in selecting a back pay start

---

[7] Plaintiff's opposition does not cite *E.E.O.C. v. Bloomberg L.P.*, 29 F. Supp. 3d 334 (S.D.N.Y. 2014), even once.  That omission is telling.  Because there is no controlling Second Circuit authority addressing the constructive discharge rule, *Bloomberg L.P.* is the leading decision in this Circuit addressing whether a plaintiff who voluntarily resigns may recover post-resignation economic damages.  In *Bloomberg L.P.*, the court held that a plaintiff who resigns absent a constructive discharge cannot recover such damages where the position sought was not "unique" and the plaintiff did not face permanent obstacles to career advancement.  *Id*. at 341-45.  Rather than engage with that framework or attempt to distinguish it, Plaintiff simply ignores the case altogether—presumably because its reasoning forecloses the post-resignation damages theory advanced here.

date—the date the first job opened after the plaintiff passed the entry examination.  *Id.* at 1006.  That holding reflects deference to remedial judgment, not a mandate that back pay invariably begins when a position opens.

*Joe's Stone Crabs, Inc.* is no more helpful to Plaintiff.  There, the Eleventh Circuit *vacated* the damages award at issue precisely because the district court used a start date outside the applicable limitations period.  *Id.* at 1276.  The court held that back pay calculations must be anchored to a discriminatory act within the actionable period—in that case, the only "roll call" (*i.e.*, hiring event) within 300 days of the EEOC's charge.  *Id.*  The case thus reinforces that statutory time limits constrain back pay calculations rather than supporting the accrual theory Plaintiff advances.

Moreover, Dr. Dwyer herself confirmed the fatal flaw in Plaintiff's theory.  She conceded that if Wainer assumed the role after Plaintiff's resignation in June 2018—which he did, in October 2018—her damages calculation would need to be revised downward.  (Dwyer Tr. at 79:18-81:7.)  This admission establishes that the back pay accrual date is not March 2018, when the position allegedly became vacant, as there was no overlap between Plaintiff's employment and Wainer's assumption of the New York-based position—and thus no basis for back pay to begin accruing in March 2018.

**B.    Dr. Dwyer's Front Pay Analysis Remains Unsupported By Economic Principles.**

Plaintiff argues only that some courts have permitted lengthy front pay awards under certain circumstances that are not present here.  (*See* Opp. at 6.)  But that does not address the Rule 702 issue.  The question is whether Dr. Dwyer used reliable methodology to conclude that Plaintiff is entitled to 24 years of front pay.  Plaintiff never answers that question.

The front pay cases cited in Plaintiff's opposition are distinguishable because they involved plaintiffs who were long-tenured, involuntarily terminated, held unique positions, or had no prospect of obtaining comparable employment. *See, e.g.*, *Padilla v. Metro-N. Commuter R.R.*, 92 F.3d 117, 126 (2d Cir. 1996) (affirming front pay award spanning over 20 years where plaintiff's specialized skills left him no reasonable prospect of comparable alternative employment); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188-89 (2d Cir. 1992) (affirming front pay award covering 17-year work life where plaintiff was involuntarily terminated after 26 years of service with the employer); *Buckley v. Reynolds Metals Co.*, 690 F. Supp. 211, 216 (S.D.N.Y. 1988) (awarding nine years of front pay where reinstatement was impracticable, plaintiff's new position was not comparable to the one he lost at his prior employer, and the court's calculation did not involve undue speculation); *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 87 (3d Cir. 2009) (affirming reduction of 25-year front pay award to 10 years because "front pay until retirement age at 65 . . . would be too speculative"); *Whittington v. Nordam Grp. Inc.*, 429 F.3d 986, 1001 (10th Cir. 2005) (affirming 62-year-old plaintiff's three-year front pay award, after nine years of service, through retirement age at 65). None of those circumstances applies here. Plaintiff was not terminated—she resigned. She did not have lengthy tenure at BLP. She was not seeking a unique position. (*See* Dwyer Tr. at 72:13-17.) And she did not struggle to obtain comparable employment.

Plaintiff also relies on two Eighth Circuit cases suggesting a presumption that employees "would continue working for the employer" until retirement age, "unless the employer provides evidence to the contrary." (*See* Opp. at 6 (citing *MacDissi v. Valmont Indus., Inc.*, 856 F.2d 1054, 1060 (8th Cir. 1988) and *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1101 n.8 (8th Cir. 1982)).) But the Second Circuit recognizes no such presumption. In any event, Plaintiff herself admits in

18

her opposition that she would not have remained continuously employed at BLP until retirement. (*See id*. at 18; *see also* Dwyer Tr. at 88:12-17 (assuming that Plaintiff would *not* "have remained employed at Bloomberg through 2049")). That admission alone forecloses any presumption in favor of a 24-year front pay projection.

### C. Plaintiff Did Not Mitigate Her Damages.

Plaintiff concedes that after leaving BLP, she chose to (i) travel to India for nearly a month; (ii) pursue unpaid academic fellowships; and (iii) write a novel. (*See id*. at 7.) She attempts to characterize these activities as "self-employment," but made no effort to earn any income from these endeavors.[8] (*See id*.)

Plaintiff's reliance on *Hawkins v. 1115 Legal Service Care*, 163 F.3d 684 (2d Cir. 1998) is misplaced. *Hawkins* explains that self-employment constitutes proper mitigation only "if it is undertaken in good faith and is a reasonable alternative to seeking other comparable employment." *Id*. at 696. There, the plaintiff "made appropriate efforts to earn money as a self-employed lawyer" after finding her prior employment at a law firm unsatisfactory. *Id*. By contrast, choosing to write fiction for years while earning nothing is not a "reasonable alternative" to diligently seeking journalism roles. *Id*.

The *Hawkins* plaintiff genuinely sought to earn money. *See id*. Plaintiff did the opposite— for years, she pursued unpaid academic positions and novel writing with no effort to generate

---

[8] Plaintiff also refers to unspecified "freelance assignments," but her deposition testimony confirms that those assignments cannot constitute "self-employment" sufficient to satisfy her mitigation obligation. (Opp. at 7.) Plaintiff testified that she did not become a "freelance editor" until June 2020—two years after leaving BLP. (Syeed Tr. at 176:13-16.) Before then, she performed no freelance work during her fellowship at the Institute for Advanced Study from September 2019 through June 2020. (*Id*. at 177:15-19.) And when she did begin freelancing, it consisted of only sporadic assignments over a three-month period, from June to October 2020, some of which she performed free of charge. (*Id*. at 178:17-25.) Plaintiff's subsequent declaration asserting that she was "self-employed as a freelance editor" from September 2020 through December 2021 directly contradicts her deposition testimony and cannot create a genuine dispute of fact. (Dkt. 107, Syeed Decl. ¶ 14.) *See Garrison v. Am. Sugar Refin., Inc.*, 789 F. Supp. 3d 291, 314 (S.D.N.Y. 2025) (disregarding affidavit because it was contradicted by plaintiff's prior testimony).

income. Every case cited in *Hawkins* involved plaintiffs who started businesses in an effort to generate actual earnings. *See Smith v. Great Am. Rests., Inc.*, 969 F.2d 430, 438 (7th Cir. 1992) (jury could find plaintiff's opening of her own restaurant was a reasonable venture); *Carden v. Westinghouse Elec. Corp.*, 850 F.2d 996, 1005 (3d Cir. 1988) (plaintiff attempted to mitigate by starting his own business). None of these cases resembles Plaintiff's unpaid fellowships and novel-writing. Writing fiction for three years—however personally fulfilling—is not a reasonable alternative to seeking comparable employment, nor does it reflect any effort to advance professionally as a journalist. Unpaid, hobby-like pursuits that generate no income and bear no connection to Plaintiff's field cannot satisfy the duty to mitigate. *Cf. Hansard v. Pepsi-Cola Metro. Bottling Co.*, 865 F.2d 1461, 1468 (5th Cir. 1989) (holding that plaintiff's part-time flea-market venture did not constitute self-employment sufficient to satisfy his duty to mitigate). Plaintiff is not entitled to have BLP subsidize years of zero income while she removed herself from the workforce to pursue a passion project. *See Tuszynski v. Innovative Servs., Inc.*, No. 01-cv-6302, 2005 WL 221234, at *6 (W.D.N.Y. Jan. 29, 2005) (cutting off back pay after plaintiff chose to pursue lower-paying self-employment as a barber without seeking other suitable, higher-paying work).

Plaintiff's interrogatory responses further undermine her position. In response to Interrogatory No. 13—which asked her to identify all post-BLP employment, ***including self-employment***—Plaintiff listed only her academic research positions. (Webber Decl. Ex. 3 at 21-22.) She did not identify novel writing or freelance projects. If she truly considered those activities "self-employment," she would have disclosed them in response to a direct interrogatory. She cannot now claim that these hobbies were "self-employment," in contrast to her sworn interrogatory response, in an effort to defeat summary judgment. *See Shantou Real Lingerie Mfg.*

20

*Co. v. Native Grp. Int'l, Ltd.*, 401 F. Supp. 3d 433, 438 (S.D.N.Y. 2018) ("a party cannot escape summary judgment merely by . . . submitting self-serving affirmations that contradict prior testimony asserted in . . . interrogatories") (internal citation and quotation marks omitted); *Mazzuocola v. Thunderbird Prods. Corp.*, No. 90-cv-0405, 1995 WL 311397, at *9 (E.D.N.Y. May 16, 1995) ("Factual assertions made in an affidavit submitted in opposition to a motion for summary judgment may be disregarded if those assertions are contradicted by earlier statements in response to interrogatories.").

Plaintiff's fallback "alternative mitigation strategy" argument effectively concedes inadequate mitigation.  (Opp. at 8.)  She contends that even if her mitigation efforts were insufficient, damages should be reduced only by what she could have earned under some hypothetical strategy.  (*See id*. at 8-9.)  The cases she cites—*Troy v. Bay State Computer Group, Inc.*, 141 F.3d 378, 382 (1st Cir. 1998) and *Hopkins v. Price Waterhouse*, 920 F.2d 967, 981-82 (D.C. Cir. 1990)—are distinguishable.  Both are out-of-circuit wrongful discharge cases involving plaintiffs who remained in the workforce and actively sought employment; both courts nonetheless reduced back pay to reflect earning capacity.  Neither case supports the notion that a plaintiff who abandons her profession to travel, pursue unpaid fellowships, and write fiction may recover full damages offset only by some theoretical alternative earning capacity.

## IV.    Plaintiff Effectively Concedes That Dr. Dwyer's Opinions Regarding Wainer's Qualifications Are Improper.

Lastly, Plaintiff claims that Dr. Dwyer "does not offer opinion on relative qualifications." (Opp. at 19.)  But Dr. Dwyer affirmatively stated in her report that Wainer "had less experience" than Plaintiff and "did not have a master's degree."  (Amended Report at 2.)  Those are plainly comparative qualifications opinions regardless of how Plaintiff attempts to characterize them.

Dr. Dwyer admitted she: (i) had no independent knowledge regarding Wainer's background; (ii) did not independently verify any information about him; and (iii) acknowledged that his qualifications were irrelevant to her economic analysis. (Dwyer Tr. at 42:18-49:9.) Plaintiff does not dispute those concessions.

Instead, Plaintiff merely argues that "no expert testimony is offered" regarding Wainer's qualifications. (Opp. at 20.) But the record speaks for itself. Dr. Dwyer's report contains express comparative statements about Wainer's qualifications. Those opinions are outside her expertise as an economist, constitute impermissible legal opinions on the ultimate issue of discriminatory intent, and are irrelevant to any legitimate economic analysis. The Court should strike them accordingly. *See Navigators Ins. Co. v. Goyard, Inc.*, 608 F. Supp. 3d 44, 48 (S.D.N.Y. 2022) (Gorenstein, J.) ("The rule prohibiting experts from providing their legal opinions or conclusions is 'so well-established that it is often deemed a basic premise or assumption of the evidence law— a kind of axiomatic principle.'") (citation omitted).

## **CONCLUSION**

For the foregoing reasons, and the reasons stated in BLP's moving brief, the Court should grant BLP's motion and exclude the opinions and testimony of Dr. Dwyer.

Dated: July 2, 2026
      New York, New York               PROSKAUER ROSE LLP


                                   */s/ Elise M. Bloom*
                                   Elise M. Bloom
                                   Michelle A. Annese
                                   Matthew S. Rosenthal
                                   Eleven Times Square
                                   New York, New York 10036
                                   Tel. 212.969.3000
                                   ebloom@proskauer.com
                                   mannese@proskauer.com
                                   msrosenthal@proskauer.com

Mark W. Batten (admitted *pro hac vice*)
One International Place
Boston, Massachusetts 02110
Tel. 617.526.9850
mbatten@proskauer.com

*Attorneys for Defendant*
*Bloomberg L.P.*